No. 26-1785

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

SHERROD BROWN, JON OSSOFF, ROY COOPER, AND KRISTEN MCDONALD RIVET,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of a Public Notice by the
Federal Communications Commission's Media Bureau
DA 26-300

---

**PETITIONERS' OPENING BRIEF**

---

David R. Fox
Richard A. Medina
Nicole E. Wittstein
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135
dfox@elias.law
rmedina@elias.law
nwittstein@elias.law

*Counsel for Petitioners Sherrod Brown, Jon Ossoff, Roy Cooper, and
Kristen McDonald Rivet*

# TABLE OF CONTENTS

Table of Authorities ............................................................................. iii

Introduction ............................................................................................1

Jurisdictional Statement ........................................................................4

Statement of the Issues ..........................................................................4

Statement of the Case ............................................................................4

I.     Statutory and Regulatory Framework ............................................4

II.    The Media Bureau's LUC Guidance ...............................................9

III.   Petitioners ....................................................................................10

IV.   Petitioners' Application for Review ..............................................13

Summary of the Argument....................................................................14

Argument...............................................................................................18

I.     The LUC Guidance unlawfully dilutes candidates' exclusive entitlement to lowest unit charge by offering it to non-candidate political committees. .....18

    A.   Party committees' coordinated expenditures are not use by a candidate............................................................................20

    B.   Advertisements by JFCs with non-candidate members are not "use" by a candidate. ...............................................................25

II.    The Court has jurisdiction over this appeal because the LUC Guidance is a "final order" under the Communications Act................................................31

III.   No further exhaustion of administrative remedies is required. ....................40

    A.   Petitioners have satisfied all statutory exhaustion requirements. .......41

    B.   Further exhaustion should not be required........................................46

       1.  Requiring Petitioners to await the FCC's indefinite timeframe for administrative action would cause undue prejudice. .....................48

       2.  The agency's remedy is inadequate. ...............................................53

       3.  Countervailing interests do not favor exhaustion. .........................54

    C.   Alternatively, the decision is reviewable because the FCC has constructively denied Petitioners' Application for Review. ...............55

i

Conclusion .............................................................................................56

Certificate of Compliance ..................................................................58

Certificate of Service ...........................................................................59

Addendum of Statutes and Regulations .................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*Am. Fed'n of Teachers v. Dep't of Educ.,*
  779 F. Supp. 3d 584 (D. Md. 2025) ...................................................... 32, 33, 35

*Am. Fed'n of Teachers v. Dep't of Educ.,*
  796 F. Supp. 3d 66 (D. Md. 2025) .................................................................31

*Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Baltimore,*
  855 F.3d 247 (4th Cir. 2017) .................................................................. 53, 54

*Black v. SEC,*
  125 F.4th 541 (4th Cir. 2025) .......................................................................35

*Bowen v. Mich. Acad. of Family Physicians,*
  476 U.S. 667 (1986) ......................................................................................40

*Byrd v. Haas,*
  17 F.4th 692 (6th Cir. 2021) ..................................................................... 55, 56

*Cal. Cmtys. Against Toxics v. EPA,*
  934 F.3d 627 (D.C. Cir. 2019) ......................................................................32

*Cavalier Tel., LLC v. Va. Elec. & Power Co.,*
  303 F.3d 316 (4th Cir. 2002) .............................................................. 47, 54, 55

*Cawthorn v. Amalfi,*
  35 F.4th 245 (4th Cir. 2022) .........................................................................37

*Chamber of Com. v. OSHA,*
  636 F.2d 464 (D.C. Cir. 1980) ......................................................................32

*Children's Hosp. of King's Daughters, Inc. v. Azar,*
  896 F.3d 615 (4th Cir. 2018) ................................................................... 32, 33

*Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.,*
  489 U.S. 561 (1989) ................................................................................. 46, 53

*County of Maui v. Haw. Wildlife Fund,*
  590 U.S. 165 (2020) ......................................................................................30

*Env't Def. Fund, Inc. v. Hardin*,
   428 F.2d 1093 (D.C. Cir. 1970)................................................................55

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018)...............................................................................21

*FEC v. Colorado Republican Federal Campaign Committee*,
   41 F. Supp. 2d 1197 (D. Colo. 1999)......................................................25

*Gentry v. E. W. Partners Club Mgmt. Co. Inc.*,
   816 F.3d 228 (4th Cir. 2016) ........................................................... 22, 23

*Georgia Power Co. v. Teleport Communications Atlanta, Inc.*,
   346 F.3d 1047 (11th Cir. 2003) ..............................................................45

*Guerrero-Lasprilla v. Barr*,
   589 U.S. 221 (2020)...............................................................................46

*Hall v. United States*,
   44 F.4th 218 (4th Cir. 2022) ..................................................................38

*Hernstadt v. FCC*,
   677 F.2d 893 (D.C. Cir. 1980)......................................................... 5, 20–22

*Huawei Tech. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) .....................................................................35

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*,
   874 F.2d 205 (4th Cir. 1989) ............................................................ 32, 33

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ............................................................ 49, 52

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)........................................................... 18, 19, 55

*Mayes v. Am. Hallmark Ins. Co. of Texas*,
   114 F.4th 1077 (9th Cir. 2024) ...............................................................39

*McCarthy v. Madigan*,
   503 U.S. 140 (1992).......................................................................*passim*

iv

*McKart v. United States*,
   395 U.S. 185 (1969).................................................................54

*Muhammad v. Fleming*,
   29 F.4th 161 (4th Cir. 2022) ...................................................38

*NRSC v. FEC*,
   609 U.S. ----, 2026 WL 1868932 (U.S. June 30, 2026) .................... 1, 2, 7, 15, 52

*Novak v. Bank of N.Y. Mellon Tr. Co., NA.*,
   783 F.3d 910 (1st Cir. 2015)....................................................39

*O'Hara v. Nika Tech., Inc.*,
   878 F.3d 470 (4th Cir. 2017) ...................................................43

*Richman Bros. Records, Inc. v. FCC*,
   124 F.3d 1302 (D.C. Cir. 1997)........................................... 44, 45

*Ross v. Blake*,
   578 U.S. 632 (2016).......................................................... 41, 47

*Rotkiske v. Klemm*,
   589 U.S. 8 (2019)....................................................................44

*Russello v. United States*,
   464 U.S. 16 (1983)..................................................................30

*Scoggins v. Lee's Crossing Homeowners Ass'n*,
   718 F.3d 262 (4th Cir. 2013) ...................................................55

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005)............................................ 2, 6, 50

*Smith v. Berryhill*,
   587 U.S. 471 (2019)................................................................40

*Smith v. Ill. Bell Tel. Co.*,
   270 U.S. 587 (1926)................................................................46

*Stewart v. Iancu*,
   912 F.3d 693 (4th Cir. 2019) ...................................................42

*Volvo GM Heavy Truck Corp. v. U.S. Dep't of Lab.*,
  118 F.3d 205 (4th Cir. 1997) ........................................................ 48, 53

## Federal Statutes

28 U.S.C. § 1446 .............................................................................39

28 U.S.C. § 2342 ..........................................................................4, 31

28 U.S.C. § 2675 ....................................................................... 43, 44

42 U.S.C. § 1997e ...........................................................................43

42 U.S.C. § 405 ...............................................................................43

47 U.S.C. § 155 ..................................................................... *passim*

47 U.S.C. § 315 ..................................................................... *passim*

47 U.S.C. § 402 ...............................................................................31

47 U.S.C. § 503 ...............................................................................34

52 U.S.C. § 30101 ..................................................................... 16, 27

52 U.S.C. § 30102 ................................................................. *passim*

52 U.S.C. § 30116 ............................................................ 6, 7, 15, 21

## Federal Regulations

7 C.F.R. § 276.7 ..............................................................................37

8 C.F.R. § 103.6 ..............................................................................37

11 C.F.R. § 102.17 .................................................................. *passim*

42 C.F.R. § 93.500 ..........................................................................37

47 C.F.R. § 0.61 ...........................................................................4, 36

47 C.F.R. § 1.102 ............................................................................37

47 C.F.R. § 1.115 ...................................................................... 14, 42

47 C.F.R. § 73.1942 ................................................................................. 20, 28

**Other Authorities**

90 Fed. Reg. 8526 .........................................................................................7

DISCLOSE Act, S. 3295, 111th Cong. (2010) ..........................................23

*In re Codification of the Comm'ns Pol. Programming Pol'ys*,
    7 FCC Rcd. 678 (1991) ................................................... 19, 22, 33, 34

*In re Codification of the Comm'ns Pol. Programming Pol'ys*,
    Memorandum Opinion and Order, 7 FCC Rcd. 4611 (1992) .............23

Liz Goodwin, *Republicans Privately Fear This Swing State Democrat*, Wash. Post
    (Mar. 23, 2026), https://perma.cc/BA9M-9U9Y ........................... 11, 50

Matthew Foldi, *INTERVIEW: RNC Chair Joe Gruters on the RNC's election
    integrity wins and how the GOP can defy history in 2026*, Wash. Rep. (June 23,
    2026), https://perma.cc/9F8G-UZUR ...........................................2, 51

Max Cohen & John Bresnahan, *Ossoff Gears Up for Fight of His Political Life in
    2026*, Punchbowl News (Feb. 6, 2025),
    https://punchbowl.news/article/campaigns/jon-ossoff-gets-ready-for-2026-
    senate-race/ ................................................................... 11, 50, 51

Max Greenwood, *NRSC Chair Tim Scott Predicts Record-Breaking Spending in
    2026 Senate Race*, Campaigns & Elections (Feb. 10, 2025),
    https://perma.cc/S7CG-V7RP .................................................. 10–12, 50

*NRCC Targets 26 Offensive Seats to Expand House Majority*, NRCC (Mar. 17,
    2025), https://perma.cc/AET6-AV4J ........................................... 13, 50

*Participles Generally*, Chicago Manual of Style § 5.114 ........................37

**INTRODUCTION**

Federal law gives "legally qualified candidates," and *only* "legally qualified candidates," a special right to buy advertising time from broadcasters at particularly favorable rates known as "lowest unit charge" or "LUC" in the lead-up to elections. 47 U.S.C. § 315(b)(1). But earlier this year, the Federal Communications Commission's Media Bureau issued a "Public Notice" that undermined and diluted the value of candidates' right to lowest unit charge by instructing broadcasters to also offer LUC to two categories of non-candidate speakers: political parties engaged in coordinated expenditures, and joint fundraising committees with non-candidate members.

The LUC Guidance is contrary to the statute and inconsistent with longstanding FCC regulations. As the Trump Administration's Solicitor General told the Supreme Court just last year, the Communications Act requires "low rates for candidate spending, but not for party spending—whether coordinated or independent." Reply Brief for the Federal Respondents at 23, *NRSC v. FEC*, No. 24-621, 2025 WL 3068193 at *23 (U.S. Oct. 1, 2025) (citing 47 U.S.C. § 315(b)(1)'s "legally qualified candidate" language). That is because party coordinated spending is still *party* spending, not candidate spending: it consists of a "*political party's spending* on campaign activities in coordination with candidates." *NRSC v. FEC*, 609 U.S. ---, 2026 WL 1868932, at *3 (U.S. June 30, 2026) (emphasis added). A

1

similar analysis applies to spending by JFCs with non-candidate members, which Federal Election Commission regulations demand be paid for in substantial part by the participating non-candidates, who have no statutory right to lowest unit charge. 11 C.F.R. § 102.17(c)(7).

The LUC Guidance's attempt to extend lowest unit charge to non-candidate advertisements is of immense and urgent importance. The Supreme Court's June 30 *NRSC* decision invalidated longstanding limits on party coordinated expenditures. *NRSC*, 2026 WL 1868932, at *3. The Republican Party has vowed to seize on that decision to spend *hundreds of millions* of dollars on coordinated TV advertising "at the candidate rate" in the 2026 election to "obliterate" Democratic candidates, including Petitioners.[1] If left in force, the LUC Guidance will cause Petitioners to "face intensified competition" for limited airtime in violation of the Communications Act. *Shays v. FEC*, 414 F.3d 76, 86 (D.C. Cir. 2005) (emphasis omitted). In particular, Petitioners will find their independent campaign messages drowned out by political party messaging purchased at low rates to which only candidates have a legal right.

Contrary to the FCC's arguments, the lawfulness of the LUC Guidance is reviewable now. The LUC Guidance is undeniably final in fact—it is, in substance,

---

[1] Matthew Foldi, *INTERVIEW: RNC Chair Joe Gruters on the RNC's election integrity wins and how the GOP can defy history in 2026*, Wash. Rep. (June 23, 2026), https://perma.cc/9F8G-UZUR.

a legislative rule, and the FCC concedes that it is both the start and the end of the relevant administrative record. It was issued by the Media Bureau, not the full FCC, but the Communications Act expressly provides that any "decision, report, or action" taken by the FCC's delegate "shall have the same force and effect" as if it were taken by the FCC, unless and until "reviewed" by the full Commission. 47 U.S.C. § 155(c)(3). The Commission does not contend that it has in fact "reviewed" the LUC Guidance. And while the Act further provides that "[t]he filing of an application for review . . . shall be a condition precedent to judicial review" of a delegated action, *id.* § 155(c)(7), Petitioners met that condition precedent by filing an application for review two months ago, which the FCC has—as far as Petitioners can tell—done nothing with. The statute requires nothing more, and to the extent prudential exhaustion principles apply, they should be waived because of futility and because of their inadequacy to redress Petitioners' looming irreparable harm.

The statutory entitlement to lowest unit charge for the 2026 General Election begins on September 4, 2026, and with it the promised onslaught of hundreds of millions of dollars of unlawful party spending at lowest unit charge in opposition to Petitioners' candidacies. If there is to be any effective relief, it must come before then. The Court should grant the Petition and set aside the LUC Guidance as contrary to the Communications Act.

3

## JURISDICTIONAL STATEMENT

This case arises from the FCC Media Bureau's delegated authority under 47 C.F.R. § 0.61; *see also* 47 U.S.C. § 155(c). This Court has jurisdiction to review final orders of the FCC, 28 U.S.C. § 2342(1), and the LUC Guidance is a final order, as explained *infra*. This appeal is timely because the 60-day clock to seek review had not yet started when Petitioners filed their petition on June 19, 2026. *See* 47 U.S.C. § 155(c)(7).

## STATEMENT OF THE ISSUES

Whether the FCC Media Bureau's LUC Guidance is contrary to 47 U.S.C. § 315(b) and implementing regulations.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Framework

Section 315(b)(1) of the Communications Act of 1934 entitles "legally qualified candidate[s] for any public office" who "use . . . any broadcasting station" shortly before their elections to do so at "the lowest unit charge of the station for the same class and amount of time for the same period." 47 U.S.C. § 315(b)(1). This entitlement is more valuable than it sounds, because those rates are often 3 to 13 times lower than ordinary commercial rates, according to NRSC.[2] This steep

---

[2] Matthew Foldi (@MatthewFoldi), X (June 30, 2026, at 2:50 PM EST), https://perma.cc/BHK6-5W3X.

discount allows candidates to purchase a greater volume of advertising and multiplies the impact of every dollar spent. It takes effect 45 days before the candidate's primary election or runoff and 60 days before the candidate's general election. *Id.* § 315(b)(1)(A). It was enacted in its present form as part of the Federal Election Campaign Act of 1971 (FECA), which comprehensively regulates the finances of federal campaigns. *See Hernstadt v. FCC*, 677 F.2d 893, 897 (D.C. Cir. 1980).

FECA requires all federal candidates to designate a "principal campaign committee" to accept contributions and make expenditures on the candidate's behalf. 52 U.S.C. § 30102(e)(1). Everyone agrees that stations must offer lowest unit charge for advertisements purchased by those principal campaign committees on behalf of the "legally qualified candidate" they support. Everyone also agrees that stations need *not* offer lowest unit charge to independent, non-candidate groups making independent expenditures. JA 2. But on March 30, 2026, the FCC Media Bureau issued the LUC Guidance, which instructed broadcasters to offer lowest unit charge not only to candidates' principal campaign committees, but also to two other categories of political committees: party committees engaged in coordinated expenditures under 52 U.S.C. § 30116(d), and joint fundraising committees formed under 52 U.S.C. § 30102(e)(3)(A)(ii), even if they have non-candidate members. While the legal dispute in this Petition is ultimately over the meaning of the

5

Communications Act, understanding it requires an explanation of federal campaign finance law's treatment of those two categories of committees.

**Party Committee Coordinated Expenditures.** FECA sharply limits the size of "contributions" that may be made to federal political committees, including candidate committees. *See* 52 U.S.C. § 30116(a). To prevent donors from evading those limits by directly paying vendors on a candidate's behalf, FECA also generally treats as contributions, subject to those same limits, "coordinated" expenditures— that is, ones that are "made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." *Id.* § 30116(a)(7)(B)(i); *see Shays v. FEC*, 414 F.3d 76, 97 (D.C. Cir. 2005). For most spenders, a contribution and a coordinated expenditure are therefore the same thing. But FECA contains an important exception to that principle, which Congress enacted with its 1974 FECA amendments: State and national political party committees may make coordinated expenditures in connection with federal candidates' campaigns without those expenditures being treated as contributions. *See* 52 U.S.C. § 30116(d). Thus, for party committees, making contributions and making coordinated expenditures are legally distinct acts. Contributions by party committees "to any candidate and his authorized political committees" are sharply limited to $5,000 per federal election for most candidates, and $62,000 for Senate candidates. *Id.* §§ 30116(a)(2)(A), (h); 90 Fed. Reg. 8526.

6

Coordinated expenditures, in contrast, were once subject to separate, significantly higher limits, and in the wake of the Supreme Court's *NRSC* decision, they are now subject to no limits at all. But to be free from limits, coordinated expenditures must still be *the party's* expenditures—that is, the party must be the one paying the bills—because the parties' direct monetary contributions to candidate committees are still subject to strict limits under FECA. *See* 52 U.S.C. §§ 30116(a)(2)(A), (h); *NRSC*, 2026 WL 1868932, at *3, *9 (describing coordinated expenditures as a "political party's spending on campaign activities in coordination with candidates" and emphasizing that the party's and candidate's interests "are not identical").

**Joint Fundraising Committees.** In addition to establishing a principal campaign committee, FECA allows federal candidates to "designate a political committee established solely for the purpose of joint fundraising by such candidates as an [additional] authorized committee." 52 U.S.C. § 30102(e)(3)(A)(ii); 11 C.F.R. § 102.17(a)(1), (2). Such committees are commonly known as "joint fundraising committees" or "JFCs." To form a JFC, the participating committees must establish a separate committee (or designate one of the participating committees) to serve as the joint fundraising representative and enter into an agreement that "state[s] a formula for the allocation of fundraising proceeds." 11 C.F.R. § 102.17(c)(1). A JFC's only permissible purpose is to "collect contributions, pay fundraising costs from gross proceeds and from funds advanced by participants, and disburse net

7

proceeds to each participant." *Id.* § 102.17(b)(1); *see* 52 U.S.C. § 30102(e)(3)(A)(ii). In doing so, the FEC's joint fundraising regulation requires JFC participants to split expenses for each fundraising effort in proportion to their split of proceeds from that effort. 11 C.F.R. § 102.17(c)(7).

In recent years, candidates have formed JFCs with party committees, which have higher contribution limits than candidates; with national party committees' even-higher-limit specialty accounts; and with other non-candidate committees, which also have higher contribution limits than candidates. In many cases, an overwhelming majority of proceeds of these JFCs flows to the non-candidate committees, which therefore—by law—bear the overwhelming majority of expenses as well.[3]

Beginning in the 2024 election cycle, select JFCs began running advertisements that were nearly indistinguishable from ordinary campaign ads. These advertisements advocated expressly for a specific Republican Senate candidate and against their Democratic opponent. The only feature that distinguished these ads from typical candidate or party-coordinated ads was a brief fundraising

---

[3] *See, e.g.*, *Nevada Victory Committee*, FEC, https://www.fec.gov/data/committee/C00890962/ (last visited July 6, 2026); *Wisconsin Victory Committee*, FEC, https://www.fec.gov/data/committee/C00889493/ (last visited July 6, 2026).

pitch—a call to "join" the candidate's "team"—in the final few seconds, along with an on-screen QR code that prompts donations to the JFC.

## II.   The Media Bureau's LUC Guidance

Until recently, the FCC had not provided direct guidance on whether party committees engaged in candidate-coordinated spending and JFCs with non-candidate members are entitled to lowest unit charge for their use of broadcasting stations shortly before elections. On March 30, 2026, however, the Media Bureau issued the challenged LUC Guidance. The LUC Guidance states the Bureau's position that "the LUC requirements are applicable to (1) authorized committees, including authorized committees that engage in joint fundraising with legally qualified candidates for federal office, and (2) advertisements that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office." JA 1. It states that "the FCC has long held that LUC provisions of section 315(b) apply to both candidates and their authorized campaign committees" because the Act "repeatedly refers to candidates and their authorized committees as sharing the rights it confers." *Id.* It asserts that "[t]he FCC's rules do not recognize distinctions between types of committees for LUC purposes (*e.g.*, principal campaign committee, joint fundraising committee) provided that the committee is an authorized committee of the candidate under the FECA." *Id.* at 2. And it further purports to "restate previous Media Bureau guidance" (which it neither cites nor

9

otherwise identifies) that "candidate-party coordinated advertisements are subject to the LUC provisions, provided that the ad otherwise complies with other applicable requirements." *Id.*

### III. Petitioners

Petitioners are Democratic candidates for the U.S. House of Representatives and U.S. Senate in the upcoming 2026 election. Each is running in a highly competitive race that has been targeted by the Republican Party for coordinated party expenditures in support of Petitioners' opponents.

Petitioner Sherrod Brown served as United States Senator from Ohio from 2007 until 2025. In 2024, Senator Brown lost his seat by less than 4% in a hotly contested race. He is now challenging sitting Senator Jon Husted, who Ohio Governor Mike DeWine appointed to fill the seat vacated by Vice President J.D. Vance. NRSC has characterized the Ohio Senate seat as one of only three "true defensive targets."[4] Senator Brown therefore expects the race will draw significant spending by NRSC, including in party-candidate coordinated advertisements. In 2024, NRSC spent more than $1.9 million on media in coordination with Senator

---

[4] Max Greenwood, *NRSC Chair Tim Scott Predicts Record-Breaking Spending in 2026 Senate Race*, Campaigns & Elections (Feb. 10, 2025), https://perma.cc/S7CG-V7RP.

Bernie Moreno's campaign to unseat Senator Brown,[5] and nearly $90,000 more in independent expenditures.[6]

Petitioner Jon Ossoff is a United States Senator from Georgia. Senator Ossoff won his seat in 2020 in an exceedingly close and nationally watched race. On election night, no candidate received more than 50% of the vote, forcing the race to a runoff between Senator Ossoff and then-incumbent Senator David Perdue. In the runoff election on January 5, 2021, Senator Ossoff prevailed by only 1.2%. The Republican Party has publicly touted Senator Ossoff's seat "as their top pickup opportunity in the Senate,"[7] and reporters have suggested that the race "may become the most expensive Senate race ever."[8] Indeed, the 2020 race for Senator Ossoff's seat currently holds the record for most expensive Senate race in history,[9] with NRSC spending $1.3 million in coordinated expenditures with then-Senator

---

[5] *Party-coordinated Expenditures*, FEC https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S4OH00192&cycle=2024 (last visited July 6, 2026).

[6] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=C00027466&cycle=2024&is_notice=true&candidate_id=S6OH00163 (last visited July 6, 2026).

[7] Liz Goodwin, *Republicans Privately Fear This Swing State Democrat*, Wash. Post (Mar. 23, 2026), https://perma.cc/BA9M-9U9Y.

[8] Max Cohen & John Bresnahan, *Ossoff Gears Up for Fight of His Political Life in 2026*, Punchbowl News (Feb. 6, 2025), https://punchbowl.news/article/campaigns/jon-ossoff-gets-ready-for-2026-senate-race/.

[9] Greenwood, *supra* note 4.

Perdue's campaign,[10] and another $14 million in independent expenditures opposing Ossoff's candidacy.[11]

Petitioner Roy Cooper is the former Governor of North Carolina. He announced his candidacy for United States Senate on July 28, 2025, and he won the Democratic Party primary election for U.S. Senate in North Carolina on March 4, 2026. Like Ohio, NRSC has characterized the North Carolina Senate seat as a "true defensive target[]."[12] In 2022, when North Carolinians last elected a U.S. Senator, NRSC spent $1.7 million in coordinated expenditures with Senator Ted Budd for media supporting his campaign.[13] And it spent more than $6 million in independent expenditures opposing the Democratic candidate.[14]

Petitioner Kristen McDonald Rivet represents Michigan's 8th District in the House of Representatives. Representative McDonald Rivet won her seat in 2024 in

---

[10] *Party Coordinated Expenditures*, FEC, https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S4GA11285&cycle=2020 (last visited July 6, 2026).

[11] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=C00027466&cycle=2020&is_notice=true&candidate_id=S8GA00180 (last visited July 6, 2026).

[12] Greenwood, *supra* note 4.

[13] *Party Coordinated Expenditures*, FEC https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00027466&candidate_id=S2NC00505&cycle=2022 (last visited July 6, 2026).

[14] *Independent Expenditures*, FEC https://www.fec.gov/data/independent-expenditures/?data_type=processed&most_recent=true&q_spender=NRSC&cycle=2022&is_notice=true&candidate_id=S2NC00497 (last visited July 6, 2026).

12

an election in which Donald Trump carried her district by two points. Representative McDonald Rivet will be on the ballot in November 2026 to keep her seat in MI-8. NRCC has announced its plan to target MI-8 to expand its House majority this election cycle.[15] In the 2024 election cycle, NRCC spent nearly $630,000 in independent expenditures on media opposing Representative McDonald Rivet's candidacy.[16] And in 2022, NRCC coordinated more than $100,000 in expenditures with the Republican candidate for MI-8.[17]

## IV.    Petitioners' Application for Review

On April 29, 2026, Petitioners timely filed an Application for Review asking the FCC to set aside the Media Bureau's LUC Guidance. Petitioners' application explained that the LUC Guidance is unlawful because it instructs stations to offer lowest unit charge to advertisements from party committees engaged in coordinated spending and from JFCs with non-candidate members, when neither constitutes the use of a broadcasting station by a legally qualified candidate, in violation of Section 315(b)(1)'s plain text.

---

[15] *NRCC Targets 26 Offensive Seats to Expand House Majority*, NRCC (Mar. 17, 2025), https://perma.cc/AET6-AV4J.

[16] *Independent Expenditures*, FEC, https://www.fec.gov/data/independent-expenditures/?data_type=processed&q_spender=C00075820&is_notice=false&most_recent=true&candidate_id=H4MI08218&min_date=01%2F01%2F2023&max_date=12%2F31%2F2024 (last visited July 6, 2026).

[17] *Party Coordinated Expenditures*, FEC, https://www.fec.gov/data/party-coordinated-expenditures/?committee_id=C00075820&candidate_id=H0MI08141 (last visited July 6, 2026).

No other party opposed the application within the fifteen-day deadline allowed under the Commission's regulations. *See* 47 C.F.R. § 1.115(d). Yet the FCC has entirely ignored Petitioners' application. Aside from a system-generated filing confirmation, the FCC has communicated nothing to Petitioners about the status of the application, and the regulations do not dictate any timeline for review. Because they face imminent, irreparable harm, Petitioners petitioned for review of the LUC Guidance, and the FCC's constructive denial of Petitioners' challenge to the guidance, on Friday, June 19, 2026. The Clerk docketed the petition on June 22.

## SUMMARY OF THE ARGUMENT

**I.** The LUC Guidance is contrary to law because it demands that broadcasters offer lowest unit charge to non-candidate committees with no statutory entitlement to that benefit. Section 315(b)(1) provides for lowest unit charge only "for the use of any broadcasting station *by any person who is a legally qualified candidate* for any public office in connection with his campaign." 47 U.S.C. § 315(b)(1) (emphasis added). Lowest unit charge is therefore available only for uses of broadcasts by candidates, and not for other political advertisements by other groups.

The LUC Guidance violates this simple statutory command by demanding that stations make lowest unit charge available not only to candidates, but also to two categories of political committees: (1) party committees, when they buy political advertisements after coordinating with candidates; and (2) joint fundraising

14

committees, even if they have non-candidate members. Neither party-coordinated advertisements nor advertisements by JFCs with non-candidate members constitute "use" of the airwaves by a *candidate,* so they are not entitled to lowest unit charge under Section 315(b)(1)'s plain text.

Advertisements by party committees are not entitled to lowest unit charge because they are not "use" of a broadcasting station "by . . . a legally qualified candidate," *id.*, even if they are "coordinated" with a candidate. The Federal Election Campaign Act (FECA) distinguishes between (1) party committee *contributions* to candidate committees for the candidate's own use, *see* 52 U.S.C. §§ 30116(a)(1)(A), (h), and (2) party committee coordinated *expenditures*, which must be made directly by the party committee, *see id.* § 30116(d). The latter are "use" by a party committee, not by a candidate, because they are required to be the party committee's expenditures—if they were the candidate's use, they would be unlawful contributions to the candidate's committee. After all, *NRSC* emphasized that the expenditures at issue were "the party's expenditures," and that the distinction between party funds and candidate funds mattered because the party's and candidate's "interests are not identical." *NRSC*, 2026 WL 1868932, at *9.

Advertisements by JFCs with candidate and non-candidate members are also not entitled to lowest unit charge because, by law, much of the cost of those advertisements is borne by non-candidate members who are not entitled to lowest

15

unit charge. *See* 11 C.F.R. § 102.17(c)(7). The Media Bureau justified its guidance by noting that JFCs can be formally designated as "authorized committees" of candidates under FECA. But FECA allows candidates to designate JFCs as "authorized committees" "*solely* for the purpose of joint fundraising." 52 U.S.C. § 30102(e)(3)(A)(ii) (emphasis added). That designation reflects that the JFC spends *the candidate's* share of fundraising expenses and receives *the candidate's* share of contributions on behalf of the candidate, before transferring the candidate's share of net proceeds to the candidate's principal committee. *See id.* § 30101(6). It does not justify treating JFC expenditures as candidate expenditures entitled to lowest unit charge, even though some, and often nearly all, of those expenditures are paid for by non-candidate committees with no right to lowest unit charge. The phrase "authorized committee" does not appear in the text of Section 315(b)(1), which grants *only candidates* the right to lowest unit charge.

**II.** Petitioners satisfied all legal requirements for judicial review of the LUC Guidance, so there is no procedural barrier to review.

*First*, the LUC Guidance is a reviewable final order. Despite the self-serving labels the Media Bureau affixed to the document, the LUC Guidance is, in substance and operation, an improperly promulgated legislative rule, and thus necessarily final agency action. The Media Bureau's new rule extends the statutory entitlement to lowest unit charge to new entities. And regulated parties face severe financial

16

penalties if they deny lowest unit charge to these newly eligible committees. The FCC cannot avoid judicial review based on the fiction that the LUC Guidance merely "remind[s] broadcasters and the public" about lowest unit charge requirements when the LUC Guidance in fact imposes a new obligation. JA 1.

It makes no difference that the LUC Guidance was issued by the Media Bureau instead of the full Commission. Under the Communications Act, actions taken pursuant to delegated authority, including the LUC Guidance, "shall have the same force and effect" as actions by the full Commission, unless and until actually "reviewed" by the full Commission. 47 U.S.C. § 155(c)(3). No such review has taken place—and even in its filings in this Court, the agency has offered no indication that such review is at all imminent. The LUC Guidance therefore remains final.

*Second*, Petitioners have satisfied the only statutory exhaustion requirement: *filing* an application for review before the FCC. *See id.* § 155(c)(7). The scope of the Communications Act's exhaustion requirement is intentionally narrow: Congress required parties to file an application for review to afford the FCC an opportunity to correct errors by subordinate divisions, but it did *not* impose any immovable requirement to wait for a decision should the Commission let it linger. Other statutory exhaustion requirements *do* expressly require a decision before seeking judicial review, and the Court should presume that material variation is intentional.

17

Thus, to the extent courts have traditionally required parties to wait out a decision from the Commission before seeking judicial review, that complete exhaustion requirement is necessarily prudential and judge-made—not statutory—and thus subject to equitable exceptions.

The Court should not require any further exhaustion of the FCC's review process here. Petitioners face irreparable harm when lowest unit charge becomes available for unauthorized party-coordinated and JFC advertisements on September 4. But the FCC's motion to dismiss does not even say that the FCC is reviewing Petitioners' application, nor does it propose a timeline for doing so. The LUC Guidance is patently contrary to statute—and it is ultimately "emphatically the province and duty of [this Court]," not the FCC, "to say what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

The Court should exercise that authority and set the LUC Guidance aside.

## ARGUMENT

### I. The LUC Guidance unlawfully dilutes candidates' exclusive entitlement to lowest unit charge by offering it to non-candidate political committees.

The validity of the LUC Guidance turns entirely on a pure question of statutory interpretation as to which the Court must "exercise [its own] independent judgment," *Loper Bright*, 603 U.S. at 412: Does the meaning of "candidate" under

18

the Communications Act include non-candidate party committees and JFCs? Contrary to the FCC Media Bureau's position, the answer is clearly no.

The LUC Guidance must be set aside because it unlawfully requires broadcasters to offer lowest unit charge for advertisements that are not entitled to it under the Communications Act. Section 315(b)(1) provides for lowest unit charge *only* "for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign." 47 U.S.C. § 315(b)(1). Lowest unit charge is therefore available only for uses of broadcasts *by candidates*, and not for other political advertisements.

This is not a novel concept. The FCC previously agreed that "*only candidates* are entitled to lowest unit charge benefits," and it has "*never* held that independent entities" that support or oppose candidates are "entitled to the lowest unit charge." *In re Codification of the Comm'ns Pol. Programming Pol'ys*, 7 FCC Rcd. 678, 685–86, 685 n.54 (1991) (emphasis added). For that reason, Commission regulations implementing the statutory lowest unit charge provision provide that lowest unit charge is available for use only by "any *person* who is a legally qualified *candidate* for any public office." 47 C.F.R. § 73.1942(a) (emphasis added).

This limited scope of the right to lowest unit charge is intentional. As courts have recognized, Congress enacted the lowest unit charge provision to address its growing "concern[s] about" rate discrimination against candidates and "the

19

increasing cost of election campaigns." *Hernstadt*, 677 F.2d at 897. To that end, the provision "regulat[es] rates charged political candidates," and it was "viewed [by Congress] as providing an additional break for candidates." *Id.* It "was intended to ensure that, during the pre-election period, *candidates* would receive . . . volume and frequency discounts regardless of the number of announcements purchased." *Id.* at 900 (emphasis added). But Congress intentionally did not extend that same right to other political speakers, to avoid "imposing unreasonable and possibly economically devastating burdens on small stations." *Id.* at 898.

The LUC Guidance violates those long-established principles by extending the lowest unit charge obligations to two categories of non-candidates: party committees engaged in coordinated spending and JFCs with candidate and non-candidate members. The LUC Guidance must be set aside because neither constitutes the use of a broadcasting station by a legally qualified candidate, as Section 315(b)(1)'s plain text demands.

### A. Party committees' coordinated expenditures are not use by a candidate.

Party committees' coordinated expenditures are not entitled to lowest unit charge because they are expenditures by the party committees, not by candidates, so they are not "use" of a broadcasting station "by . . . a legally qualified candidate" as Section 315(b)(1) requires. This follows directly from FECA's distinction between (1) party committee *contributions* to candidate committees, which transfer funds to

20

candidates that the candidates can then spend to purchase broadcast time for their own "use," *see* 52 U.S.C. § 30116(a)(1)(A), (h), and (2) party committee coordinated *expenditures*, which must be made directly by the party committee, *not* the candidate, although the party and candidate are free to discuss and plan them in advance, *see id.* § 30116(d). For party committee advertisements to be *the candidate's* use, they would need to be purchased by the candidate's campaign, not by the party—and if so, they would involve *contributions* by party committees to the campaign, rather than coordinated expenditures. By treating party committee advertisements as candidate spending under the Communications Act when it is party spending under FECA, the LUC Guidance improperly puts the two statutes "at war with one another," instead of reading them "as a harmonious whole." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018).

The Solicitor General agrees that Section 315(b)(1) does not require lowest unit charge for the "use" of a broadcasting station by a political party or any other non-candidate political group—only by a "legally qualified candidate." Just last year, the Solicitor General represented to the Supreme Court that lowest unit charge is available *only* for candidates and is "not [available] for *party spending—whether coordinated or independent*." Reply Brief for the Federal Respondents at 23, *NRSC*, No. 24-621 (U.S. Oct. 1, 2025), 2025 WL 3068193 at *23 (emphasis added). And the Solicitor General declined to withdraw or clarify this position even when the

21

conflict with the LUC Guidance was pointed out to the Supreme Court. *See* Supplemental Brief for Intervenor-Respondents, *NRSC*, No. 24-621 (U.S. Apr. 7, 2026).

Congress intentionally did not grant political parties lowest unit charge. It specifically crafted the provision to address rate discrimination "against *political candidates*," and to address the rising costs of *campaigns. Hernstadt*, 677 F.2d at 897; *see also In re Codification of the Comm'ns Pol. Programming Pol'ys*, 7 FCC Rcd. at 685 n.54 (recognizing Congress's intent to "reduce *candidates'* escalating campaign costs."). If Congress had wanted to extend lowest unit charge to party expenditures also, it easily could have said so when it first authorized coordinated expenditures a short two years after passing the lowest unit charge requirement. But it opted instead to limit the entitlement to avoid "imposing unreasonable and possibly economically devastating burdens on small stations." *Hernstadt*, 677 F.2d at 898; *see also Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 234 (4th Cir. 2016) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174 (2009)). And several decades later, when Congress specifically considered amending the Communications Act to extend lowest unit charge to party

22

committees, the measure failed. *See* DISCLOSE Act, S. 3295, 111th Cong. § 401(a)(1)(c) (2010).[18]

Consistent with the provision's text and purpose, the Commission has previously "never held that independent entities were entitled to the lowest unit charge," even for ads supporting or opposing candidates, but had instead emphasized that "the lowest unit charge *inures to the benefit of candidates only*." *In re Codification of the Comm'ns Pol. Programming Pol'ys*, 7 FCC Rcd. at 685 n.54. (emphasis added). Rather, the Commission historically interpreted Section 315(b)(1) to mean that "only candidates or their authorized campaign committees are entitled to the LUC pursuant to Section 315(b)." *In re Codification of the Comm'ns Pol. Programming Pol'ys*, Memorandum Opinion and Order, 7 FCC Rcd. 4611, 4614 ¶ 23 (1992). As explained below with respect to JFCs, *infra* I.B, this interpretation is overbroad and contrary to statute to the extent it permits JFCs to benefit from lowest unit charge even when some of their members are not candidate committees, merely because they are designated as "authorized committees" for the limited purpose of joint fundraising. But *party committees'* coordinated spending fails even the FCC's overbroad historical test. With one exception in presidential contests that

---

[18] *See also* David Oxenford, *House Committee Passes Revised DISCLOSE Act, Without New Lowest Unit Rate Provisions*, Broad. L. Blog (May 23, 2010), https://perma.cc/9V5T-A52S.

is inapplicable to Petitioners' circumstances,[19] party committees are not and cannot be "authorized campaign committees" under FECA because, by their very nature, they "support[] or ha[ve] supported more than one candidate" for office, and they exist to do more than "solely . . . joint fundraising." 52 U.S.C. § 30102(e)(3)(A). Thus, party coordinated expenditures are made neither by a candidate nor by "their authorized campaign committee[]," so they fail the Commission's own longstanding test of lowest unit charge eligibility.

The Commission has no answer to these arguments. The Guidance acknowledges that advertising "purchased by political parties as an independent expenditure is not entitled to LUC." JA 2. It points out that such expenditures are not coordinated with candidates. But it does not explain how coordination could convert a party's own expenditure into the use of a station by a candidate. And while the Guidance purports to merely "restate previous Media Bureau guidance" on the subject, it does not cite any and Petitioners are aware of none. JA 2. The only source the Guidance cites on this subject is *FEC v. Colorado Republican Federal Campaign Committee*, 41 F. Supp. 2d 1197 (D. Colo. 1999). But that case—which was ultimately reversed, *FEC v. Colorado Republican Federal Campaign Committee*,

---

[19] FECA allows a presidential candidate nominated by a political party to designate the national committee of the party as a principal campaign committee, but only if the national committee retains separate accounts for that function. 52 U.S.C. § 30102(e)(3)(A)(i).

533 U.S. 431 (2001)—holds no such thing. The quoted language—that "independent expenditures do not qualify for the lowest rates on the purchase of broadcasting time, as coordinated expenditures would"—is not a holding of the court but merely a description of one party's statement of undisputed facts. 41 F. Supp. 2d at 1210.

The LUC Guidance's instruction that "candidate-party coordinated advertisements are subject to the LUC provisions" is therefore unlawful, because it purports to extend the entitlement to lowest unit charge to the use of broadcasting stations by political parties, whereas—as the Commission has long recognized—Congress limited that entitlement to candidates only.

### B. Advertisements by JFCs with non-candidate members are not "use" by a candidate.

Advertisements by JFCs with non-candidate members are also not "use" of a broadcasting station "by . . . a legally qualified candidate" that is entitled to lowest unit charge because by law, much of the cost and much of the fundraising benefit of those advertisements must be borne by the non-candidate members of the JFC who have no right to lowest unit charge. In practice, those non-candidate members often completely dominate JFC fundraising. In the 2024 cycle, for example, NRSC and Rogers for Senate formed a JFC, Michigan Victory Committee, that spent more than 98% of its receipts (more than $9 million) on advertising, while disbursing very little to its participants: just over 1% of its receipts (just under $100,000) to NRSC, and just 0.02% (barely $2,000) to Rogers for Senate, the only candidate-committee

25

member.[20] Under FEC rules, that means that NRSC—the recipient of 98% of the proceeds after advertising expenses—must have paid for 98% of the more than $9 million in advertising expenses, while Rogers for Senate paid just 2%. *See* 11 C.F.R. § 102.17(c)(7). And, as explained above, NRSC as a party committee is not entitled to lowest unit charge because its advertising expenses are not the use by *a candidate* of a broadcasting station. Yet the LUC Guidance requires stations to treat all the advertising expenses of this JFC as "use" by a candidate whose committee pays for almost none of them.

The Michigan Victory Committee did not stand alone. NRSC used the same strategy in Nevada and Wisconsin.[21] And even JFCs that do raise substantial money, rather than serving merely as advertising vehicles, often raise far more for party committees and PACs that are not entitled to lowest unit charge than they raise for candidate committees that are so entitled—meaning that their advertising expenses are overwhelmingly paid by committees not entitled to lowest unit charge. Grow the Majority, for example—Speaker Mike Johnson's principal joint fundraising committee—made more than half of its 2025 disbursements to party committees and

---

[20] *See Michigan Victory Committee – Disbursements*, FEC, https://www.fec.gov/data/committee/C00888883/?tab=spending#total-disbursements (last visited July 6, 2026).
[21] *See supra* note 3.

26

non-candidate PACs, and less than half to candidate committees that could be entitled to lowest unit charge.[22]

The LUC Guidance's only justification for extending lowest unit charge to advertising purchased by JFCs like these—advertising which by law is paid for primarily by committees that are not entitled to lowest unit charge—is that the JFCs are formally designated as "authorized campaign committees" of the participating candidates. *See* JA 2. But FECA allows candidates to designate JFCs as "authorized committees" "*solely* for the purpose of joint fundraising." 52 U.S.C. § 30102(e)(3)(A)(ii) (emphasis added). That designation reflects that the JFC spends the candidate's share of fundraising expenses and receives the candidate's share of contributions on behalf of the candidate, before transferring the candidate's share of net proceeds to the candidate's principal committee. *See id.* § 30101(6). But that *at most* makes the *candidate's share* of the JFC's expenditures into candidate expenditures—it does not in any way transform the portions of the JFC's expenditures paid for by non-candidate committees into candidate use that could qualify for lowest unit charge. It therefore does not justify treating expenditures by JFCs with non-candidate members as entitled to lowest unit charge, as the LUC

---

[22] *Grow the Majority – Spending*, FEC, https://www.fec.gov/data/committee/C00858373/?tab=spending (last visited July 6, 2026).

Guidance does, because those expenditures are partially—and often overwhelmingly—paid for by non-candidates.

The mere fact that JFCs are designated as "authorized committees" by participating candidates does not justify the LUC Guidance's anomalous treatment of JFC expenditures funded in large part by non-candidates as if they were candidate use. The phrase "authorized committee" does not appear in the text of Section 315(b)(1), which grants *only candidates* the right to lowest unit charge. Nor does it appear anywhere in the Commission's regulations. *See* 47 C.F.R. § 73.1942. The only place the phrase "authorized committee" appears in the relevant statute is in a different subsection of Section 315, 47 U.S.C. § 315(b)(2). And that Subsection (b)(2), titled "Content of broadcasts," does not grant substantive rights to candidates, authorized committees, or anyone else. Instead, it places conditions on a *candidate's* right to lowest unit charge, which is separately conferred in Subsection (b)(1). Subsection (b)(2) provides that, to be eligible for lowest unit charge, a candidate must make a "written certification" that "the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office, in any broadcast using the rights and conditions of access under [the Communications Act]," unless the ad also includes a disclaimer indicating that the candidate approved the broadcast and that the candidate's authorized committee paid for the broadcast. *Id.* § 315(b)(2)(A), (C). By its plain terms, this condition

28

applies to "*any*" television or radio broadcast made by the candidate *or* the candidate's authorized committee—not just those that are entitled to lowest unit charge.

Subsection (b)(2) therefore does not mean that every "authorized committee" broadcast is entitled to lowest unit charge. It simply means that, for a candidate to receive lowest unit charge for their *own* ads, they must certify that neither they nor any of their "authorized committees" will run *any* advertisement that mentions an opponent without including the required disclaimer. In other words, Section 315(b)(1) offers a limited benefit to candidates—lowest unit charge for candidate ads—in exchange for a broader commitment to abide by the conditions in Subsection (b)(2) in both candidate ads *and* authorized committee ads—including JFC ads. Nothing in the statute or its purpose limits the universe of broadcasts covered by Subsection (b)(2) to those covered by Subsection (b)(1). Thus, there is no reason to read the limitations in Subsection (b)(2) as enlarging the scope of entities entitled to lowest unit charge under Subsection (b)(1).

Confirming this, Subsection (b)(2)(B) provides that if the candidate "or any authorized committee of such candidate" breaches the conditions in Subsection (b)(2)(A), then "such *candidate* shall not be entitled to receive [lowest unit charge] for such broadcast or *any other* broadcast" within the covered period. *Id.* § 315(b)(2)(B) (emphasis added). Notably, this subsection does not say that a

29

violation of Subsection (b)(2)(A) disentitles "authorized committees" from receiving lowest unit charge. If Congress meant for *both* "candidates" and "authorized committees" to get lowest unit charge, then the omission of "authorized committees" from this second clause of Subsection (b)(2)(B) would make little sense—it would produce a loophole that would swallow subsection (b)(2) whole. *See County of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 183 (2020) (rejecting a reading of a statute that "is inconsistent with the statutory text and simultaneously creates a massive loophole").

That both the "carrot" in Subsection (b)(1)—entitlement to lowest unit charge—and the "stick" in Subsection (b)(2)(B)—disentitlement from lowest unit charge—mention only "candidates" and not "authorized committees" is telling. This is particularly so because Congress *did* mention "authorized committees" in the parts of Subsection (b)(2) that describe the universe of ads subject to the disclaimer requirement. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration omitted).

Thus, because broadcasting purchased by JFCs with non-candidate members is partially—and often overwhelmingly—paid for by non-candidate committees that

30

are not entitled to lowest unit charge, the LUC Guidance is unlawful in requiring stations to extend lowest unit charge to such broadcasts.

## II. The Court has jurisdiction over this appeal because the LUC Guidance is a "final order" under the Communications Act.

The Court has jurisdiction to set aside the straightforwardly unlawful LUC Guidance because, under the Communications Act, the Media Bureau's guidance is a final order. 28 U.S.C. § 2342(1) (granting the federal circuit courts "exclusive jurisdiction to enjoin, set aside, suspend . . . , or to determine the validity of . . . all final orders of the Federal Communications Commission"); *see also* 47 U.S.C. § 402(a) (authorizing judicial review of "any order of the Commission"). The LUC Guidance constitutes final agency action because it is a legislative rule disguised as mere guidance. And the text of the Communications Act confirms that all statutory requirements for this Court's review have been met.

**A.** The LUC Guidance is, in substance and operation, a "legislative" rule and thus necessarily final. *See Am. Fed'n of Teachers v. Dep't of Educ.*, 796 F. Supp. 3d 66, 99 (D. Md. 2025) ("'An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations—is a legislative rule,' which is always a final agency action." (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014)); *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019) (explaining that "the finality analysis" is "distinct from the test for

31

whether an agency action is a legislative rule" only because "all legislative rules are final, [but] not all final rules are legislative"). To be sure, the document purports to merely "remind broadcasters and the public about the FCC's lowest unit charge (LUC) requirements." JA 1. But this Court and others have long recognized that whether an agency rule is substantive or interpretive is a pragmatic inquiry, and it does not depend on an agency's self-serving characterizations. *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989) (explaining that an agency's "characterization of its statement as an exposition of its policy or interpretation of the standard does not preclude [the Court from] finding that it is something more" (quoting *Nat'l Knitwear Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 666 F.2d 81, 82 (4th Cir. 1981))); *Chamber of Com. v. OSHA*, 636 F.2d 464, 468 (D.C. Cir. 1980) ("[W]e do not classify a rule as interpretive just because the agency says it is."). Courts thus regularly find that guidance documents and other nominally "nonfinal" agency actions are, in fact, reviewable legislative rules. *See, e.g.*, *Children's Hosp. of King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620–21 (4th Cir. 2018) (concluding that a policy announced in a Frequently Asked Questions document "f[e]ll[] on the legislative end of the 'spectrum'" (quoting *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018))); *Am. Fed'n of Teachers v. Dep't of Educ.*, 779 F. Supp. 3d 584, 611–12 (D. Md. 2025) (concluding a "Dear Colleague" letter was a legislative rule and final agency action even though such

32

letters "are generally interpretive rules, and usually do not require notice and comment").

The LUC Guidance is unquestionably legislative in nature.[23] As this Court has explained, "[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Children's Hosp.*, 896 F.3d at 620 (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014)). The LUC Guidance does just that. As Petitioners explained above, the plain text of the Communications Act entitles only *candidates* to lowest unit charge in the 60 days before a general election. 47 U.S.C. § 315(b)(1); *see supra* I. It makes no mention of authorized committees or party coordinated expenditures in defining the scope of that right. And, as the LUC Guidance acknowledges, existing FCC rules extend that entitlement only to a candidate's authorized *campaign* committee. *See* JA 1 ("Accordingly, the FCC has long held that LUC provisions of section 315(b) apply to both candidates and their authorized campaign committees." (citing *In re Codification of the Comm'ns Pol. Programming Pol'ys*, Memorandum Opinion and Order, 7 FCC Rcd. at 4614 ¶ 23));

---

[23] For this reason, the LUC Guidance likewise violates the APA's notice-and-comment requirement. *See Jerri's Ceramic Arts*, 874 F.2d at 208 ("Legislative rules which fail to satisfy [notice-and-comment] procedural requirements must be set aside."). But nothing the FCC might say during formal rulemaking proceedings would change the fact that the LUC Guidance is contrary to statute, so notice and comment would be an empty exercise.

33

*see also In re Codification of the Comm'ns Pol. Programming Pol'ys*, 7 FCC Rcd. at 685–86, 685 n.54 ("[*O*]*nly candidates* are entitled to lowest unit charge benefits," and the FCC has "*never* held that independent entities" that support or oppose candidates are "entitled to the lowest unit charge" (emphasis added)). Neither Congress nor any FCC rulemaking has ever extended lowest unit charge to party committees, JFCs, or any other "authorized committee" aside from a candidate's principal campaign committee. And as for the party coordinated expenditures, while the LUC Guidance purports "to restate previous Media Bureau guidance regarding LUC eligibility for candidate-party coordinated ads," it cites no such guidance, and Petitioners are aware of none. *See* JA 2.

The LUC Guidance also carries undeniable real-world impacts—it leaves broadcasters no choice but to comply. As the Media Bureau emphasizes, lowest unit charge is a "*requirement*." JA 1 (emphasis added). And noncompliance carries hefty penalties. A broadcaster may be subject to fines, forfeitures, or rebates if they deny lowest unit charge for qualifying candidate advertisements in the lead up to an election, including fines up to $25,000 *per day* for "continuing violations" of the Act. *See* 47 U.S.C. § 503(b)(2)(A). Because the LUC Guidance redefines *who* is eligible for lowest unit charge in the first place, it necessarily subjects broadcasters to new penalties if they fail to comply. The LUC Guidance reshapes the legal landscape governing lowest unit charge by extending the entitlement to party

34

committees and JFCs—a move Congress has not authorized. Despite the labels affixed by the agency, the guidance is thus undeniably legislative, and therefore reviewable final agency action.

Alternatively, even if the LUC Guidance is an interpretive rule only, it remains final and reviewable under the *Bennett v. Spear* framework, for many of the same reasons. *See Am. Fed'n of Teachers*, 779 F. Supp. 3d at 610 ("An interpretive rule can still be final agency action, and thus subject to judicial review, if it satisfies the test from *Bennett*."); *see also Huawei Tech. USA, Inc. v. FCC*, 2 F.4th 421, 435 (5th Cir. 2021) ("A Hobbs Act 'final order' is analytically identical to 'final agency action' under the APA." (citing 5 U.S.C. § 704)). Under that standard, "[a] final order 'must mark the "consummation" of the agency's decisionmaking process,' and it 'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Black v. SEC*, 125 F.4th 541, 546 (4th Cir. 2025) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Both conditions are satisfied here. Section 155(c)(3) confirms the LUC Guidance is the agency's final word on the matter unless and until the FCC *in fact* takes up Petitioners' application for review—something it shows no present intention to do. And the statutory penalties for violating the lowest unit charge requirement confirm that "legal consequences will flow" from the Media Bureau's guidance.

35

**B.** In its motion to dismiss, the FCC argues at least one of two facts nevertheless renders the LUC Guidance nonfinal: (1) that it was issued by the Media Bureau instead of the full Commission, and (2) that Petitioners filed an application for review by the full Commission. The text of the Communications Act forecloses both arguments.

On the first point, the Communications Act provides that an action taken by a bureau within the FCC based on authority delegated by the FCC is no less final than an action by the full Commission. Section 155(c)(3) provides that "[a]ny order, decision, report, or action made or taken pursuant to" delegated authority "shall have the same force and effect, and shall be made, evidenced, and enforced in the same manner, as orders, decisions, reports, or other actions of the Commission." 47 U.S.C. § 155(c)(3); *see also* 47 C.F.R. § 0.61(e) (delegating to the Media Bureau authority to "[a]dminister and enforce rules and policies regarding political programming and related matters"). That the Media Bureau issued the LUC Guidance, and not the FCC, thus has no bearing on its finality.

Section 155(c)(3) also makes clear that the LUC Guidance *remains* final, even though Petitioners filed an application for review of the LUC Guidance by the full Commission, as Section 155(c)(7) required them to do before seeking judicial review. Specifically, Section 155(c)(3) provides that actions taken pursuant to delegated authority "have the same force and effect" as "actions of the Commission"

36

unless and until the order is "*reviewed*" by the full Commission. 47 U.S.C. § 155(c)(3) (emphasis added).

Congress's decision to use the past participle, "reviewed," confirms that the mere *filing* of such an application does not strip an otherwise final order of its status unless and until it is "reviewed." *See Participles Generally*, Chicago Manual of Style § 5.114 ("The past participle denotes the verb's action as being *completed*." (emphasis added)); *Cawthorn v. Amalfi*, 35 F.4th 245, 258 (4th Cir. 2022) ("The past tense is 'backward looking'; it refers to things that have already happened, not those yet to come."). Finality would give way only if the FCC *in fact* reviews the LUC Guidance—something the agency has not done and that nothing in its motion to dismiss suggests it has immediate plans to do. Reinforcing this reading, the FCC's regulations—unlike those other agencies have promulgated—confirm that the filing of an application for review of a "non-hearing" matter, such as this, does not automatically stay the effect of the challenged decision. *See* 47 C.F.R. § 1.102(b)(3); *contra, e.g.*, 8 C.F.R. § 103.6(f)(1) (providing for automatic stay of immigration bond breach determinations by USCIS during administrative appeal period); 42 C.F.R. § 93.500(d) (same for HHS research misconduct proceedings); 7 C.F.R. § 276.7(e) (same for Food and Nutrition Service actions).

Consistent with that analysis, Section 155(c)(7) requires only "the *filing* of an application for review," and not the *resolution* of an application for review, as a

"condition precedent" to seeking judicial review of actions under delegated authority like the LUC Guidance. 47 U.S.C. § 155(c)(7). Had Congress wanted to require *resolution* of an application for review as a condition for judicial review of delegated actions, it could easily have said so—either by providing that delegated actions are *not* final in Section 155(c)(3), instead of saying they are final as Section 155(c)(3) does, or by providing that resolution of the application for review is a condition precedent for judicial review. Congress did neither, and its choice must be given legal effect. *See, e.g.*, *Hall v. United States*, 44 F.4th 218, 237–38 (4th Cir. 2022) (Richardson, J., concurring in the judgment) ("When a statute expressly identifies conditions, it unambiguously includes only those requirements. . . . It is not the role of courts to add requirements that Congress could have included but for whatever reason did not."); *Muhammad v. Fleming*, 29 F.4th 161, 166 (4th Cir. 2022) (declining "to judicially create a requirement" that "Congress knew how to impose" but "did not impose").

**C.** In its motion to dismiss, the FCC also argues that the Petition is "incurably premature," because it was filed before the "60-day filing window" in 47 U.S.C. § 155(c)(7) "open[ed]." Doc. 17 at 8–9. But Section 155(c)(7) does not create a "window"—it sets a deadline. It provides that the time "within which a petition for review must be filed . . . *shall be computed from* the date upon which public notice is given of orders disposing of all applications for review filed in any case." 47

38

U.S.C. § 155(c)(7) (emphasis added). It does not say that the time for filing *begins* when the application for review is disposed of. Nor does it say that a petition for review is premature if filed before that time.

Federal statutes often use the word "within" to connote a deadline rather than a window. For example, 28 U.S.C. § 1446(b)(1) provides: "The notice of removal of a civil action or proceeding shall be filed *within* 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading . . ." (emphasis added). As the Ninth Circuit has explained, "The plain text of § 1446(b)(1) sets a deadline for removal, not a 'window' for removal. Nothing in the statute's text can be construed as barring a defendant from filing a notice of removal before formal service." *Mayes v. Am. Hallmark Ins. Co. of Texas*, 114 F.4th 1077, 1079 (9th Cir. 2024); *see also Novak v. Bank of N.Y. Mellon Tr. Co., NA.*, 783 F.3d 910, 913 (1st Cir. 2015) (per curiam) ("[A] defendant can remove at any time before the removal period runs, including before the clock begins ticking."). Here, similarly, that the time "within which" to file a petition for review is "computed from" disposition of an application for review, 47 U.S.C. § 155(c)(7) does not mean that a petition cannot be filed "before the clock begins ticking." *Novak*, 783 F.3d at 913.

39

### III.    No further exhaustion of administrative remedies is required.

Courts have long recognized a "strong presumption that Congress intends judicial review of administrative action." *Smith v. Berryhill*, 587 U.S. 471, 483 (2019) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). Requiring complete exhaustion of administrative remedies in this case to await an agency ruling that may not come for *months*, if ever, would effectively preclude judicial review of a patently unlawful agency directive—a directive that grants unauthorized parties carte blanche to weaponize the Supreme Court's recent ruling in *NRSC v. FEC*, to obtain millions of dollars in benefits federal law does not actually provide, to the detriment of Petitioners who are actually entitled to those benefits.

The unlawful LUC Guidance is reviewable now because Petitioners have satisfied statutory exhaustion requirements, and any further prudential exhaustion is unnecessary in light of the substantial, irreparable harm Petitioners face without prompt judicial intervention. Administrative exhaustion requirements come in two forms: statutory exhaustion requirements, which are mandatory, and prudential—or judge-made—exhaustion principles, which are a matter of judicial discretion. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded by statute on other grounds as stated in Woodford v. Ngo*, 548 U.S. 81, 84–85 (2006).

40

Here, the Communications Act's exhaustion requirement in the first category is quite narrow—and Petitioners satisfied it by filing an application for review before the full Commission challenging the LUC Guidance. Nothing in the Communications Act's text requires the Commission to *decide* an application before a court takes up the issue. Because the Act's text is clear, further exhaustion is a matter of judicial discretion. The FCC has shown no haste to review this urgent matter—indeed, their motion to dismiss did not remotely suggest the FCC has begun any review of the LUC Guidance or propose a timeline in which it would do so. Judicial review is needed to avoid irreparable harm to Petitioners and their campaigns when lowest unit charge becomes available on September 4.

### A. Petitioners have satisfied all statutory exhaustion requirements.

Whether a party aggrieved by agency action is required, without exception, to exhaust all available administrative remedies is fundamentally a question of statutory interpretation. And here, both the text and structure of the Communications Act are clear that the only *statutory* exhaustion requirement to challenge a Media Bureau action is to *file* an application for review before the Commission—and Petitioners did so. The Act requires no more.

Where a statute speaks to exhaustion, courts must obey that text and neither add nor subtract requirements. *See Ross v. Blake*, 578 U.S. 632, 640 n.1 (2016) (cautioning that "adherence to [a statute's] text runs both ways," and "judicial

41

rulings that imposed extra-statutory limitations on" the ability to sue are just as unlawful as those removing requirements). "When construing a statute," this court "strive[s]," "first and foremost . . . to implement congressional intent by examining the plain language." *Stewart v. Iancu*, 912 F.3d 693, 702 (4th Cir. 2019) (quoting *Minor v. Bostwick Lab'ys, Inc.*, 669 F.3d 428, 434 (4th Cir. 2012)). Section 155(c) of the Communications Act prescribes the procedure to seek review of actions by any of the Commission's bureaus, including the Media Bureau. *See* 47 U.S.C. § 155(c). "Any person aggrieved by" an "action" taken pursuant to delegated authority "may file an application for review by the Commission." *Id.* § 155(c)(4); *see also* 47 C.F.R. § 1.115 (describing procedure for filing application for review). The Act further provides that "[t]he filing of [such] application for review . . . shall be a condition precedent to judicial review of any . . . action made or taken pursuant to" delegated authority. 47 U.S.C. § 155(c)(7). But until such action is actually "reviewed" by the full Commission, an action by a bureau has "the same force and effect . . . [as] actions of the Commission." *Id.* § 155(c)(3).

A straightforward reading of the text reveals only one mandatory prerequisite to judicial review of a bureau action: "[t]he *filing* of an application for review" before the full Commission. *Id.* § 155(c)(7). The Act does not condition judicial review on *complete* exhaustion of administrative remedies, including a Commission ruling on the merits. Indeed, the same subsection later refers to any "orders disposing of all

42

applications for review," but it does *not* do so in the first sentence establishing "condition[s] precedent to judicial review." *See id.* To find that Congress has foreclosed judicial review until the full Commission has resolved an application for review would require reading language into the statute that simply is not there—a reading this Court cannot allow. *See O'Hara v. Nika Tech., Inc.*, 878 F.3d 470, 475 (4th Cir. 2017) ("Courts are not free to read into the language of a statute what is not there, but rather should apply the statute as written." (citation modified)).

A comparison with other administrative exhaustion regimes confirms Section 155(c)(7)'s narrow scope. In other contexts, Congress has expressly conditioned judicial review on a party presenting, and an agency *resolving*, a request for administrative review. *See, e.g.*, 42 U.S.C. § 405(g) ("Any individual, after any final *decision* of the Commissioner of Social Security *made after a hearing* to which he was a party . . . may obtain a review of such decision by a civil action[.]" (emphasis added)); 28 U.S.C. § 2675 (FTCA precluding judicial review "unless the claimant shall have first presented the claim to the appropriate Federal agency *and his claim shall have been finally denied by the agency in writing* and sent by certified or registered mail" (emphasis added)). And others yet unequivocally require *complete* "exhaustion" of available procedures in explicit terms. *E.g.*, 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are *exhausted*." (emphasis added)).

43

Had Congress intended to absolutely foreclose judicial review until after the full Commission *decided* an application for review, it could have said so. *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when . . . Congress has shown that it knows how to adopt the omitted language or provision."). For example, Congress could have said, "a final 'order[] disposing of all applications for review filed in any case' shall be a condition precedent to judicial review." *See* 47 U.S.C. § 155(c)(7) (referencing such orders later in the provision). Or it could have required that a party both "file" an application for review and that such application be "finally denied by the [FCC] in writing." 28 U.S.C. § 2675. But it did not.

The FCC relies on contrary decisions from the D.C. and Eleventh Circuits, but their reasoning is atextual, outdated, and should not guide the Court here. The D.C. Circuit's opinion in *International Telecard Association v. FCC*, 166 F.3d 387 (D.C. Cir. 1999), is not grounded in the text of Section 155(c)(7). *See* Doc. 17 at 6 (citing this decision). In rejecting the petitioner's argument that Section 155(c)(7) required only the *filing* of an application for review and not resolution by the Commission, the court considered itself bound by its earlier ruling in *Richman Bros. Records, Inc. v. FCC*, 124 F.3d 1302 (D.C. Cir. 1997). But the petitioner in *Richman Bros. Records* never even *filed* an application for review, as Section 155(c)(7) expressly requires—instead, it asked the court to "suspend the [statutory] exhaustion

44

requirement" entirely "in the case of a referral made under the doctrine of primary jurisdiction." 124 F.3d at 1304. So while *Richman* said, without closely examining the Act's text, that it had "every reason to think . . . that the Congress did not intend that the court review a staff decision that has not been adopted by the Commission itself," this was mere dicta that did not reflect engagement with Section 155(c)(7)'s contrary text. *Id.* And when *International Telecard* later elevated this dicta to holding in a five-paragraph, per curiam opinion, it conducted no further textual analysis. This exceedingly thin reasoning should not persuade in the face of the ample textual evidence that Congress, by making delegated actions final unless and until "reviewed," and by requiring only the "filing" of an application for review, did intend to permit review of delegated actions. *Supra* II.

The Eleventh Circuit has made a similar error. In *Georgia Power Co. v. Teleport Communications Atlanta, Inc.*, 346 F.3d 1047 (11th Cir. 2003), the court correctly recognized the two statutory prerequisites for judicial review of an FCC bureau's order: a party may obtain such review if "(1) it files an application for review by the full Commission, and (2) the relevant order becomes final." *Id.* at 1050 (emphasis added). But the Eleventh Circuit mistakenly held that "once [a party] *files* an application for review, the subordinate unit's order is non-final, and hence nonreviewable under 28 U.S.C. § 2344." *Id.* (citing 47 U.S.C. § 155(c)(3)) (emphasis added). That is not what Section 155(c)(3) says. Rather, as explained

45

above, Section 155(c)(3) provides that an action taken pursuant to delegated authority has "the same force and effect" as an action "of the Commission" "unless [it is] *reviewed*" by the Commission. 47 U.S.C. § 155(c)(3) (emphasis added); *see supra* II. Contrary to the Eleventh Circuit's conclusion, the delegated action thus remains final unless and until FCC review actually occurs.

## B.    Further exhaustion should not be required.

Because the plain text of the Communications Act requires only the *filing* of an Application for Review, any further exhaustion of administrative remedies is necessarily a matter of judicial discretion. "[W]here Congress has not *clearly* required exhaustion, sound judicial discretion governs." *McCarthy*, 503 U.S. at 144 (emphasis added). Unlike many judicial review statutes, the Communications Act does not provide a specified amount of time that Petitioners must wait for a decision before seeking judicial review. The FCC's position, it seems, is that the full Commission can simply sit on the Application indefinitely and thereby preclude judicial review altogether. But that would violate the "well-settled" and "strong" presumption that agency decisions are judicially reviewable. *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (citation omitted); *see also Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 587 (1989) (holding that the "lack of a reasonable time limit in the current administrative . . . procedure renders it inadequate"); *cf. Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587, 591–92 (1926) (a claimant

46

"is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for equitable relief"). And while prudential exhaustion principles might usually require an applicant to wait some reasonable amount of time before administrative remedies may be considered "exhausted," such judge-made rules are, as the Supreme Court has recognized, subject to judicial discretion. *See Ross*, 578 U.S. at 639 ("No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions.").

The Court must therefore exercise its discretion to determine whether Petitioners should be required to await FCC action on their application for review. "[I]n determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *Cavalier Tel., LLC v. Va. Elec. & Power Co.*, 303 F.3d 316, 323 (4th Cir. 2002). "Application of this balancing principle is intensely practical . . . because attention is directed to both the nature of the claim presented and the characteristics of the particular administrative procedure provided." *Id.* (quoting *McCarthy*, 503 U.S. at 146). The Supreme Court has recognized

> [T]hree circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion, namely (1) resort to the administrative remedy may prejudice a subsequent court challenge of the contested agency action; (2) the agency's remedy may be inadequate; and (3) the administrative remedy may be inadequate where the administrative

47

agency body is shown to be biased or to have otherwise predetermined the issues before it.

*Volvo GM Heavy Truck Corp. v. U.S. Dep't of Lab.*, 118 F.3d 205, 211 n.8 (4th Cir. 1997) (citing *McCarthy*, 503 U.S. at 146–47). For similar reasons, at least the first and second circumstances are present here.

### 1.   Requiring Petitioners to await the FCC's indefinite timeframe for administrative action would cause undue prejudice.

"Requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action. Such prejudice may result, for example, from an unreasonable or indefinite timeframe for administrative action." *McCarthy*, 503 U.S. at 146–47. Petitioners are four legally qualified candidates for the U.S. House of Representatives and U.S. Senate and their principal campaign committees. Senator Sherrod Brown, Senator Jon Ossoff, Governor Roy Cooper, and Representative Kristen McDonald Rivet will all appear on the 2026 general election ballot. Under Section 315(b), Petitioners are indisputably entitled to lowest unit charge for their political advertisements.

Election day is November 3, 2026, but the statutory period during which broadcast stations must offer lowest unit charge begins on September 4, 2026. The unlawful regime imposed by the LUC Guidance thus threatens Petitioners—each of whom is running in a highly competitive race—with imminent and irreparable harm because, starting on September 4, it will subject them to an increased volume of

48

negative advertisements purchased at a lower rate. "And once the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). An "indefinite timeframe for administrative action" would therefore "occasion undue prejudice to subsequent assertion of a court action" because Petitioners will be unable to obtain effective relief after the election. *McCarthy*, 503 U.S. at 146–47.

For the reasons Petitioners explain above, a straightforward, textual reading of Section 315(b) does not require broadcasters to offer party committees or JFCs lowest unit charge in these circumstances. Broadcasters *should* be permitted to charge party committees—which are vastly better resourced than Petitioners and their designated campaign committees—normal rates for airtime. But the Media Bureau's LUC Guidance instead unlawfully requires broadcasters to charge party committees lowest unit charge for candidate-coordinated advertisements and JFC advertisements, thereby significantly reducing the cost to run ads against Petitioners and supporting their opponents. This illegal discount for party coordinated and JFC ads places Petitioners at a competitive disadvantage, forcing them to respond to a higher volume of the counter advertisements than otherwise could have been purchased at the same price point, and diluting their independent campaign messaging—which is supposed to be privileged by the Communications Act—with party messaging at lower rates than it is entitled to under law.

Federal law widely recognizes such "competitive injuries" for political candidates. A candidate for office suffers a legally cognizable injury "when regulations illegally structure [the] competitive environment" governing their election. *Shays*, 414 F.3d at 87. That is, candidates "suffer injury to a statutorily protected interest if" governing regulations require them to "compete for office in contests tainted" by illegal practices. *Id.* at 85. Such an injury arises, for example, when a candidate "face[s] *intensified* competition" under an unlawful regulatory scheme, requiring them to "anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow." *Id.* at 86.

And the issue will undeniably affect Petitioners' election contests specifically because the Republican national party committees have committed to spending substantial funds in support of Petitioners' opponents. The NRCC has announced it is targeting Representative McDonald Rivet's seat to attempt to expand the Republicans' majority in the House of Representatives this fall.[24] And NRSC says that it views Senator Ossoff's seat, as well as the North Carolina and Ohio seats for which Governor Cooper and Senator Brown are running, as critical to maintaining Republican control of the Senate.[25] Petitioners therefore expect that the Republican party committees will dedicate substantial resources to political advertising

---

[24] NRCC, *supra* note 15.

[25] Greenwood, *supra* note 4; Goodwin, *supra* note 7; Cohen & Bresnahan, *supra* note 8.

opposing Petitioners' campaigns and supporting their opponents, including through coordinated expenditures and JFC advertising. That is exactly what NRCC and NRSC have done in recent years: these committees have spent millions of dollars in coordinated expenditures with Republican candidates in recent election cycles, and it is expected they will shatter existing spending records this cycle.[26]

NRSC and other Republican committees have already promised to target Democratic Senate candidates like Petitioners using the same JFC strategy they pioneered in 2024 and through coordinated party spending. In its "2026 Battle Plan," NRSC promises donors that it will "build[] on our success we saw last cycle by deploying Joint Fundraising Committee (JFC) ads . . . which *allow us to unlock the candidate rate on linear television* and close the gap with the Democrats' ActBlue advantage."[27] The chair of NRSC and NRCC's sister committee, the RNC, touted in an interview that Republican Party committees stand ready to spend *hundreds of millions* of dollars on coordinated TV advertising "at the candidate rate" to "obliterate" Democratic candidates.[28]

Following the Supreme Court's recent decision in *NRSC v. FEC*, No. 24-621, 2026 WL 1868932 (U.S. June 30, 2026), the stakes are even higher. In *NRSC*, the Court held that "FECA's limits on political parties' coordinated expenditures violate

---

[26] *See* Cohen & Bresnahan, *supra* note 8.
[27] NRSC, *2026 Battle Plan* (Doc. 8-2) at 14 (emphasis added).
[28] Foldi, *supra* note 1.

51

the First Amendment." *Id.* at \*3. That means that political party committees like NRSC may now spend *unlimited* sums of money in coordination with candidates for office. And with the LUC Guidance in place, any coordinated spending on advertisements after September 4 will be entitled to the lowest unit charge— dramatically multiplying the impact of every coordinated dollar spent.

None of these harms can be remedied after the fact. *See League of Women Voters of N.C.*, 769 F.3d at 247. Waiting on the FCC to act therefore will not merely "prejudice" Petitioners' right to "subsequent[ly] assert[] a court action," *McCarthy*, 503 U.S. at 146–47, it will preclude effective judicial review altogether. While the FCC protests that the application has been pending for only two months, Doc. 17 at 9, the beginning of the period in which stations are required to offer lowest unit charge is just two months away. And there has thus far been no indication that the FCC has taken *any* action on Petitioners' pending Application for Review, or that it plans to do so. The FCC's Motion to Dismiss tersely says only that the "Commission has not yet ruled on the application for review." Doc. 17 at 4. Not only does the FCC decline to offer even an aspirational timeline for adjudicating the pending application, nothing in the record or in its filings suggests that the Commission is actively considering it.

52

### 2. The agency's remedy is inadequate.

For similar reasons, the Commission's inaction on Petitioners' Application for Review shows that any remedy available from the FCC through that process would be inadequate to provide Petitioners with effective relief. "Administrative remedies that are inadequate need not be exhausted." *Coit Indep. Joint Venture*, 489 U.S. at 587; *see also Volvo GM Heavy Truck Corp.*, 118 F.3d at 211 n.8 (4th Cir. 1997) (explaining that "circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion" include where "the agency's remedy may be inadequate"); *cf. Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of Baltimore*, 855 F.3d 247, 252 (4th Cir. 2017) ("Indeed, the Supreme Court has observed that exhaustion may be excused as futile when the agency charged with administrative review is not empowered to . . . grant effective relief." (citing *McCarthy*, 503 U.S. at 147–48)).

Here, the "lack of a reasonable time limit in the current administrative . . . procedure renders it inadequate" because it allows the FCC to "delay" administrative review "indefinitely, denying a litigant its day in court." *Coit Indep. Joint Venture*, 489 U.S. at 587. The Commission need not even delay "indefinitely" to deny Petitioners their "day in court"—a delay of just a few more months will have that effect. Even if the Commission were inclined to revisit or set aside the Media Bureau's LUC Guidance, any decision that comes after the statutory lowest unit

53

charge period begins on September 4 will come too late to provide fully "effective relief." *Balfour Beatty Infrastructure, Inc.*, 855 F.3d at 252. And any relief that comes after the November election has come and gone will be altogether illusory.

### 3. Countervailing interests do not favor exhaustion.

Any "countervailing institutional interests favoring exhaustion" cannot overcome Petitioners' interest "in retaining prompt access to a federal judicial forum." *Cavalier Tel.*, 303 F.3d at 323 (quoting *McCarthy*, 503 U.S. at 146). The exhaustion requirement "serves 'to allow an agency the opportunity to use its discretion and expertise to resolve a dispute without premature judicial intervention and to allow the courts to have [the] benefit of an agency's talents through a fully developed administrative record." *Id.* at 322 (quoting *Thetford Props. IV Ltd. v. Dep't of Hous. & Urban Dev.*, 907 F.2d 445, 448 (4th Cir. 1990)); *see also McKart v. United States*, 395 U.S. 185, 194 (1969) ("And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise.").

This case does not involve agency discretion and does not require application of the agency's expertise to a set of facts. *Cf. Cavalier Tel.*, 303 F.3d at 325 (requiring exhaustion "[d]ue to the discretionary nature of the Commission's enforcement powers" and "the expertise of the Commission"). Instead, it presents a

54

straightforward question of statutory interpretation. And courts "must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters.*, 603 U.S. at 394. Agencies like the FCC "have no special competence in resolving statutory ambiguities. Courts do." *Id.* at 400–01. Depriving Petitioners of their only chance at an effective remedy before the 2026 election so that the full Commission can review the LUC Guidance therefore would not serve any "institutional interests" that could outweigh Petitioners' "interest in judicial enforcement." *Cavalier Tel.*, 303 F.3d at 323.

## C. Alternatively, the decision is reviewable because the FCC has constructively denied Petitioners' Application for Review.

Alternatively, if the Court concludes that a decision on Petitioners' Application for Review is required, the Court should treat the Commission's silence as a constructive denial. "[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970). Courts "have recognized constructive denials of this sort in other contexts." *Byrd v. Haas*, 17 F.4th 692, 698 (6th Cir. 2021) (collecting cases); *cf. Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272 (4th Cir. 2013) ("[T]he HOA's failure to take any action for such an extended period operated as a constructive denial of the ATV request.").

55

Petitioners' Application for Review explicitly requested that the FCC "expedite this matter and promptly set aside the LUC Guidance," because "JFC and party-coordinated broadcast spending against them will begin in just the next few months." Pet. Ex. B, Doc. 3-3 at 19. In "practical terms," the FCC's inaction "amount[s] to an outright denial" of that request. *Byrd*, 17 F.4th at 698. From Petitioners' perspective, there is "no material difference" between the FCC's silence on that request and denying it. *Id.* For the reasons explained above, by failing to take any steps to review Petitioners' application on an expedited basis in advance of the 2026 election season, the Commission has ensured that Petitioners will be unable to obtain any effective relief through the Commission's administrative processes. That is effectively a denial of Petitioners' request that the Commission set aside the LUC Guidance in advance of the 2026 election season.

## CONCLUSION

The Court should grant the Petition and set aside the LUC Guidance.

Dated: July 6, 2026

**ELIAS LAW GROUP LLP**

By: /s/ *David R. Fox*

David R. Fox
Richard A. Medina
Nicole E. Wittstein
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135
dfox@elias.law
rmedina@elias.law
nwittstein@elias.law

57

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,960 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2605) in 14 pt Times New Roman Font.


By: /s/ *David R. Fox*

David R. Fox

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record who have entered an appearance.

By: /s/ *David R. Fox*

David R. Fox

## ADDENDUM OF STATUTES AND REGULATIONS

## STATUTES

## 28 U.S.C. § 2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

    (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

. . .

## 47 U.S.C. § 155. Commission

. . .

(c) Delegation of functions; exceptions to initial orders; force, effect and enforcement of orders; administrative and judicial review; qualifications and compensation of delegates; assignment of cases; separation of review and investigative or prosecuting functions; secretary; seal

    (1) When necessary to the proper functioning of the Commission and the prompt and orderly conduct of its business, the Commission may, by published rule or by order, delegate any of its functions (except functions granted to the Commission by this paragraph and by paragraphs (4), (5), and (6) of this subsection and except any action referred to in sections 204(a)(2), 208(b), and 405(b) of this title) to a panel of commissioners, an individual commissioner, an employee board, or an individual employee, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter; except that in delegating review functions to employees in cases of adjudication (as defined in section 551 of Title 5), the delegation in any such case may be made only to an employee board consisting of two or more employees referred to in paragraph (8) of this subsection. Any such rule or order may be adopted, amended, or rescinded only by a vote of a majority of the members of the Commission then holding office. Except for cases involving the authorization of service in the instructional television fixed service, or as otherwise provided in this chapter, nothing in this paragraph shall authorize the

60

Commission to provide for the conduct, by any person or persons other than persons referred to in paragraph (2) or (3) of section 556(b) of Title 5, of any hearing to which such section applies.

. . .

(3) Any order, decision, report, or action made or taken pursuant to any such delegation, unless reviewed as provided in paragraph (4) of this subsection, shall have the same force and effect, and shall be made, evidenced, and enforced in the same manner, as orders, decisions, reports, or other actions of the Commission.

(4) Any person aggrieved by any such order, decision, report or action may file an application for review by the Commission within such time and in such manner as the Commission shall prescribe, and every such application shall be passed upon by the Commission. The Commission, on its own initiative, may review in whole or in part, at such time and in such manner as it shall determine, any order, decision, report, or action made or taken pursuant to any delegation under paragraph (1) of this subsection.

. . .

(7) The filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title, shall be computed from the date upon which public notice is given of orders disposing of all applications for review filed in any case.

. . .

**47 U.S.C. § 315. Candidates for public office.**

. . .

(b) Charges

(1) In general

The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his

61

campaign for nomination for election, or election, to such office shall not exceed--

(A) subject to paragraph (2), during the forty-five days preceding the date of a primary or primary runoff election and during the sixty days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period; and

(B) at any other time, the charges made for comparable use of such station by other users thereof.

(2) Content of broadcasts

(A) In general

In the case of a candidate for Federal office, such candidate shall not be entitled to receive the rate under paragraph (1)(A) for the use of any broadcasting station unless the candidate provides written certification to the broadcast station that the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office, in any broadcast using the rights and conditions of access under this chapter, unless such reference meets the requirements of subparagraph (C) or (D).

(B) Limitation on charges

If a candidate for Federal office (or any authorized committee of such candidate) makes a reference described in subparagraph (A) in any broadcast that does not meet the requirements of subparagraph (C) or (D), such candidate shall not be entitled to receive the rate under paragraph (1)(A) for such broadcast or any other broadcast during any portion of the 45-day and 60-day periods described in paragraph (1)(A), that occur on or after the date of such broadcast, for election to such office.

(C) Television broadcasts

A candidate meets the requirements of this subparagraph if, in the case of a television broadcast, at the end of such broadcast there appears simultaneously, for a period no less than 4 seconds--

62

(i) a clearly identifiable photographic or similar image of the candidate; and

(ii) a clearly readable printed statement, identifying the candidate and stating that the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast.

(D) Radio broadcasts

A candidate meets the requirements of this subparagraph if, in the case of a radio broadcast, the broadcast includes a personal audio statement by the candidate that identifies the candidate, the office the candidate is seeking, and indicates that the candidate has approved the broadcast.

(E) Certification

Certifications under this section shall be provided and certified as accurate by the candidate (or any authorized committee of the candidate) at the time of purchase.

(F) Definitions

For purposes of this paragraph, the terms "authorized committee" and "Federal office" have the meanings given such terms by section 30101 of Title 52.

## 52 U.S.C. § 30101. Definitions

. . .

(6) The term "authorized committee" means the principal campaign committee or any other political committee authorized by a candidate under section 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate.

. . .

## 52 U.S.C. § 30102. Organization of political committees

. . .

(e) Principal and additional campaign committees; designations, status of candidate, authorized committees, etc.

63

(1) Each candidate for Federal office (other than the nominee for the office of Vice President) shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate. Such designation shall be made no later than 15 days after becoming a candidate. A candidate may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate. Such designation shall be in writing and filed with the principal campaign committee of such candidate in accordance with subsection (f)(1).

. . .

(3)(A) No political committee which supports or has supported more than one candidate may be designated as an authorized committee, except that--

(i) the candidate for the office of President nominated by a political party may designate the national committee of such political party as a principal campaign committee, but only if that national committee maintains separate books of account with respect to its function as a principal campaign committee; and

(ii) candidates may designate a political committee established solely for the purpose of joint fundraising by such candidates as an authorized committee.

(B) As used in this section, the term "support" does not include a contribution by any authorized committee in amounts of $2,000 or less to an authorized committee of any other candidate.

. . .

## 52 U.S.C. § 30116. Limitations on contributions and expenditures

(a) Dollar limits on contributions

(1) Except as provided in subsection (i) and section 30117 of this title, no person shall make contributions--

(A) to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000;

64

(B) to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000, or, in the case of contributions made to any of the accounts described in paragraph (9), exceed 300 percent of the amount otherwise applicable under this subparagraph with respect to such calendar year;

(C) to any other political committee (other than a committee described in subparagraph (D)) in any calendar year which, in the aggregate, exceed $5,000; or

(D) to a political committee established and maintained by a State committee of a political party in any calendar year which, in the aggregate, exceed $10,000.

. . .

(d) Expenditures by national committee, State committee, or subordinate committee of State committee in connection with general election campaign of candidates for Federal office

(1) Notwithstanding any other provision of law with respect to limitations on expenditures or limitations on contributions, the national committee of a political party and a State committee of a political party, including any subordinate committee of a State committee, may make expenditures in connection with the general election campaign of candidates for Federal office, subject to the limitations contained in paragraphs (2), (3), and (4) of this subsection.

. . .

(h) Senatorial candidates

Notwithstanding any other provision of this Act, amounts totaling not more than $35,000 may be contributed to a candidate for nomination for election, or for election, to the United States Senate during the year in which an election is held in which he is such a candidate, by the Republican or Democratic Senatorial Campaign Committee, or the national committee of a political party, or any combination of such committees.

. . .

65

## REGULATIONS

### 11 C.F.R. § 102.17. Joint fundraising by committees other than separate segregated funds

(a) General. Nothing in this section shall supersede 11 CFR part 300, which prohibits any person from soliciting, receiving, directing, transferring, or spending any non-Federal funds, or from transferring Federal funds for Federal election activities.

(1)(i) Political committees may engage in joint fundraising with other political committees or with unregistered committees or organizations. The participants in a joint fundraising effort under this section shall either establish a separate committee or select a participating committee, to act as fundraising representative for all participants. The fundraising representative shall be a reporting political committee and an authorized committee of each candidate for federal office participating in the joint fundraising activity. If the participants establish a separate committee to act as the fundraising representative, the separate committee shall not be a participant in any other joint fundraising effort, but the separate committee may conduct more than one joint fundraising effort for the participants.

(ii) The participants may hire a commercial fundraising firm or other agent to assist in conducting the joint fundraising activity. In that case, however, the fundraising representative shall still be responsible for ensuring that the recordkeeping and reporting requirements set forth in this section are met.

(2) The procedures in 11 CFR 102.17(c) will govern all joint fundraising activity conducted under this section. The participants in joint fundraising activity may include political party committees (whether or not they are political committees under 11 CFR 100.5), candidate committees, multicandidate committees, and unregistered organizations which do not qualify as collecting agents under 11 CFR 102.6(b).

. . .

(c) Joint fundraising procedures. The requirements of 11 CFR 102.17(c)(1) through (8) shall govern joint fundraising activity conducted under this section.

(1) Written agreement. The participants in a joint fundraising activity shall enter into a written agreement, whether or not all participants are political committees under 11 CFR 100.5. The written agreement shall identify the fundraising representative and shall state a formula for the allocation of

66

fundraising proceeds. The formula shall be stated as the amount or percentage of each contribution received to be allocated to each participant. The fundraising representative shall retain the written agreement for a period of three years and shall make it available to the Commission on request.

. . .

(7) Allocation of expenses and distribution of net proceeds.

(i) If participating committees are not affiliated as defined in 11 CFR 110.3 prior to the joint fundraising activity and are not committees of the same political party;

(A) After gross contributions are allocated among the participants under 11 CFR 102.17(c)(6), the fundraising representative shall calculate each participant's share of expenses based on the percentage of the total receipts each participant had been allocated. If contributions from sources prohibited under the Act have been received and distributed under 11 CFR 102.17(c)(6)(iii), those contributions need not be included in the total receipts for the purpose of allocating expenses under this section. To calculate each participant's net proceeds, the fundraising representative shall subtract the participant's share of expenses from the amount that participant has been allocated from gross proceeds.

(B) A participant may only pay expenses on behalf of another participant subject to the contribution limits of 11 CFR part 110.

(C) The expenses from a series of fundraising events or activities shall be allocated among the participants on a per-event basis regardless of whether the participants change or remain the same throughout the series.

(ii) If participating committees are affiliated as defined in 11 CFR 110.3 prior to the joint fundraising activity or if participants are party committees of the same political party, expenses need not be allocated among those participants. Payment of such expenses by an unregistered committee or organization on behalf of an affiliated political committee may cause the unregistered organization to become a political committee.

67

(iii) Payment of expenses may be made from gross proceeds by the fundraising representative.

**47 C.F.R. § 73.1942. Candidate rates**

(a) Charges for use of stations. The charges, if any, made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his or her campaign for nomination for election, or election, to such office shall not exceed:

(1) During the 45 days preceding the date of a primary or primary runoff election and during the 60 days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period.