**No. 26-1785**

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

SHERROD BROWN, JON OSSOFF, ROY COOPER, AND KRISTEN MCDONALD RIVET,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,

*Respondents*,

NATIONAL REPUBLICAN CONGRESSIONAL CAMPAIGN COMMITTEE AND NATIONAL REPUBLICAN SENATORIAL COMMITTEE

*Respondent-Intervenors*.

---

On Petition for Review of a Public Notice by the
Federal Communications Commission's Media Bureau
DA 26-300

---

## AMICUS CURIAE BRIEF OF CAMPAIGN LEGAL CENTER
## IN SUPPORT OF PETITIONERS

---

Tara Malloy
Erin Chlopak
Saurav Ghosh
Shanna Ports
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
tmalloy@campaignlegalcenter.org
echlopak@campaignlegalcenter.org
sghosh@campaignlegalcenter.org
sports@campaignlegalcenter.org

*Attorneys for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae Campaign Legal Center makes the following disclosure regarding its corporate status:

Campaign Legal Center is a nonprofit corporation, has no parent corporation, and no publicly held corporation has any form of ownership interest in it.


Date: July 16, 2026                */s/ Tara Malloy*
                                   Tara Malloy
                                   Campaign Legal Center

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ iii

GLOSSARY OF ABBREVIATIONS ............................................................. vii

INTEREST OF AMICUS CURIAE ................................................................ 1

SUMMARY OF ARGUMENT ....................................................................... 2

ARGUMENT .................................................................................................. 6

    I.     Under the Communications Act, Only Legally Qualified Candidates Are Entitled to the Lowest Unit Charge. ................................................. 6

          A.    Congress extended the lowest unit charge to "candidates" to ensure candidates had access to broadcast advertising without imposing undue financial burdens on broadcasters. ...................................... 6

          B.    The FCC Notice exceeds the FCC's authority by expanding the lowest unit charge entitlement beyond "legally qualified candidate[s]." .......................................................................... 7

    II.    The Rise of Candidate-Super PAC JFCs Illustrates How the FCC Notice Is Contrary to Federal Law. ......................................................... 9

          A.    The FEC issues advisory opinions that protect requesters and similarly situated parties from adverse enforcement actions. .......... 9

          B.    The FEC's actions in response to a pair of 2024 advisory opinion requests have opened the door to candidate-super PAC JFCs that can run campaign-style ads largely financed by the super PAC .... 10

          C.    Candidates are already taking advantage of the Team Graham advisory opinion and creating JFCs with super PACs. .................. 14

          D.    Extending the lowest unit charge to JFCs comprised of candidates and super PACs contradicts the plain language and purposes of the Communications Act. .................................................................. 18

CONCLUSION .............................................................................................. 21

CERTIFICATE OF COMPLIANCE ............................................................. 22

CERTIFICATE OF SERVICE ...................................................................... 23

ii

# TABLE OF AUTHORITIES

**Cases**                                                                   **Pages**

*Citizens United v. FEC*, 558 U.S. 310 (2010)........................................................3

*Hernstadt v. FCC*, 677 F.2d 893 (D.C. Cir. 1980) .......................................2, 5, 6, 9

*McConnell v. FEC*, 540 U.S. 93 (2003)...................................................................1

*SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) ...........................................3

**Statutes, Codes, and Rules**

47 U.S.C. § 315(b)(1)..........................................................................2, 6, 19

52 U.S.C. § 30106..............................................................................13

52 U.S.C. § 30108................................................................................9

52 U.S.C. § 30109..............................................................................13

52 U.S.C. § 30125..............................................................................11

11 C.F.R. § 100.5(e)(6) .........................................................................3

11 C.F.R. § 102.17..........................................................................3, 12

**Other Authorities**

*About CLC*, CLC, https://campaignlegal.org/about (last visited July 16, 2026).......1

Advisory Opinion Request, DSCC, Montanans for Tester & Gallego for Arizona to FEC (Sep. 18, 2024), https://www.fec.gov/files/legal/aos/2024-13/202413R_1.pdf .................................................................11, 12

Advisory Opinion Request, Team Graham, Inc. to FEC (June 12, 2024), https://www.fec.gov/files/legal/aos/2024-07/202407R_1.pdf............................10

Collins Victory Committee, Amended Statement of Organization (Mar. 20, 2025), https://docquery.fec.gov/pdf/830/202503209754278830/202503209754278830.pdf ...................................................................15

Cornyn Victory Committee, Amended Statement of Organization (Apr. 22, 2025), https://docquery.fec.gov/pdf/259/202504229756342259/202504229756342259.pdf ...................................................................15

Equality PAC, Amended Statement of Organization (Mar. 25, 2026), https://docquery.fec.gov/pdf/711/202603259856841711/202603259856841711.pdf ...................................................................................16

Equality Project PAC, Amended Statement of Organization (June 29, 2026), https://docquery.fec.gov/pdf/199/202606299874277199/202606299874277199.pdf ...................................................................................16

FCC, Use of Broadcast and Cablecast Facilities by Candidates for Public Office, 37 Fed. Reg. 5796 (Mar. 21, 1972)...................................................................................7

FEC Advisory Opinion 2007-24 (Burkee) (Dec. 10, 2007), https://www.fec.gov/files/legal/aos/2007-24/2007-24.pdf ...................................3

FEC Advisory Opinion 2010-11 (Commonsense Ten) (July 22, 2010), https://www.fec.gov/files/legal/aos/2010-11/AO-2010-11.pdf ...........................4

FEC Advisory Opinion 2024-07 (Team Graham, Inc.) (Aug. 29, 2024), https://www.fec.gov/files/legal/aos/2024-07/2024-07.pdf .............4, 8, 10, 11, 17

FEC Advisory Opinion 2024-13 (DSCC, Montanans for Tester & Gallego for Arizona) (Oct. 10, 2024) https://www.fec.gov/files/legal/aos/2024-13/2024-13.pdf ...................................................................................13

*Financial Summary (2025-2026): Collins Victory Committee*, FEC, https://www.fec.gov/data/committee/C00692897/?tab=summary (last visited July 13, 2026)...................................................................................16

*Financial Summary (2025-2026): Cornyn Victory Committee*, FEC, https://www.fec.gov/data/committee/C00770180/?tab=summary (last visited July 13, 2026)...................................................................................15

*Financial Summary (2025-2026): Graham Majority Fund*, FEC, https://www.fec.gov/data/committee/C00690891/?tab=summary (last visited July 13, 2026)...................................................................................15

*Financial Summary (2025-2026): Max Miller Victory*, FEC, https://www.fec.gov/data/committee/C00779827/?tab=summary (last visited July 13, 2026)...................................................................................17

*Financial Summary (2025-2026): Torres Victory Fund*, FEC, https://www.fec.gov/data/committee/C00754598/?tab=summary (last visited July 13, 2026)...................................................................................16

Graham Majority Fund, Amended Statement of Organization (Sep. 11, 2025), https://docquery.fec.gov/pdf/245/202509119790045245/202509119790045245.pdf ...............................................................................................................14

Jobs & Prosperity PAC, Statement of Organization (Nov. 27, 2025), https://docquery.fec.gov/pdf/444/202511279793334444/202511279793334444.pdf. ..............................................................................................................17

Leadership PACs, 68 Fed. Reg. 67013 (Dec. 1, 2003) ............................................3

Max Miller Victory, Statement of Organization (Dec. 4, 2025), https://docquery.fec.gov/pdf/392/202512049793376392/202512049793376392.pdf. ..............................................................................................................17

Memorandum Opinion & Order, *In re Codification of the Commission's Political Programming Policies*, 7 FCC Rcd. 4611 (1992)...................................................7

Pine Tree Results PAC, Amended Statement of Organization (Sep. 10, 2025), https://docquery.fec.gov/pdf/684/202509109789979684/202509109789979684.pdf ...............................................................................................................15

Public Notice, Media Bureau, FCC (Nov. 2, 2020), https://docs.fcc.gov/public/attachments/DA-20-1305A1.pdf............................7

*Registering as a Hybrid PAC*, FEC, https://www.fec.gov/help-candidates-and-committees/filing-pac-reports/registering-hybrid-pac/ (last visited July 13, 2026) ...............................................................................................................16

Report & Order, *In re Codification of the Commission's Political Programming Policies*, 7 FCC Rcd. 678 (1991)................................................................8, 20

Security is Strength PAC, Amended Statement of Organization (Jan. 29, 2026), https://docquery.fec.gov/pdf/148/202601299794429148/202601299794429148.pdf ...............................................................................................................14

Statement of Vice Chair Ellen L. Weintraub at 1, FEC Advisory Opinion 2024-07 (Team Graham, Inc.) (Aug. 30, 2024), https://www.fec.gov/files/legal/aos/2024-07/202407S_1.pdf...........................10

Texans for a Conservative Majority, Amended Statement of Organization (Sep. 23, 2025), https://docquery.fec.gov/pdf/503/202509239790382503/202509239790382503.pdf ...............................................................................................................15

Torres Victory Fund, Amended Statement of Organization (Feb. 10, 2026),
   https://docquery.fec.gov/pdf/678/202602109834300678/202602109834300678.
   pdf ...............................................................................................................16

Vote Certification, FEC Advisory Opinion 2024-13 (DSCC, Montanans for Tester
   & Gallego for Arizona) (Oct. 10, 2024),
   https://www.fec.gov/files/legal/aos/2024-13/202413V_1.pdf ...........................13

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **BCRA** | Bipartisan Campaign Reform Act |
| **CLC** | Campaign Legal Center |
| **Communications Act** | Communications Act of 1934, as amended, 47 U.S.C. § 315(b)(1) |
| **DSCC** | Democratic Senatorial Campaign Committee |
| **FCC** | Federal Communications Commission |
| **FCC Notice** | Public Notice, Media Bureau, FCC (Mar. 30, 2026) |
| **FEC** | Federal Election Commission |
| **FECA** | Federal Election Campaign Act |
| **JFC** | Joint Fundraising Committee |
| **NRSC** | National Republican Senatorial Committee |
| **PAC** | Political Action Committee |

## INTEREST OF AMICUS CURIAE[1]

Amicus Curiae Campaign Legal Center ("CLC") is a nonpartisan, nonprofit organization working for a more transparent, inclusive, and accountable democracy at all levels of government. *See About CLC*, CLC, https://campaignlegal.org/about (last visited July 16, 2026). CLC has substantial experience with the issues pertinent to this litigation, and has participated in numerous matters addressing the intersection of political advertising, the regulation of broadcast communications, and federal campaign finance law. These activities include commenting on rulemakings, policy statements, and other administrative proceedings before the Federal Election Commission ("FEC") and Federal Communications Commission ("FCC") and litigating campaign finance cases in federal courts across the country, including by participating in every major U.S. Supreme Court campaign finance case since *McConnell v. FEC*, 540 U.S. 93 (2003).

Amicus curiae has conferred with counsel for petitioners, respondents, and intervenors, and counsel for each of those parties has indicated that they do not oppose the filing of this amicus brief by July 16, 2026, provided that the brief otherwise complies with the requirements of Federal Rule of Appellate Procedure 29, which it does.

---

[1] Counsel for amicus curiae authored this brief in its entirety. No party or party's counsel authored any part of this brief, and no person, other than amicus and its counsel, contributed money to fund its preparation or submission.

1

## SUMMARY OF ARGUMENT

The FCC's March 30, 2026 "Public Notice" ("FCC Notice") extended the right of "legally qualified candidate[s]" to purchase broadcast advertising at the "lowest unit charge" to (1) political party committees making coordinated expenditures with candidates, and (2) joint fundraising committees ("JFCs") in which a candidate is a participant. Public Notice, Media Bureau, FCC (Mar. 30, 2026), ECF No. 3-2. This guidance is contrary to both the plain language and purposes of the governing statute, the Communications Act of 1934, as amended, 47 U.S.C. § 315(b)(1) ("Communications Act"). Congress extended the lowest unit charge to "legally qualified candidate[s]"—not, as the FCC now claims, to JFCs and political parties. *See* 47 U.S.C. § 315(b)(1); ECF No. 3-2. Requiring stations to offer the lowest unit charge to political spenders beyond candidates and their campaigns undermines the dual purposes of the Communications Act, which were to provide *candidates* with a discount so that they can reach voters, while avoiding placing undue financial burdens on broadcast stations. *See Hernstadt v. FCC*, 677 F.2d 893, 897-98 (D.C. Cir. 1980).

The unlawfulness of the FCC Notice is even more apparent when considered in light of recent FEC decisions interpreting federal campaign finance law, and in particular, the FEC's loosening of federal rules governing joint fundraising committees. Joint fundraising is a long-standing practice, which the FEC has

2

authorized by regulation and advisory opinion, wherein candidates enhance their fundraising power by "jointly" raising funds with other entities—typically forming a separate political committee that exists solely to collect the funds and finance the fundraising venture—such as other candidates of the same political party, candidate-sponsored "leadership political action committees" ("leadership PACs"),[2] as well as the national and state committees of the candidates' political party. 11 C.F.R. § 102.17; *see* FEC Advisory Op. 2007-24 (Burkee) (Dec. 10, 2007), https://www.fec.gov/files/legal/aos/2007-24/2007-24.pdf. Joint fundraising by candidates and party committees has surged in recent election cycles, *see infra* Part II.C, but the FEC supercharged this fundraising practice in August 2024 by issuing an advisory opinion that for the first time authorized a candidate's principal campaign committee to participate in a JFC with a super PAC,[3] and the JFC to

---

[2] A leadership PAC is "a political committee that is directly or indirectly established, financed, maintained or controlled by a candidate for Federal office or an individual holding Federal office but which is not an authorized committee of the candidate or individual." 11 C.F.R. § 100.5(e)(6). Historically, officeholders use leadership PACs to make contributions "to other Federal candidates to gain support when . . . seek[ing] a leadership position in Congress" or to fund "travel when campaigning for other Federal candidates." Leadership PACs, 68 Fed. Reg. 67013, 67014 (Dec. 1, 2003).

[3] Super PACs, technically "independent-expenditure-only political committees," are political committees that are legally permitted—pursuant to the U.S. Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010), and the U.S. Court of Appeals for the D.C. Circuit's decision in *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010)—to raise and spend unlimited amounts of money, including money from corporations and labor unions, provided they do not coordinate with any

disseminate public communications. *See* FEC Advisory Op. 2024-07 (Team Graham, Inc.) (Aug. 29, 2024), https://www.fec.gov/files/legal/aos/2024-07/2024-07.pdf. Notably, in evaluating another advisory opinion request submitted in 2024, the FEC also failed to prohibit JFCs from financing advertisements that expressly advocate for the JFC's participating candidates, such that super PAC participants could effectively underwrite the costs of campaign-style ads when those ads are financed through a JFC in which the candidate also participates. *See infra* Part II.B. Super PACs are plainly ineligible for the lowest unit charge under the Communications Act, and the FCC's effective extension of the discount to super PACs—as long as they pay for election ads through a JFC that also features a candidate participant—underscores how far the FCC has deviated from the text of the statute.

The 2026 midterm election is the first full election cycle since the FEC issued the Team Graham advisory opinion, *i.e.*, the first cycle in which candidates' campaign committees and super PACs may participate in JFCs, and there are a growing number of such committees registering with the FEC. Under the FCC Notice, these JFCs can access the lowest unit charge, despite the fact that they might

---

candidate or party committee and make only independent expenditures. *See* FEC Advisory Op. 2010-11 (Commonsense Ten) (July 22, 2010), https://www.fec.gov/files/legal/aos/2010-11/AO-2010-11.pdf.

include many non-candidate participants—*e.g.*, multiple super PACs and one candidate might form a JFC, with the candidate paying only a small fraction of the costs of any JFC-funded advertisements. Accordingly, communications effectively sponsored by super PACs—which are legally required to be "independent" from candidates in spending money on elections, and which would otherwise have to pay the market rate for advertising time—will be able to buy discounted ad stock.

The prospect that the FCC Notice will result in subsidized super PAC-funded political advertising further underscores that the FCC's legal interpretation is contrary to law. Requiring stations to offer the lowest unit charge to JFCs that may be substantially or predominantly underwritten by super PACs, merely because these committees also have a candidate participant, fundamentally contravenes the clear text and purposes behind the Communications Act's provision of the lowest unit charge to "candidates." *See Hernstadt*, 677 F.2d at 897-98. Not only are JFCs obviously *not* "candidates," but offering them the lowest unit charge does nothing to lower the costs of campaigning and risks financially burdening broadcast stations in a manner contrary to Congress's intent.

For the reasons described below and in Petitioners' brief, Amicus urges the Court to correct the FCC's overreach and set aside the FCC Notice.

5

# ARGUMENT

## I.     Under the Communications Act, Only Legally Qualified Candidates Are Entitled to the Lowest Unit Charge.

### A.     Congress extended the lowest unit charge to "candidates" to ensure candidates had access to broadcast advertising without imposing undue financial burdens on broadcasters.

In the Communications Act, Congress required broadcast stations to sell ad time to a "legally qualified candidate for any public office in connection with his campaign for nomination for election" to such office at the "lowest unit charge" in the immediate runup to a primary and general election. 47 U.S.C. § 315(b)(1). In effect, "legally qualified candidate[s]" must be allowed to purchase ad time at the same rate as a station's "most favored commercial advertiser[s]," who receive volume and frequency discounts that a candidate would not otherwise be able to access. *Hernstadt*, 677 F.2d at 898, 900 (quoting S. Rep. No. 92-96, at 27 (1971)).

Congress created the lowest unit charge requirement because it was concerned about the rising cost of political advertising and wanted to ensure that candidates were not priced out of reaching voters just before an election. *See id.* at 898, 900. Congress decided to require broadcast stations to offer candidates their lowest available rate—rather than mandating a set rate or a specific percentage discount— to avoid imposing unreasonable and "possibly economically devasting" burdens on small stations, which might face financial hardship if they had to give away a portion of their ad inventory for a fraction of what they usually charge. *See id.* at 898.

6

Accordingly, Congress sought to advance two goals in legislating the lowest unit charge: (1) making advertising affordable for candidates shortly before an election so that voters can hear their positions, and (2) ensuring broadcast stations are not substantially harmed by being required to run discounted campaign ads.

### B. The FCC Notice exceeds the FCC's authority by expanding the lowest unit charge entitlement beyond "legally qualified candidate[s]."

For decades, the FCC's guidance closely tracked the Communications Act and stated that only candidates and their campaign committees are entitled to the lowest unit charge. *See* FCC, Use of Broadcast and Cablecast Facilities by Candidates for Public Office, 37 Fed. Reg. 5796, 5802 (Mar. 21, 1972) ("The provision applies only to broadcasts by candidates for public office."); Mem. Op. & Order, *In re Codification of the Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 4611, 4614 ¶ 23 (1992) (stating that the benefit applies to "candidates or their authorized *campaign committees*" (emphasis added)); Public Notice, Media Bureau, FCC (Nov. 2, 2020), https://docs.fcc.gov/public/attachments/DA-20-1305A1.pdf (describing the entitlement as one "bestow[ed] upon individuals running for public office").

However, on March 30, 2026, the FCC published a Public Notice stating that candidates *and* (1) JFCs including a candidate, *and* (2) political party committees coordinating with a candidate, are all entitled to the lowest unit charge. FCC Notice,

ECF No. 3-2. The FCC Notice also stated that, in line with longstanding guidance, "independent expenditure[s]" are not entitled to the lowest unit charge. *Id.*; *see* Report & Order, *In re Codification of the Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 678, 685 n.54 (1991) ("[W]e have never held that independent entities were entitled to the lowest unit charge.").

As Petitioners' opening brief explains, *see* ECF No. 3-3 at 9-22, extending the lowest unit charge to two additional classes of political advertisers—JFCs and party committees—is contrary to both the plain language and purposes of the Communications Act. Beyond the effects of the FCC's unlawful guidance on JFCs in which the participants are political parties and candidates, *see id.* at 16-19, another emerging scenario even more dramatically illustrates the inconsistency of the FCC's guidance with the law it purports to implement: super PACs jointly fundraising with candidates.

Since August 2024, the FEC has explicitly permitted candidates and *super PACs* to participate together in JFCs. *See* FEC Advisory Op. 2024-07 (Team Graham, Inc.). The FEC's advisory opinion compounds the harmful effects of the FCC Notice. Together these rulings allow super PACs, which are legally barred from coordinating with candidates and can only make *independent* expenditures—the very type of communication that the FCC acknowledges are not entitled to the lowest unit charge—to form JFCs with candidates, pay all or the lion's share of those JFCs'

8

advertising expenses, and do so at the lowest unit charge. *See infra* Part II.B. Super PACs advertising at the lowest unit charge is a far cry from the text and purposes of the Communications Act—indeed, it is precisely the opposite outcome of what Congress was seeking to achieve when it enacted the lowest unit charge provision. *See Hernstadt*, 677 F.2d at 898, 900 (quoting S. Rep. No. 92-96, at 27 (1971)).

## II.    The Rise of Candidate-Super PAC JFCs Illustrates How the FCC Notice Is Contrary to Federal Law.

An overview of recent legal developments from the FEC, along with joint fundraising data from the current election cycle, highlights the unlawfulness and practical ramifications of the FCC Notice.

### A.    The FEC issues advisory opinions that protect requesters and similarly situated parties from adverse enforcement actions.

The Federal Election Campaign Act ("FECA") empowers the FEC to issue advisory opinions concerning the application of the federal campaign finance laws. 52 U.S.C. § 30108. Any person who receives an advisory opinion, and "any person involved in any specific transaction or activity which is indistinguishable in all its material aspects from the transaction or activity" approved in the advisory opinion, may rely on the advisory opinion as protection from sanctions. *Id.* § 30108(c)(1)(A)-(B). Accordingly, campaigns, political committees, and other actors regularly seek advisory opinions from the FEC to ensure that their proposed conduct does not violate the federal campaign finance laws.

9

**B.**     **The FEC's actions in response to a pair of 2024 advisory opinion requests have opened the door to candidate-super PAC JFCs that can run campaign-style ads largely financed by the super PAC.**

On June 12, 2024, Team Graham, Inc.—the late Senator Lindsey Graham's authorized principal campaign committee—submitted an advisory opinion request asking the FEC whether it could form a JFC that would be made up of the campaign committee, Graham's leadership PAC, Fund for America's Future, the National Republican Senatorial Committee ("NRSC"), and an unnamed super PAC. Advisory Op. Request at 1, Team Graham, Inc. to FEC (June 12, 2024), https://www.fec.gov/files/legal/aos/2024-07/202407R_1.pdf. The request explained that the JFC would disseminate "public communications in the form of solicitations" as part of its fundraising efforts. *Id.* at 2.

On August 29, 2024, the FEC issued an advisory opinion stating that it would be permissible for the campaign and super PAC to jointly participate in the proposed JFC. FEC Advisory Op. 2024-07 (Team Graham, Inc.). The FEC concluded that the JFC's communications would not be treated as coordinated communications, which super PACs are legally prohibited from making with candidates under the federal campaign finance laws.[4] FEC Advisory Op. 2024-07 (Team Graham, Inc.) at 6-8.

---

[4] This conclusion defied common sense, as the campaign and super PAC would be working together—coordinating—to develop the JFC's public communications. However, only one Commissioner opined that candidate-super PAC joint fundraising violates "the spirit [and] letter of" FECA. *See* Statement of Vice Chair

10

The opinion concluded that as long as the JFC limited contributions to the super PAC to $5,000 (the annual limit for contributions to traditional PACs), as well as barring contributions from sources not allowed to give money to candidates, like corporations and unions, Team Graham would not run afoul of the "soft money" prohibitions in the Bipartisan Campaign Reform Act ("BCRA").[5] *Id.* at 4-6.

Shortly thereafter, in September 2024, the FEC received another advisory opinion request about joint fundraising. The Democratic Senatorial Campaign Committee ("DSCC"); Montanans for Tester, Senator Jon Tester's principal campaign committee; and Gallego for Arizona, then-Representative Ruben Gallego's principal campaign committee for the U.S. Senate in Arizona, asked whether and how a JFC could "run television advertisements that primarily advocate for the election" or defeat of a federal candidate "but also contain a brief fundraising solicitation at the end of the advertisements."[6] Advisory Op. Request at 1, DSCC,

---

Ellen L. Weintraub at 1, FEC Advisory Op. 2024-07 (Team Graham, Inc.) (Aug. 30, 2024), https://www.fec.gov/files/legal/aos/2024-07/202407S_1.pdf.

[5] BCRA prohibits federal candidates and officeholders, along with any committees they establish, finance, maintain, or control (such as a JFC), from soliciting, receiving, directing, or transferring funds that do not comply with the limitations, source prohibitions, and reporting requirements contained in FECA, *i.e.*, "soft money." 52 U.S.C. § 30125(e)(1)(A); FEC Advisory Op. 2024-07 (Team Graham, Inc.) at 5-6.

[6] The request was patterned off advertisements that the NRSC was already running. The Requesters sought assurance that the tactic was legal before following suit. *See* ECF No. 22-1 at 8-9, 25-28.

Montanans for Tester & Gallego for Arizona to FEC (Sep. 18, 2024), https://www.fec.gov/files/legal/aos/2024-13/202413R_1.pdf.

The requesters proposed that Tester would form a JFC with the DSCC, and the first two thirds of incoming contributions would be allocated to the DSCC and the final third to Tester. *Id.* at 2. The JFC would then use the money to finance television ads that advocated Tester's election and showed "a QR code during the final few seconds that, when scanned, link[ed] to an online fundraising page for the [ ] Joint Fundraising Committee." *Id.* The QR code would accompany "a brief oral solicitation." *Id.* Despite the ad being almost fully dedicated to advocating for Tester—and never mentioning the DSCC—the DSCC would pay for two thirds of the ad's cost and Tester would pay the remaining one third.[7] *See id.* The requesters proposed the same arrangement for a JFC in which Gallego and the DSCC would participate. *See id.*

---

[7] JFCs are required to establish an allocation formula that controls how contributions received are divided between the participants. 11 C.F.R. § 102.17(c)(1), (c)(6)(i). For example, three political committees could form a JFC and determine that Committee A gets the first cut of each contribution (up to its legal limit), Committee B gets the next cut (up to its legal limit), and Committee C gets whatever is left (up to its legal limit). Accordingly, if a contributor provides a small contribution, Committee C may not get any money.

When a JFC pays its expenses, it must pay in proportion to the way the receipts were divided. *Id.* § 102.17(c)(7)(i)(A). That means that Committee A would pay the most for any expense, followed by Committee B, then Committee C. Committee C could end up paying virtually nothing if very few JFC donors made the maximum contribution.

12

The FEC was unable to issue an advisory opinion, splitting 3-3 on whether the proposed JFC ads and cost allocations were lawful. *See* Vote Certification, FEC Advisory Op. 2024-13 (DSCC, Montanans for Tester & Gallego for Arizona) (Oct. 10, 2024), https://www.fec.gov/files/legal/aos/2024-13/202413V_1.pdf. Since then, party committees, presumably reading the Commission's split on the issue as tacit permission,[8] have engaged in the very conduct described in the advisory opinion request. Indeed, Petitioners' opening brief describes multiple prominent examples of JFCs running campaign-style ads, primarily financed by the NRSC, expressly advocating for 2024 Senate candidates. ECF No. 22-1 at 8-9, 25-26.

It is only a matter of time before super PACs jointly fundraising with candidates follow suit. A candidate-super PAC JFC, reading the FEC's 3-3 split in FEC Advisory Op. 2024-13 (DSCC, Montanans for Tester & Gallego for Arizona)

---

[8] The FEC has six Commissioners, and issuing an advisory opinion requires the affirmative vote of at least four Commissioners. 52 U.S.C. § 30106(a)(1), (c). Likewise, in the enforcement context, it takes at least four votes to initiate an investigation, enter into a conciliation agreement to resolve a violation, or institute a lawsuit seeking a civil penalty against a party that is subject to a complaint. *Id.* §§ 30106(c), 30109(a)(2), (a)(4)(A)(i), (a)(6)(A). Because of this structure, three Commissioners could vote to approve an advisory opinion, which ultimately fails, but still go on to block an enforcement action against the requester or a similarly situated party for the conduct proposed in the advisory opinion request. The regulated community is aware of this and acts accordingly—regularly moving forward with conduct that failed to gain the required four-vote approval in the advisory opinion context.

13

(Oct. 10, 2024) https://www.fec.gov/files/legal/aos/2024-13/2024-13.pdf as tacit permission, may pay for ads that predominantly feature express advocacy supporting the candidates, and that are funded (or at least largely underwritten) by the participating super PAC(s). Accordingly, in view of the Team Graham advisory opinion permitting such joint fundraising arrangements, super PACs may soon primarily finance JFC ads that are effectively indistinguishable from candidates' campaign ads airing on television and radio stations. The FCC Notice would allow such super PAC-financed JFC ads to benefit from the lowest unit charge. ECF No. 3-2.

### C. Candidates are already taking advantage of the Team Graham advisory opinion and creating JFCs with super PACs.

Numerous candidates in the 2026 election cycle have already formed JFCs with allied super PACs. For example, before his recent passing, Senator Graham—pursuant to the FEC's Team Graham advisory opinion—amended the statement of organization for his pre-existing JFC, Graham Majority Fund, to include his campaign, leadership PAC, the NRSC, and a super PAC named Security is Strength PAC.[9] Graham Majority Fund raised nearly $5 million during 2025 and early 2026,

---

[9] Graham Majority Fund, Am. Statement of Org. at 2, 5 (Sep. 11, 2025), https://docquery.fec.gov/pdf/245/202509119790045245/202509119790045245 .pdf; Security is Strength PAC, Am. Statement of Org. at 2 (Jan. 29, 2026), https://docquery.fec.gov/pdf/148/202601299794429148/202601299794429148 .pdf.

*Financial Summary (2025-2026): Graham Majority Fund*, FEC, https://www.fec.gov/data/committee/C00690891/?tab=summary (last visited July 13, 2026), which is more than enough to create and place broadcast ads.

Other high-profile Senate elections have also featured JFCs with super PAC participants. In Texas, where a competitive Republican primary race captured national attention, Senator John Cornyn created the Cornyn Victory Committee, which included his campaign committee and leadership PACs, the NRSC, and two super PACs: Conservative Majority Project Super PAC and Texans for a Conservative Majority.[10] The JFC raised over $8.5 million in connection with Cornyn's primary. *Financial Summary (2025-2026): Cornyn Victory Committee*, FEC, https://www.fec.gov/data/committee/C00770180/?tab=summary (last visited July 13, 2026). Similarly, Senator Susan Collins created the Collins Victory Committee, which lists as its participants Collins's campaign committee, her leadership PAC, the NRSC, and a super PAC called Pine Tree Results PAC.[11] It has

---

[10] Cornyn Victory Comm., Am. Statement of Org. at 2, 5 (Apr. 22, 2025), https://docquery.fec.gov/pdf/259/202504229756342259/202504229756342259.pdf; Texans for a Conservative Majority, Am. Statement of Org. at 2 (Sep. 23, 2025), https://docquery.fec.gov/pdf/503/202509239790382503/202509239790382503.pdf.

[11] Collins Victory Committee, Am. Statement of Org. at 2, 5 (Mar. 20, 2025), https://docquery.fec.gov/pdf/830/202503209754278830/202503209754278830.pdf; Pine Tree Results PAC, Am. Statement of Org. at 2 (Sep. 10, 2025), https://docquery.fec.gov/pdf/684/202509109789979684/202509109789979684.pdf.

already raised over $4 million this cycle. *Financial Summary (2025-2026): Collins Victory Committee*, FEC, https://www.fec.gov/data/committee/C00692897/?tab=summary (last visited July 13, 2026).

House candidates are beginning to follow suit. Representative Ritchie Torres, for example, has a JFC, the Torres Victory Fund, which includes his campaign committee, leadership PAC, the New York State Democratic Committee, and two hybrid PACs:[12] Equality PAC and Equality Project PAC.[13] Torres Victory Fund raised nearly $6.5 million ahead of Torres's primary. *Financial Summary (2025-2026): Torres Victory Fund*, FEC, https://www.fec.gov/data/committee/C00754598/?tab=summary (last visited July

---

[12] A hybrid PAC is like two committees under one roof: it maintains one account that operates like a regular committee (*i.e.*, it is subject to federal source prohibitions and contribution limits, and can make contributions to candidates and/or party committees) and a separate, segregated account that operates like a super PAC (*i.e.*, it can accept unlimited amounts of money, including money from corporations and labor unions, but must operate independently of candidates and party committees). *See Registering as a Hybrid PAC*, FEC, https://www.fec.gov/help-candidates-and-committees/filing-pac-reports/registering-hybrid-pac/ (last visited July 13, 2026).

[13] Torres Victory Fund, Am. Statement of Org. at 2, 5 (Feb. 10, 2026), https://docquery.fec.gov/pdf/678/202602109834300678/202602109834300678.pdf; Equality PAC, Am. Statement of Org. at 2 (Mar. 25, 2026), https://docquery.fec.gov/pdf/711/202603259856841711/202603259856841711.pdf; Equality Project PAC, Am. Statement of Org. at 2 (June 29, 2026), https://docquery.fec.gov/pdf/199/202606299874277199/202606299874277199.pdf.

16

13, 2026). Representative Max Miller's "Max Miller Victory" JFC is comprised of his campaign committee, his leadership PAC, the Ohio Republican Party State Central and Executive Committee, a qualified multicandidate PAC, and the super PAC "Jobs & Prosperity PAC."[14] It raised over $1 million before Miller's primary. *Financial Summary (2025-2026): Max Miller Victory*, FEC, https://www.fec.gov/data/committee/C00779827/?tab=summary (last visited July 13, 2026). Accordingly, JFCs featuring candidates and super PACs are raising millions of dollars—well more than enough to create and place broadcast advertisements expressly advocacy for the participating candidates.

Advertising through these JFCs has undeniable advantages, particularly in light of the FEC's and FCC's recent, collective guidance: super PACs can work with candidates to develop JFC advertisements—something they are legally barred from doing outside of the joint fundraising context. *See* FEC Advisory Op. 2024-07 (Team Graham, Inc.). According to the FEC, those ads can extensively advocate the election or defeat of a candidate, as long as they include a brief solicitation. *See supra* Part II.B. The JFC's allocation formulation can be structured in a way that

---

[14] Max Miller Victory, Statement of Org. at 2, 5 (Dec. 4, 2025), https://docquery.fec.gov/pdf/392/202512049793376392/202512049793376392.pdf; Jobs & Prosperity PAC, Statement of Org. at 2 (Nov. 27, 2025), https://docquery.fec.gov/pdf/444/202511279793334444/202511279793334444.pdf.

guarantees the participating super PACs pay the vast majority of the cost for those advertisements. *See supra* at 12 n.7. And, based on the FCC's recent, flawed guidance, the JFC can place those ads at a discounted rate that, under the law, is reserved exclusively for "candidates." *See* FCC Notice, ECF No. 3-2.

In short, campaign-style ads financed by JFCs were already the perfect vehicle for super PACs to coordinate with and thus maximally benefit candidates; the FCC's conclusion—unsupported by law—that JFCs can take advantage of the lowest unit charge only exacerbates this concerning trend. Should the FCC Notice stand, it is all but certain that super PACs will not only continue to work with candidates to develop and fund the precise ads the candidates desire, but also reach a larger audience with those ads because they will be less expensive to disseminate on television and radio.

D.    **Extending the lowest unit charge to JFCs comprised of candidates and super PACs contradicts the plain language and purposes of the Communications Act.**

The FCC's move to make the lowest unit charge available to JFCs with a candidate participant is unsupported by the law, as underscored by super PACs' newfound ability to participate in JFCs with candidates. The Communications Act extends the lowest unit charge to candidates, not other groups that spend money on political advertising—especially political committees that are legally required to remain independent of candidates.

18

A simple hypothetical perfectly illustrates the flaw in the FCC's reasoning: three super PACs and one candidate could form a JFC with an allocation formula dictating that incoming contributions (up to the prevailing PAC contribution limit of $5,000) will flow to each super PAC before even a penny reaches the candidate's campaign committee. If every donor to this JFC gave $15,000 or less, the campaign would receive no money from the JFC distributions—all of the donors' funds would go to the three super PACs (receiving $5,000 each) under the JFC's allocation formula.[15] Then, the JFC could use the proceeds to place ads expressly advocating for the participating candidate, who would not be required to pay anything for the JFC's ads because their campaign did not receive any money from the JFC's distributions. Yet per the FCC's guidance, the JFC would be able to place those ads—which were wholly paid for by super PACs—at the lowest unit charge. That absurd, deeply problematic, and yet entirely plausible outcome is unsupported by the law and in fact undermines Congress's basic legislative purpose.

This hypothetical JFC's advertisements—which are in no part financed by a candidate—are plainly not a "use of [a] broadcasting station by" a "legally qualified candidate," within the meaning of the statute. *See* 47 U.S.C. § 315(b)(1). Moreover,

---

[15] Considering donors turn to super PACs when they have already made the maximum contribution to the candidate, it would not be unusual for a supporter to contribute just to the participating super PACs.

if a candidate is not even paying for the ads, the lowest unit charge is not serving its legislative purpose because it is not doing anything to reduce costs for *campaigns*.

Rather than advancing legislative intent, the FCC's extension of the lowest unit charge to JFCs undercuts one of the purposes of the Communications Act by placing an undue financial burden on broadcast stations. Instead of just selling *candidates* advertising at the lowest rate, broadcast stations now have to sell discounted ads to JFCs (and political party committees engaging in coordinated spending).

The FCC itself recognizes that super PACs spending on electoral ads from their own accounts would not be entitled to the lowest unit charge as super PACs are obviously not "candidates." *See* FCC Notice; *see also* Report & Order, *In re Codification of the Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 678, 685 n.54 (1991). That admission should resolve the question here, as the same result must hold for super PACs spending on electoral ads through a JFC. The FCC Notice allowing such committees to air ads at the lowest unit charge is unlawful and threatens to severely harm both our electoral system and broadcasters, who will be forced to provide discounted ad time to a far wider swath of political groups than Congress ever intended to benefit.

20

## CONCLUSION

For the foregoing reasons, as well as those articulated by Petitioners, this Court should grant the petition and set aside the FCC Notice.

**Date: July 16, 2026**                                    Respectfully submitted,

_/s/ Tara Malloy_
Tara Malloy
Erin Chlopak
Saurav Ghosh
Shanna Ports
Campaign Legal Center
1101 14th Street NW, Ste. 400
Washington, DC  20005
tmalloy@campaignlegalcenter.org
echlopak@campaignlegalcenter.org
sghosh@campaignlegalcenter.org
sports@campaignlegalcenter.org

21

## CERTIFICATE OF COMPLIANCE

1.  The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Local Rule 32(g)(1) because this brief contains 4,748 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

2.  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

Date: July 16, 2026

*/s/ Tara Malloy*
Tara Malloy
Campaign Legal Center

22

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2026, I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Tara Malloy
Tara Malloy
Campaign Legal Center

23