# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

SHERROD BROWN, JON OSSOFF, ROY A. COOPER, III, and KRISTEN MCDONALD RIVET,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents,*

NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE and NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

*Intervenors.*

On Petition for Review of a Public Notice by the Federal Communications Commission's Media Bureau

## BRIEF FOR RESPONDENTS

|  |  |
|---|---|
|  | D. Adam Candeub<br>*General Counsel* |
|  | Jacob M. Lewis<br>*Deputy General Counsel* |
|  | Sarah E. Citrin<br>*Deputy Associate General Counsel* |
|  | Scott M. Noveck<br>*Counsel* |
| Sharon Swingle<br>Jennifer Utrecht<br>   *Attorneys* | FEDERAL COMMUNICATIONS COMMISSION |
| U.S. DEPARTMENT OF JUSTICE<br>CIVIL DIVISION, APPELLATE STAFF<br>950 Pennsylvania Ave. NW<br>Washington, DC 20530 | 45 L Street NE<br>Washington, DC 20554<br>(202) 418-1740<br>fcclitigation@fcc.gov |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 5

STATEMENT OF THE ISSUES .................................................. 6

STATEMENT OF THE CASE ...................................................... 6

    A.    Statutory And Regulatory Background ................................ 6

    B.    Factual Background And Proceedings Below ...................... 9

STANDARD OF REVIEW ......................................................... 12

SUMMARY OF THE ARGUMENT .......................................... 13

ARGUMENT ............................................................................... 17

I.    THE PETITION FOR REVIEW MUST BE DISMISSED FOR LACK OF JURISDICTION ............................................................ 17

    A.    The Court Lacks Jurisdiction To Review A Staff-Level Notice That Has Not Yet Been Reviewed By The Commission. ........................................................................ 18

        1.    The notice is not a reviewable final order because Commission review is still pending. ............................ 19

        2.    The notice is not reviewable because it is staff-level action that has not been reviewed by the Commission. ................................................... 22

        3.    Petitioners' "constructive denial" fallback argument is likewise unavailing. ............................... 26

    B.    Petitioners Lack Standing To Challenge The Media Bureau's Reading Of The LUC Requirement. ..................... 29

II.    THE MEDIA BUREAU'S UNDERSTANDING OF THE LUC REQUIREMENT COMPLIES WITH SECTION 315(b) ...................... 36

    A.    The Media Bureau Correctly Understood The LUC Requirement To Apply To Candidate–Party Coordinated Ads And Joint Fundraising Committees. ......... 36

    B.    Petitioners' Arguments Lack Merit. ................................... 39

**Page**

CONCLUSION ...................................................................... 45

CERTIFICATE OF COMPLIANCE....................................... 46

# TABLE OF AUTHORITIES

**Cases:**                                                           **Page(s)**

*Ala. Power Co. v. FCC,*
  311 F.3d 1357 (11th Cir. 2002) ....................................... 14, 19, 23, 24

*Allen v. Wright,*
  468 U.S. 737 (1984) ........................................................... 30

*Already, LLC v. Nike, Inc.,*
  568 U.S. 85 (2013) ............................................................. 34

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................... 20

*Bost v. Illinois State Bd. of Elections,*
  607 U.S. 71 (2026) ............................................................. 30

*Brown v. Gardner,*
  513 U.S. 115 (1994) ........................................................... 40

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC,*
  982 F.3d 258 (4th Cir. 2020) ............................................. 22

*Cheney v. U.S. Dist. Ct.,*
  542 U.S. 367 (2004) ..................................................... 13, 28

*Council Tree Commc'ns v. FCC,*
  503 F.3d 284 (3d Cir. 2007) .............................................. 25

*Davis v. FEC,*
  554 U.S. 724 (2008) ........................................................... 32

*Environmentel, LLC v. FCC,*
  661 F.3d 80 (D.C. Cir. 2011) ............................................. 25

*FCC v. AT&T, Inc.,*
  146 S. Ct. 1418 (2026) ....................................................... 22

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ........................................................... 30

*FEC v. Colo. Republican Fed. Campaign Comm.*,
533 U.S. 431 (2001)................................................................42

*Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. EPA*,
313 F.3d 852 (4th Cir. 2002)................................................20

*Frank Krasner Enters., Ltd. v. Montgomery Cnty.*,
401 F.3d 230 (4th Cir. 2005)................................................12

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)................................................................40

*Hernstadt v. FCC*,
677 F.2d 893 (D.C. Cir. 1980) ..............................................7

*Hollingsworth v. Perry*,
570 U.S. 693 (2013)................................................................30

*Horsehead Res. Dev. Co. v. EPA*,
130 F.3d 1090 (D.C. Cir. 1997)............................................25

*ICC v. Bhd. of Locomotive Eng'rs*,
482 U.S. 270 (1987)........................................................ 19, 21

*In re Cheney*,
406 F.3d 723 (D.C. Cir. 2005) (en banc) ............................28

*In re Trump*,
958 F.3d 274, 325 (4th Cir. 2020) (en banc), *vacated as moot*,
592 U.S. 1233 (2021)..............................................................32

*In re Va. Beach*,
42 F.3d 881 (4th Cir. 1994)..................................................27

*Int'l Telecard Ass'n v. FCC*,
166 F.3d 387 (D.C. Cir. 1999) (per curiam)..............*passim*

Page(s)

*Linda R.S. v. Richard D.,*
410 U.S. 614 (1973)................................................................35

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)...............................................................12

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)...............................................................29

*Marshall v. Meadows,*
105 F.3d 904 (4th Cir. 1997)..................................................31

*McConnell v. FEC,*
540 U.S. 93 (2003)............................................... 5, 15, 33, 35

*McEvoy v. Diversified Energy Co. PLC,*
111 F.4th 330 (4th Cir. 2024) ...............................................28

*Nat'l Republican Senatorial  Comm. v. FEC,*
609 U.S. ---, 2026 WL 1868932 (2026)........................... 10, 41

*NRC v. Texas,*
605 U.S. 665 (2025)...............................................................13

*NTCH, Inc. v. FCC,*
877 F.3d 408 (D.C. Cir. 2017) ...............................................23

*Price v. City of Charlotte,*
93 F.3d 1241 (4th Cir. 1996)..................................................32

*Qwest Corp. v. FCC,*
482 F.3d 471 (D.C. Cir. 2007) ...............................................24

*Raines v. Byrd,*
521 U.S. 811 (1997).........................................................29, 30

*Renee v. Geary,*
501 U.S. 312 (1991)...............................................................12

*Richman Bros. Records, Inc. v. FCC,*
124 F.3d 1302 (D.C. Cir. 1997) ........................................................ 25

*Ross v. Blake,*
578 U.S. 632 (2016) ........................................................................ 24

*Schlesinger v. Reservists Comm. to Stop the War,*
418 U.S. 208 (1974) ........................................................................ 30

*Shays v. FEC,*
414 F.3d 76 (D.C. Cir. 2005) ...................................................... 34, 35

*South Carolina v. United States,*
907 F.3d 742 (4th Cir. 2018) .......................................................... 28

*Stone v. INS,*
514 U.S. 386 (1995) ............................................................ 18, 19, 21

*TeleSTAR, Inc. v. FCC,*
888 F.2d 132 (D.C. Cir. 1989) (per curiam) .................................... 26

*United Transp. Union v. ICC,*
871 F.2d 1114 (D.C. Cir. 1989) ...................................................... 21

*Valley Forge Christian Coll. v. Ams. United for Separation of*
*Church & State, Inc.*, 454 U.S. 464 (1982) ...................................... 30

*W. Union Tel. Co. v. FCC,*
773 F.2d 375 (D.C. Cir. 1985) ........................................................ 25

*Wade v. FCC,*
986 F.2d 1433 (D.C. Cir. 1993) (per curiam) .................................. 20

*Wild Va. v. CEQ,*
56 F.4th 281 (4th Cir. 2022) .......................................................... 12

**Administrative Materials:**

*1991 Political Programming Order*:
*Codification of the Commission's Political Programming
Policies*, 7 FCC Rcd. 678 (1991), *on reconsideration*, 7 FCC Rcd.
4611 (1992) .................................................................................. 8, 44

*1992 Political Programming Order*:
*Codification of the Commission's Political Programming
Policies*, 7 FCC Rcd. 4611 (1992) ............................................ 8, 10, 44

*Complaint of Diane Feinstein*,
12 FCC Rcd. 10611 (1997) ...................................................................... 8

*Declaratory Ruling Concerning Section 315*,
23 F.C.C.2d 758 (1966) ......................................................................... 40

*Exclusive Jurisdiction Ruling*:
*Exclusive Jurisdiction with Respect to Violations of the Lowest
Unit Charge Requirements*, 6 FCC Rcd. 7511 (1991) ...................... 8, 22

*Political Primer*:
*The Law of Political Broadcasting & Cablecasting: Political
Primer*, 100 F.C.C.2d 1476 (1984) ............................................... passim

Public Notice, *Licensees and Cable Operators Reminded of Lowest
Unit Charge Obligations*, 4 FCC Rcd. 3823 (1988) ............................. 8

Public Notice, *Media Bureau Provides Guidance on Political
Advertising Lowest Unit Charge During Coronavirus
(COVID-19) Pandemic*, 35 FCC Rcd. 2899 (Media Bur. 2020) ............ 8

**Statutes, Regulations, And Rules:**

5 U.S.C. § 553(b)(A) ............................................................................. 22

28 U.S.C. §§ 2341–2353 ....................................................................... 18

28 U.S.C. § 2342(1) ............................................................ 13, 18, 22

28 U.S.C. § 2344 ..................................................................... 13, 18

47 U.S.C. § 154(a) .................................................................... 14, 22

47 U.S.C. § 155(c)(4) ................................................................ 26, 27

47 U.S.C. § 155(c)(7) ................................................................. *passim*

47 U.S.C. § 315(a) ............................................................................ 40

47 U.S.C. § 315(b) ...................................................................... *passim*

47 U.S.C. § 315(b)(1) ................................................................... *passim*

47 U.S.C. § 315(b)(1)(A) ................................................................... 2, 6

47 U.S.C. § 315(b)(2) .................................................................... *passim*

47 U.S.C. § 315(b)(2)(A), (B), (E) ............................................................ 37

47 U.S.C. § 315(b)(2)(F) ................................................................... 9, 37

47 U.S.C. § 315(d) ............................................................................... 7

47 U.S.C. § 315(e) ............................................................................... 3

47 U.S.C. § 402(a) .................................................................... 13, 18, 22

47 U.S.C. § 405(a) ....................................................................... 18, 24

47 U.S.C. § 405(a)(2) ........................................................................... 24

47 U.S.C. § 503(b) ............................................................................... 22

52 U.S.C. § 30101(6) ............................................................................. 9

52 U.S.C. § 30102(e)(1) ........................................................................ 9

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

52 U.S.C. § 30102(e)(3)(A)(ii) .............................................................9, 37

52 U.S.C. § 30116(d) ........................................................... 10, 41

11 C.F.R. § 102.17(a)(1)(i) ..................................................................9

11 C.F.R. § 109.20 ........................................................... 10

11 C.F.R. §§ 109.30–.32 ........................................................... 10

11 C.F.R. § 109.32(a)(3)(ii) ........................................................... 40

11 C.F.R. § 109.32(b)(4) ........................................................... 40

11 C.F.R. § 109.37(b)(2) ........................................................... 10

47 C.F.R. § 1.102(b) ........................................................... 20

47 C.F.R. § 1.1202(a) ........................................................... 26

47 C.F.R. § 73.1942 ........................................................... 7

47 C.F.R. § 76.206 ........................................................... 7

Fed. R. App. P. 21(a) ........................................................... 28

4th Cir. R. 28(b) ........................................................... 38

**Other Authorities:**

Nat'l Ass'n of Broads.,
*Political Broadcasting Catechism* (18th ed. 2014) ........................... 38

Nat'l Ass'n of Broads.,
*Political Broadcasting Handbook* (19th ed. 2024) ........................... 38

S. Rep. No. 92-96 (1971) ....................................................... 7, 35, 41, 42

No. 26-1785

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

SHERROD BROWN, JON OSSOFF, ROY A. COOPER, III,
and KRISTEN MCDONALD RIVET,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*,

NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE
and NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

*Intervenors.*

---

On Petition for Review of a Public Notice by
the Federal Communications Commission's Media Bureau

---

## BRIEF FOR RESPONDENTS

---

## INTRODUCTION

The Petitioners in this case seek to challenge a Public Notice issued

by the FCC's Media Bureau, in view of the upcoming election season, "to

remind broadcasters" of their obligations under Section 315(b) of the

Communications Act. *See* Public Notice, *FCC Media Bureau Provides*

*Guidance on Entitlement to Lowest Unit Charge for Legally Qualified*

*Candidates for Federal Office and All Authorized Committees*, DA 26-300, 2026 WL 1013722 (Media Bur. Mar. 30, 2026), *reprinted at* JA1–2.

Section 315(b) generally provides that, in the period immediately preceding an election, any use of broadcast airtime for campaign ads by a legally qualified candidate must receive the "lowest unit charge" (LUC) that the station offers for that airtime. 47 U.S.C. § 315(b)(1)(A). The Media Bureau observed, as all agree, that the LUC rate applies to the airing of campaign ads by candidates and their principal campaign committees. JA1. The Media Bureau further recognized that "candidate–party coordinated ads," in which a candidate and his or her political party's national or state committees together purchase airtime for the campaign's use, are entitled to the LUC rate. JA2. Under the language of the statute, such ads qualify as "use * * * by * * * a legally qualified candidate * * * in connection with his campaign." 47 U.S.C. § 315(b)(1)(A). The Media Bureau likewise recognized that "joint fundraising committee[s]"—committees authorized to raise funds jointly with other candidates, committees, or organizations—are entitled to the LUC rate when purchasing airtime for use by a participating candidate. JA1–2.

Petitioners identify no sound reason to vacate the Public Notice. The Media Bureau's longstanding view of Section 315(b) as described in the Public Notice comports with the text of the statute, with what has long been the prevailing practice among broadcasters, and with the past advice that Bureau staff have given in response to informal inquiries from regulated parties. Petitioners focus on who is paying for the airtime, but the text of Section 315(b) turns instead on whether the airtime is "for the use * * * by * * * a legally qualified candidate * * * in connection with his campaign," 47 U.S.C. § 315(b)(1), not how much of the cost the candidate bears. And Section 315(b)(2) requires that, to receive the LUC rate, the candidate must personally certify or approve the broadcast, ensuring that the candidate is ultimately responsible for its use. *Id.* § 315(b)(2).

In fact, the past practice of at least one Petitioner supports the Media Bureau's understanding of Section 315(b). Public records indicate, for example, that Petitioner Sherrod Brown aired coordinated ads paid for by his party's national committee during the 2024 election cycle that appear to have sought and received the LUC rate.[1] The Media Bureau

---

[1] Details of political broadcasts, including the amount charged, are available in a station's online public inspection file under 47 U.S.C. § 315(e). *See, e.g.*, WBNS-TV's records catalogued under "Sherrod

(cont'd)

can hardly be faulted for reading the statute the same way that at least one of the Petitioners (and his party's national committee) had understood it until now.

Lack of merit aside, there is a more fundamental problem with the petition for review: Petitioners seek to invoke jurisdiction under the Hobbs Act, but the Hobbs Act confers jurisdiction only over final orders of the Commission, so the Court lacks jurisdiction to reach the merits at all. The challenged Public Notice (which simply reminds interested parties of agency staff's existing understanding) is not yet a reviewable "final order" under the Hobbs Act because requests for further Commission review are still pending before the agency, and hence the Public Notice is not the consummation of the agency proceeding. Nor is the Public Notice an order "of the Commission," because it was issued by staff in a subordinate Bureau and has not yet been reviewed by the Commission itself.

---

Brown DSCC," https://publicfiles.fcc.gov/tv-profile/WBNS-TV/political-files/2024/federal/us-senate/sherrod-brown-dscc/e521b04a-ba37-96cb-9dba-533bfead71bc [https://perma.cc/H7GA-7F6H]. Party committees must also publicly report coordinated expenditures through the Federal Election Commission (FEC). *See, e.g.*, DSCC Coordinated Party Expenditure Report, Image #202410249710718666, https://docquery.fec.gov/cgi-bin/fecimg/?202410249710718666 (reporting the party's coordinated expenditure with Sherrod Brown).

An additional jurisdictional problem is that Petitioners have failed to demonstrate standing to challenge the Public Notice. Petitioners are not adversely regulated by the Public Notice, which *benefits* them by affirming their right to make coordinated or joint purchases of airtime at the lowest rate. They speculate that, given the same treatment, they will not perform as well as their opponents—something that remains to be seen. But even if that were true, litigants who have not been discriminated against generally do not have standing to challenge government action just because others are receiving an allegedly unlawful benefit. Indeed, the Supreme Court rejected essentially the same theory of standing when advanced by other political candidates in *McConnell v. FEC*, 540 U.S. 93, 227 (2003).

Because the Court lacks jurisdiction to entertain Petitioners' claims, and because those claims are baseless in any event, the petition for review should be dismissed or denied.

**JURISDICTIONAL STATEMENT**

As explained in Part I below and in our earlier motion to dismiss (Doc. No. 17), the Court lacks jurisdiction over the petition for review here.

## STATEMENT OF THE ISSUES

1.   Whether the Court has jurisdiction to review a staff-level notice that has not been reviewed by the Commission itself, and as to which the agency's proceeding has not yet concluded.

2.   Whether Petitioners have standing to challenge the Media Bureau's reading of the LUC requirement.

3.   If the Court reaches the merits, whether the Media Bureau's reading of the LUC requirement is consistent with Section 315(b).

## STATEMENT OF THE CASE

### A.   Statutory And Regulatory Background

Congress enacted Section 315(b)'s lowest unit charge requirement in Section 103(a)(1) of the Federal Election Campaign Act of 1971, Pub. L. No. 92-225, 86 Stat. 3, 4 (1972).  As adopted, Section 315(b) provides that, during the 45 days preceding a primary election or 60 days preceding a general election,

> [t]he charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign * * * shall not exceed * * * the lowest unit charge of the station for the same class and amount of time for the same period.

47 U.S.C. § 315(b)(1)(A).  In 2002, Congress amended the statute to also require that federal candidates and their authorized committees certify

or approve all advertisements as a condition of eligibility for the LUC rate. *See id.* § 315(b)(2).

Legislative history explains that Section 315(b) "attempts to give candidates for public office greater access to the media so that they may better explain their stand on the issues[] and thereby more fully and completely inform the voters." S. Rep. No. 92-96, at 20–21 (1971). Congress also reasoned that the LUC rate ensures a remunerative return for broadcasters, because it "makes use of each broadcaster's own commercial practices rather than imposing on him an arbitrary discount rate" and thereby "does no more than place the candidate on par with a broadcast station's most favored commercial advertiser." *Id.* at 27; *see Hernstadt v. FCC*, 677 F.2d 893, 898 (D.C. Cir. 1980).

Congress has given the Federal Communications Commission authority to "prescribe appropriate rules and regulations to carry out" the LUC requirement. 47 U.S.C. § 315(d). The FCC has issued various rules and orders implementing this provision. *See*, *e.g.*, 47 C.F.R. §§ 73.1942, 76.206; *The Law of Political Broadcasting & Cablecasting: Political Primer*, 100 F.C.C.2d 1476 (1984) (*Political Primer*); *Codification of the Commission's Political Programming Policies*, 7 FCC Rcd. 678 (1991) (*1991 Political Programming Order*), *on reconsideration*, 7 FCC

Rcd. 4611 (1992) (*1992 Political Programming Order*). The agency has also occasionally issued public notices in the run-up to federal elections to remind broadcasters about their obligations under Section 315(b). *E.g.*, Public Notice, *Licensees and Cable Operators Reminded of Lowest Unit Charge Obligations*, 4 FCC Rcd. 3823 (1988); Public Notice, *Media Bureau Provides Guidance on Political Advertising Lowest Unit Charge During Coronavirus (COVID-19) Pandemic*, 35 FCC Rcd. 2899 (Media Bur. 2020).

If a broadcaster fails to comply with Section 315(b)'s LUC requirement, any aggrieved party may file a formal complaint to be adjudicated before the FCC. *Exclusive Jurisdiction with Respect to Violations of the Lowest Unit Charge Requirements*, 6 FCC Rcd. 7511, 7513–14 ¶¶ 21–25 (1991) (*Exclusive Jurisdiction Ruling*); *see, e.g., Complaint of Diane Feinstein*, 12 FCC Rcd. 10611 (1997). Because disputes that arise in the heat of a political campaign often require immediate resolution, however, formal complaints have been uncommon in recent years. As an alternative, the agency provides for parties to "obtain an oral staff opinion or ruling by placing a telephone call to" the Media Bureau's political programming staff. *Political Primer*, 100 F.C.C.2d at 1478 ¶ 5.

## B. Factual Background And Proceedings Below

1. On March 30, 2026, in anticipation of the upcoming election season, the FCC's Media Bureau issued a public notice "to remind broadcasters and the public about the FCC's lowest unit charge (LUC) requirement[]." JA1. The Media Bureau stated that the LUC requirement "[is] applicable to (1) authorized committees, including authorized committees that engage in joint fundraising with legally qualified candidates for federal office, and (2) advertisements that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office." *Ibid.*

Joint fundraising committees (JFCs) are committees authorized to raise funds jointly with other candidates, committees, or organizations. 11 C.F.R. § 102.17(a)(1)(i). The Federal Election Campaign Act (FECA) expressly permits a federal candidate to designate a JFC as an "authorized committee." 52 U.S.C. § 30102(e)(3)(A)(ii); *see also id.* §§ 30101(6), 30102(e)(1). The Bureau observed that Section 315(b)(2) of the Communications Act "explicitly defines the term 'authorized committee' as having the same meaning given to it by" FECA. JA1 (citing 47 U.S.C. § 315(b)(2)(F)). And because Section 315(b) "repeatedly refers to candidates and their authorized committees as sharing the rights it

confers," the FCC "has long held that the LUC provisions of section 315(b) apply to both candidates and their authorized campaign committees," including JFCs purchasing airtime for use by one of their participating candidates. *Ibid.* (citing *1992 Political Programming Order*, 7 FCC Rcd. at 4613–14 ¶ 23).

The Bureau also "restate[d]" previous "guidance regarding LUC eligibility for candidate–party coordinated ads," JA2, in which a candidate and his or her political party's national or state committees together purchase airtime for the campaign's use.[2] Although "[a]dvertising time purchased by political parties as an *independent* expenditure is not entitled to LUC," because independent expenditures "involve no coordination between the party and a candidate," the Media Bureau explained that "[b]y contrast, * * * candidate–party *coordinated*

---

[2] *See* 52 U.S.C. § 30116(d) (permitting political party committees to make "expenditure[s] in connection with the general election campaign of" party nominees); 11 C.F.R. §§ 109.30–.32 (same); *see also* 11 C.F.R. § 109.20 (defining "coordinated" as "in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, [or] a candidate's authorized committee"); *id.* § 109.37(b)(2) (treating a "party coordinated communication" as a "coordinated party expenditure"). While these provisions purport to limit the permissible amount of coordinated expenditures, those limits were invalidated by the Supreme Court in *National Republican Senatorial Committee v. FEC*, 609 U.S. ---, 2026 WL 1868932 (2026) (*NRSC v. FEC*).

advertisements are subject to the LUC provision, provided that the ad otherwise complies with" the requirements of Section 315(b) and the Commission's implementing rules. *Ibid.* (emphasis added).

2. Petitioners are four political candidates running for federal office. Petitioners do not contend that they themselves are adversely regulated by the LUC requirement or the Media Bureau's understanding of it; after all, the Public Notice affirms their right to receive the best available rates for their campaign ads. Instead, Petitioners apparently object because they believe they will not do as good a job of taking advantage of the LUC requirement as their opponents.

On April 29, Petitioners filed an application for review of the Public Notice by the full Commission. *See* App. for Review, *reprinted at* Pet. Ex. B (Doc. No. 3-3). Petitioners did not make significant efforts to alert the agency to the potential urgency of this matter. They did not file a motion to expedite before the agency, as they have done in this Court. Nor did Petitioners ever ask the agency to stay the Public Notice pending the Commission's review. Petitioners' counsel did not contact agency staff, either before or after filing their application for review, to call attention to the need for a decision or to inquire about its status. Petitioners instead included just three sentences, buried on the final page of their

application for review, urging the agency to act "promptly." App. for Review at 19.

On June 19—just 51 days after filing their application for review, and without waiting for the Commission to rule on it—Petitioners filed their petition for review in this Court.

## STANDARD OF REVIEW

Petitioners bear the burden of establishing that the Court has jurisdiction over their petition for review, including that they have standing to challenge the Public Notice. *Wild Va. v. CEQ*, 56 F.4th 281, 293 (4th Cir. 2022) (citing *Renee v. Geary*, 501 U.S. 312, 316 (1991)); *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005).

Questions of statutory interpretation are ordinarily reviewed *de novo*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). "In exercising such judgment," courts may appropriately "seek aid from the interpretations of" the implementing agency. *Id.* at 394; *see also id.* at 412–13. Because this case falls outside the Court's statutory jurisdiction under the Hobbs Act, *see infra* Part I.A, however, Petitioners could seek relief only (if at all) under the All Writs Act, which requires—among other things—that Petitioners "show[] [their] right to issuance of the writ

is 'clear and indisputable'" and that "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380–81 (2004) (some internal quotation marks omitted); *cf. NRC v. Texas*, 605 U.S. 665, 681–82 (2025) (nonstatutory review "is essentially a Hail Mary pass" that "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute") (internal quotation marks omitted).

## SUMMARY OF THE ARGUMENT

**I.** The petition for review should be dismissed at the threshold for lack of jurisdiction.

**A.** The Court lacks jurisdiction over Petitioners' petition for review under the Hobbs Act because that statute confers jurisdiction over only "final orders" of the "Commission," 28 U.S.C. §§ 2342(1), 2344; 47 U.S.C. § 402(a), and this staff-level Public Notice is neither. It is not a final order because Petitioners have sought review of the Media Bureau's notice by the full Commission, which is still pending, so the notice is not the consummation of the agency proceeding. And the Media Bureau notice, issued by staff in a subordinate Bureau rather than by the Commission itself (*i.e.*, the FCC's "commissioners appointed by the

- 13 -

President," 47 U.S.C. § 154(a)), is not an order "of the Commission." Other provisions of the Communications Act reinforce that when an action is taken by FCC staff acting on delegated authority, "an application for review [by the full Commission] shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation." 47 U.S.C. § 155(c)(7). These overlapping requirements reflect Congress's decision to foreclose judicial review until all agency proceedings have been completed, up to and including full Commission review—as courts of appeals in other circuits have squarely held. *E.g.*, *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387 (D.C. Cir. 1999) (per curiam); *Ala. Power Co. v. FCC*, 311 F.3d 1357, 1366 (11th Cir. 2002).

**B.** Petitioners also have not established standing to challenge the Public Notice. Petitioners themselves are not adversely regulated by the Public Notice, which instead *benefits* them by affirming their campaigns' right to make coordinated or joint purchases of airtime at the lowest rate. Nor do Petitioners contend that the Public Notice denies them a benefit it gives to others or otherwise discriminates against them. Instead, Petitioners oppose the Public Notice because their opponents will receive the same treatment; given an equal opportunity to compete, the

Petitioners speculate that they will not perform as well as their opponents (even though, at this point in the election cycle, the relative spending and performance of the parties remains to be seen).

Supreme Court precedent makes clear that litigants generally do not have Article III standing to challenge government action because *someone else* is receiving an allegedly unlawful benefit, as Petitioners seek to do here, if the law offers the same benefits to the complaining parties and does not discriminate against them. This case is on all fours with the Supreme Court's holding in *McConnell v. FEC*, 540 U.S. 93 (2003), that candidates could not challenge an evenhanded increase in contribution limits on the theory that it would "deprive them of an equal ability to participate in the election process" compared to their better-resourced opponents, finding "no[] * * * legally cognizable right" was implicated because "political free trade does not necessarily require that all who participate in the political marketplace do so with exactly equal resources." *Id.* at 227 (internal quotation marks omitted).

As in *McConnell*, Petitioners have identified no personal, cognizable injury here. They do not claim to have been made to compete on an unequal playing field or otherwise to have been discriminated against. Nor has the government changed the size or bounds of the

playing field and forced Petitioners to compete against new or different competitors. And Petitioners' claim that they will be injured by enabling more political speech falls outside the zone of interests protected by Section 315(b), which seeks not to protect candidates from political advertising, but instead to facilitate more of it.

**II.** If the Court reaches the merits, it should deny the petition for review because the Media Bureau's description of the LUC requirement in the Public Notice—which seeks only to "restate previous [informal] guidance," JA2, and which aligns with what has long been the prevailing practice among broadcasters—is consistent with Section 315(b).

Under the text of Section 315(b), the relevant inquiry is whether the broadcast airtime at issue is "for the use * * * by * * * a legally qualified candidate * * * in connection with his campaign." 47 U.S.C. § 315(b)(1). Candidate–party coordinated ads, in which a candidate and his or her political party's national or state committees together purchase airtime for the campaign's use, directly satisfy that test. So does the purchase of airtime by joint fundraising committees for use by one of their participating candidates. This conclusion is reinforced by Section 315(b)(2), which requires that, to receive the LUC rate, the candidate

must personally certify or approve the broadcast—ensuring that the candidate is ultimately responsible for its use. *See id.* § 315(b)(2).

Petitioners principally argue that candidate–party coordinated ads and JFCs should not receive the LUC rate because much of the cost of the airtime in such cases may be borne by the party committee or JFC, rather than paid by the candidate and his or her campaign. But the relevant question under Section 315(b) is whether the airtime is "for the use * * * by * * * a legally qualified candidate * * * in connection with his campaign," 47 U.S.C. § 315(b)(1), not who bears the cost of the time. The FCC has long understood and applied this distinction. *See*, *e.g.*, *Political Primer*, 100 F.C.C.2d at 1492 ¶ 34(*i*) (When "[a] political party buys TV time to distribute to individual candidates for use as they choose," this is "a use by a candidate" under Section 315).

## ARGUMENT

### I. THE PETITION FOR REVIEW MUST BE DISMISSED FOR LACK OF JURISDICTION.

Statutory prerequisites to the Court's jurisdiction and bedrock requirements of Article III standing each require that the petition for review be dismissed for lack of jurisdiction.

**A.** **The Court Lacks Jurisdiction To Review A Staff-Level Notice That Has Not Yet Been Reviewed By The Commission.**

Petitioners seek to invoke this Court's jurisdiction under the Administrative Orders Review Act, 28 U.S.C. §§ 2341–2353, commonly known as the Hobbs Act. *See* Pet. for Review at 1–2 (Doc. No. 3). But the Hobbs Act supplies jurisdiction to review only certain "final order[s]" of the "Commission." 28 U.S.C. §§ 2342(1), 2344; 47 U.S.C. § 402(a). Those twin requirements work in tandem (and with harmonious provisions of the Communications Act, 47 U.S.C. §§ 155(c)(7) and 405(a)) to provide for streamlined judicial review of FCC orders only after completion of the Commission's proceedings.

The Hobbs Act's jurisdictional grant is not satisfied here for two reasons. First, the Media Bureau notice is not "final," judicially reviewable action because Petitioners sought further review from the Commission, and the Commission has not yet acted on that request. *See Stone v. INS*, 514 U.S. 386, 392 (1995); *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999) (per curiam). Second, because the notice is at most staff-level action issued by a subordinate bureau, not a decision issued by the Commission itself, Petitioners may not appeal the notice directly to this Court without first obtaining a decision from the full

Commission. *Ala. Power Co. v. FCC*, 311 F.3d 1357, 1366 (11th Cir. 2002); *Int'l Telecard*, 166 F.3d at 387–88; *see* 47 U.S.C. § 155(c)(7). Because the Court lacks jurisdiction to review the Media Bureau notice, the petition for review must be dismissed for lack of jurisdiction.

### 1. The notice is not a reviewable final order because Commission review is still pending.

The notice is not a final order under the Hobbs Act because Petitioners sought further administrative review (which is "a condition precedent to judicial review," 47 U.S.C. § 155(c)(7)) and the Commission has not yet completed that proceeding.

The Supreme Court has held that, under the Hobbs Act, "a motion [for the agency] to reconsider renders the underlying order nonfinal for purposes of judicial review." *Stone*, 514 U.S. at 392 (citing *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 284 (1987)). Thus, "a party who has sought rehearing cannot seek judicial review until the rehearing has concluded." *Ibid.* That rule applies equally here, where Petitioners filed an application for review seeking reconsideration of the Media Bureau notice by the full Commission. *Int'l Telecard*, 166 F.3d at 388. Because "a party may not simultaneously seek both agency reconsideration and judicial review of an agency's order," a "petition for judicial review filed

during the pendency of a request for agency reconsideration will be dismissed for lack of jurisdiction." *Wade v. FCC*, 986 F.2d 1433, 1433 (D.C. Cir. 1993) (per curiam).

Petitioners insist that the Public Notice is final because they believe it to have "real-world impacts" (Br. 34–35) and because it remains in effect (Br. 36–37) unless the agency grants a stay pending review (which Petitioners never asked for, *cf.* 47 C.F.R. § 1.102(b)). But allegations that an agency's action has present consequences are not enough to make it "final." Rather, the established test for finality requires that two separate conditions be met. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation and internal quotation marks omitted). And "second, the action must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Id.* at 178. *Both* conditions must be satisfied for an agency order to be final and subject to review, as the Court has recognized. *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. EPA*, 313 F.3d 852, 858 (4th Cir. 2002).

Petitioners' invocation of alleged consequences, focused exclusively on the second prong, entirely ignores the first. And that first prong plainly is not satisfied here: The challenged Public Notice is not the consummation of the agency proceeding, because the application for further administrative review by the Commission is still pending.

The Supreme Court in *Stone* cited two cases well exemplifying the point. *See* 514 U.S. at 391–92. In *Locomotive Engineers*, unions challenged agency orders that allowed certain trains to operate using non-union crews, "effective 'immediately upon consummation of'" proposed mergers; the Court held that a motion to reopen "render[ed] the orders under reconsideration nonfinal," even though the order was by then already in effect and trains were running with non-union crews. 482 U.S. at 273–76, 284–285. Similarly, in *United Transportation Union v. ICC*, 871 F.2d 1114 (D.C. Cir. 1989), a petition for reconsideration of an agency decision precluded the filing party from seeking judicial review while reconsideration was pending—even after the agency refused to stay the underlying order in the meantime. *Id.* at 1116–18 (cited by *Stone*, 514 U.S. at 392). The Media Bureau's Public Notice thus remains

interlocutory and nonfinal until the Commission rules on the application for review.[3]

### 2. The notice is not reviewable because it is staff-level action that has not been reviewed by the Commission.

The Court also lacks jurisdiction under the Hobbs Act because the Media Bureau notice is not an order "of the Commission." 47 U.S.C. § 402(a); *see* 28 U.S.C. § 2342(1) (incorporating Section 402(a)). The "Commission," in this context, means the FCC's "commissioners appointed by the President," 47 U.S.C. § 154(a), not action taken by staff in a subordinate Bureau. "When Congress says 'the Commission,' it means

---

[3] Petitioners also have not shown that the Public Notice has "legal consequences" under *Bennett*'s second prong, as opposed to mere practical effects. Petitioners err (Br. 31–34) in characterizing the Public Notice as a legislative rule; it instead amounts to an interpretive rule or statement of policy. 5 U.S.C. § 553(b)(A); *see Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 263 (4th Cir. 2020) ("Interpretive rules are those 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'"). The Public Notice is not self-enforcing and does not itself have the force of law, but instead advises how agency staff may assess future complaints. A person who believes they were improperly denied the LUC rate may file a formal complaint, but that would be just the same without the Public Notice or if the Public Notice were vacated. Action on such a complaint would take the form of a forfeiture order under 47 U.S.C. § 503(b), *see Exclusive Jurisdiction Ruling*, 6 FCC Rcd. at 7514 ¶ 25, which then has legal effect and could be contested in court. *See FCC v. AT&T, Inc.*, 146 S. Ct. 1418 (2026).

the Commission," not "delegated subdivisions" of the Commission. *NTCH, Inc. v. FCC*, 877 F.3d 408, 413 (D.C. Cir. 2017). "The Bureau's order [is] not a Commission order and, therefore, it [is] not an order subject to judicial review." *Ibid.*

The Hobbs Act's requirement is reinforced by Section 5(c)(7) of the Communications Act, which provides that when an action is taken by FCC staff acting on delegated authority, "[t]he filing of an application for review [by the full Commission] shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation." 47 U.S.C. § 155(c)(7). While the start of this provision speaks of "filing" an application for review, courts have construed Section 5(c)(7) to require that "petitioners must give the Commission an opportunity to issue a final decision; otherwise, the statutory prerequisite would be rendered useless." *Ala. Power*, 311 F.3d at 1366; *see also Int'l Telecard*, 166 F.3d at 387–88 (rejecting argument "that the act of filing an application for Commission review satisfies the statutory prerequisite to judicial review, and that petitioners need not await the Commission's decision"). That aligns with the next sentence of Section 5(c)(7), which contemplates that "[t]he time within which a petition for review must be filed" runs "from the date upon which public notice is given of orders

*disposing of* all applications for review."  47 U.S.C. § 155(c)(7) (emphasis added).  Thus, contrary to Petitioners' protests (Br. 37–38), "[t]he mere act of filing an application alone does not satisfy the jurisdictional prerequisite" for obtaining judicial review.  *Ala. Power*, 311 F.3d at 1366.[4]

To the same effect is Section 405(a) of the Communications Act.  That provision states that "[t]he filing of a petition for reconsideration shall not be a condition precedent to judicial review * * * except where the party seeking such review * * * relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass."  47 U.S.C. § 405(a)(2); *see, e.g.*, *Qwest Corp. v. FCC*, 482 F.3d 471, 474–77 (D.C. Cir. 2007).  The arguments Petitioners seek to raise here and in their application for review were not before the Media Bureau when it issued the Public Notice, so the Media Bureau had no opportunity to pass on them.  And though Petitioners have sought reconsideration of the Media Bureau

---

[4]  Petitioners are incorrect (Br. 40–42) that this is a mere "judge-made" requirement that the Court is free to ignore.  On the contrary, as *Alabama Power* explained, the requirement to obtain a final decision from the Commission results directly from Section 5(c)(7); it is not a matter of judicial discretion.  311 F.3d at 1366.  And as Petitioners' own authority confirms, courts have no authority to grant exceptions to statutorily created (as opposed to "judge-made") requirements. *Ross v. Blake*, 578 U.S. 632, 639 (2016).

notice by the Commission, they have not waited for the Commission to rule on that application for review.

These overlapping provisions each make clear that "Congress did not intend [for] the court [to] review a staff decision that has not been adopted by the Commission itself." *Int'l Telecard*, 166 F.3d at 388 (quoting *Richman Bros. Records, Inc. v. FCC*, 124 F.3d 1302, 1304 (D.C. Cir. 1997)). Congress sought "to ensure that if a delegated authority, such as the [Media] Bureau, renders a decision, the Commission itself has the opportunity to review the decision before [a] Court considers it." *Environmentel, LLC v. FCC*, 661 F.3d 80, 83–84 (D.C. Cir. 2011). In doing so, Congress "prevent[ed] a party from appealing directly to this Court from a decision made by a delegated authority." *Id.* at 84.[5]

---

[5] As explained in the FCC's motion to dismiss (Doc. No. 17, at 8–9), the lack of a final Commission order also renders the petition for review untimely. The language of the Hobbs Act establishes a fixed filing window, not a mere deadline, and so courts lack jurisdiction to consider a petition filed before that period begins. *W. Union Tel. Co. v. FCC*, 773 F.2d 375, 377–78 (D.C. Cir. 1985) (Scalia, J.); *Horsehead Res. Dev. Co. v. EPA*, 130 F.3d 1090, 1091 (D.C. Cir. 1997). As a result, a petition for review filed prior to entry of a final Commission order is "incurably premature" and must be dismissed for lack of jurisdiction. *See, e.g., Council Tree Commc'ns v. FCC*, 503 F.3d 284, 287–89, 291 (3d Cir. 2007) (citing *Western Union*); *TeleSTAR, Inc. v.*
(cont'd)

### 3. Petitioners' "constructive denial" fallback argument is likewise unavailing.

As a fallback, Petitioners urge the Court to "treat the Commission's silence as a constructive denial," characterizing it as "an outright denial * * * [f]rom Petitioners' [own] perspective." Br. 54–55 (internal quotation marks omitted). But under the Communications Act, there is no such thing as a "constructive denial" of an application for Commission review. Section 5(c)(4) of the Act requires that "every such application shall be passed upon by the Commission." 47 U.S.C. § 155(c)(4). If the Commission has not yet ruled on an application, that simply means the Commission has not yet ruled on the application. Indeed here, had Petitioners inquired with agency staff, they would have been informed that the Commission has not yet issued a decision on their application and that it remains pending before the agency. *See* 47 C.F.R. § 1.1202(a) (permitting inquiries about "the status of a proceeding, including inquiries as to the approximate time that action in a proceeding may be taken").

---

*FCC*, 888 F.2d 132, 133–34 (D.C. Cir. 1989) (per curiam). Petitioners are therefore incorrect (Br. 4) that their "appeal [*sic*] is timely because the 60-day clock to seek review ha[s] not yet started" (Br. 4), when instead their premature petition fails to confer Hobbs Act jurisdiction.

Petitioners' citations (Br. 55) to a few cases considering constructive denials under other statutory schemes do not speak to this one. Petitioners cite no case in the 92-year history of the Communications Act finding that an application for review can be "constructively denied" when the FCC has not actually denied it, and we are aware of none. That is unsurprising, given the Act's requirement that "every such application shall be passed upon by the Commission." 47 U.S.C. § 155(c)(4).

Petitioners may not impose their own deadline for agency action and then, if their demands are not satisfied, unilaterally declare that the agency has "constructively" issued a decision on an application that remains pending. Instead, if a party believes that the agency has failed to act within a reasonable period of time, it can seek an order directing the agency to act promptly, which may be granted if the situation meets "the demanding standard required for [the Court] to interfere with the agency process." *In re Va. Beach*, 42 F.3d 881, 885–88 (4th Cir. 1994); *but see id.* at 885–86 (even prolonged review does not permit judicial relief where the agency "ha[s] been occupied with legitimate agency tasks").

Absent a final order from the Commission, Petitioners may seek relief from this Court only (if at all) under the All Writs Act. But Petitioners "have not even attempted to comply with the many procedural requirements for filing a petition for a writ of mandamus," which "should 'not be used as a substitute for the regular appeals process.'" *McEvoy v. Diversified Energy Co. PLC*, 111 F.4th 330, 337 (4th Cir. 2024); *see* Fed. R. App. P. 21(a). Nor have Petitioners come close to making the required showing. The exercise of mandamus authority is "reserved for 'extraordinary causes.'" *South Carolina v. United States*, 907 F.3d 742, 754 (4th Cir. 2018). It is a "drastic" remedy "available only in 'extraordinary situations'" and "hardly ever granted." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) (some internal quotation marks omitted). "[T]hose invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief; and even if the [petitioner] overcomes all these hurdles, whether mandamus relief should issue is discretionary." *Ibid.*; *see Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380–81 (2004). Thus, even had Petitioners sought mandamus relief under the All Writs Act here, they would not have met the exacting standard to warrant such extraordinary relief.

### B. Petitioners Lack Standing To Challenge The Media Bureau's Reading Of The LUC Requirement.

This Court also lacks jurisdiction because Petitioners have failed to demonstrate standing to challenge the Public Notice.[6] To satisfy "the irreducible constitutional minimum of standing," Petitioners must demonstrate an "injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). The claimed injury must be "personal, particularized, concrete, and otherwise judicially cognizable." *Raines v. Byrd*, 521 U.S. 811, 820 (1997). Petitioners must also show causation, meaning that the injury is "fairly traceable to the challenged action," and redressability, requiring that it is "likely * * * the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (alterations and internal quotation marks omitted).

This means, first and foremost, that a plaintiff must identify a "personal" and "cognizable" injury from the challenged action. *Raines*,

---

[6] Petitioners are well aware that there are serious questions as to their standing—having briefed the issue before the Commission (see App. for Review at 17–19) and after the FCC alerted them to the issue in our motion to dismiss (Doc. No. 17 at 5 n.1)—yet they fail to address standing anywhere in their opening brief. They have thereby waived this issue. *See, e.g., Wild Va. v. CEQ*, 56 F.4th 281, 293, 302 (4th Cir. 2022); *Ali v. Hogan*, 26 F.4th 587, 595 n.6 (4th Cir. 2022) (citing *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017)).

521 U.S. at 820–21; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379–80 (2024). "[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright*, 468 U.S. 737, 754 (1984) (citing, *inter alia, Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974)); *accord All. for Hippocratic Med.*, 602 U.S. at 381.

Litigants therefore generally do not have standing to challenge government action because *someone else* is receiving an allegedly unlawful benefit if the law offers them the same benefits and does not discriminate against them. *See, e.g.*, *Hollingsworth v. Perry*, 570 U.S. 693, 704–07 (2013); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–90 (1982). Thus, for example, the Supreme Court has held that parents of children in public schools lacked standing to challenge policies allegedly benefitting discriminatory private schools. *Allen v. Wright, supra*, 468 U.S. 737.

Petitioners, however, are not themselves adversely regulated by the Public Notice they challenge.[7] On the contrary, insofar as the Public

---

[7] This case is thus unlike the Supreme Court's decision in *Bost v. Illinois State Board of Elections*, 607 U.S. 71 (2026), where the Court

(cont'd)

Notice applies to Petitioners themselves, the Media Bureau's reading of the LUC requirement *benefits* Petitioners by affirming their campaigns' right to make coordinated or joint purchases of airtime at the lowest rate. The LUC requirement does restrict *broadcasters* from charging higher rates, so a broadcaster who objects to charging the LUC rate might be a proper plaintiff—but no broadcaster seeks judicial review here. Nor in any event do Petitioners offer statements from any broadcasters saying that they have changed their rates due to the Public Notice, or representing that they will charge non-LUC rates if the Public Notice is set aside. And to the extent broadcasters independently share or do not object to the understanding of the LUC requirement reflected in the Public Notice, Petitioners cannot clearly show causation or redressability either. *See Marshall v. Meadows*, 105 F.3d 904, 906–07 (4th Cir. 1997).

Absent a direct and personal injury, Petitioners seek to invoke notions of competitor standing (Br. 49–50), but competitor standing does not apply to the situation here. "[T]he doctrine [of competitor standing]

---

held that a political candidate had standing to challenge rules governing the counting of votes for and against him. The plaintiff there was objecting to rules that operated directly on his campaign, not to their operation on someone else. That holding does not extend to the very different situation here.

- 31 -

is an *application* of Article III standing principles, not a *relaxation* of them." *In re Trump*, 958 F.3d 274, 325 (4th Cir. 2020) (en banc) (Niemeyer, J., dissenting), *vacated as moot*, 592 U.S. 1233 (2021). Competitor standing allows a plaintiff to challenge a policy that makes a benefit available to its competitor but not to the plaintiff, forcing the plaintiff to compete on an unfair playing field. *See Price v. City of Charlotte*, 93 F.3d 1241, 1248 (4th Cir. 1996) (finding standing where plaintiffs "were not competing on a level playing field"). Thus, for example, in *Davis v. FEC*, 554 U.S. 724 (2008), the Supreme Court found that a political candidate had standing to challenge "asymmetrical" contribution limits that would have allowed his opponent to accept contributions up to three times as large as he was allowed to accept. Those limits would have "burden[ed] [the candidate] by allowing his opponent to receive contributions on more favorable terms" than he was allowed. *Id.* at 734.

This case is very different. Petitioners do not contend that they are being discriminated against or made to compete on an unequal playing field. The LUC requirement as described in the Public Notice applies the same to all candidates and parties, and Petitioners are entitled to the same rates and benefits as their opponents.

Petitioners appear to complain that, given an equal opportunity to compete, they may be outmatched by their opponents.  At this time, with the relative spending of the parties through the end of the election season still unknown, that remains to be seen and is impermissibly speculative. But even assuming Petitioners' fears are right, this theory of injury is foreclosed by *McConnell v. FEC*, 540 U.S. 93 (2003).  There, the Supreme Court held that candidates could not challenge an evenhanded increase in contribution limits on the theory that it would "deprive them of an equal ability to participate in the election process" compared to their better-resourced opponents, finding "no[] * * * legally cognizable right" was implicated because "political free trade does not necessarily require that all who participate in the political marketplace do so with exactly equal resources."  *Id.* at 227 (internal quotation marks omitted).  The same is true here.

Petitioners also cannot reasonably contend that the government changed the size or bounds of the playing field and so forced Petitioners to compete against new or different competitors.  Political parties have always played a prominent role in political campaigns and have long engaged in coordinated advertisements to influence elections.  The Media Bureau simply restated that the existing practices of candidate–party

- 33 -

coordinated ads and JFCs are subject to the same rates as other uses of broadcast airtime by candidates for public office.

Neither the Supreme Court nor this Court has ever held that a competitor has standing to challenge an evenhanded and nondiscriminatory policy just because such a policy may happen to benefit someone else. On the contrary, the Supreme Court has rejected "the theory * * * that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful," cautioning that "[w]e have never accepted such a boundless theory of standing." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013).

Petitioners rely (Br. 50) on the D.C. Circuit's decision in *Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005), but that case is inapposite. *Shays* involved provisions of the Bipartisan Campaign Reform Act in which Congress sought to restrict or prohibit particular campaign practices. The court emphasized that these provisions were specifically designed to "protect[] [candidates] from prohibited campaign practices" and to provide "a statutory right to 'fair decisionmaking.'" *Id.* at 83–84, 94. The plaintiff candidates thus argued that FEC regulations relaxing or undermining those restrictions caused them to "suffer injury to a statutorily protected interest." *Id.* at 85; *accord ibid.* ("they suffer injury

to their interest[] protected by that statute"). On that basis, the court found standing on the theory that "Congress may enact statutes creating legal rights, the invasion of which creates standing, *even though no injury would exist without the statute.*" *Id.* at 89 (emphasis added) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)); *see also id.* at 85 (standing exists "when a statute 'reflects a legislative purpose to protect a competitive interest'") (brackets omitted); *id.* at 89 ("[B]y banning certain campaign practices, Congress has created such rights."). And the court purported to distinguish *McConnell v. FEC* specifically on this basis. *See id.* at 88–89; *but see id.* at 118–23 (Henderson, J., dissenting).

Here, the rights and interests addressed by Congress in Section 315(b) are entirely different. Rather than imposing a restriction on campaign activity, Section 315(b) seeks to promote more robust and widespread political messaging. *See* S. Rep. No. 92-96, at 20–21 (Section 315(b) aims to provide "greater access to the media" in order to "more fully and completely inform the voters"). Section 315(b) seeks not to protect candidates from political advertising, but instead to facilitate more of it. Given Section 315(b)'s aim of reducing barriers to political messaging, Petitioners' apparent claim that they will be injured by enabling more political speech falls outside the zone of interests protected by the statute.

## II. THE MEDIA BUREAU'S UNDERSTANDING OF THE LUC REQUIREMENT COMPLIES WITH SECTION 315(b).

If the Court reaches the merits, it should deny the petition for review because the description of the LUC requirement in the Public Notice is entirely consistent with Section 315(b).

### A. The Media Bureau Correctly Understood The LUC Requirement To Apply To Candidate–Party Coordinated Ads And Joint Fundraising Committees.

Under the text of Section 315(b) as written and enacted, the key inquiry is whether the broadcast airtime at issue is "for the use * * * by * * * a legally qualified candidate * * * in connection with his campaign." 47 U.S.C. § 315(b)(1). The Media Bureau correctly observed that "candidate–party coordinated ads," in which a candidate and his or her political party's national or state committees together purchase airtime for use of the candidate's campaign, squarely qualify for the LUC rate under that test. JA2. Whatever role a party committee may play in helping to produce or fund a coordinated advertisement, the "use" of airtime "by [the] candidate" for an advertisement "in connection with his campaign" qualifies for the LUC rate under the plain text of the statute. This is confirmed by Section 315(b)(2)'s requirement that, to receive the LUC rate, the candidate must personally certify or approve the

broadcast—ensuring that the candidate is ultimately responsible for its use. *See* 47 U.S.C. § 315(b)(2).

For the same reason, the Media Bureau was correct that joint fundraising committees (JFCs) that raise funds on behalf of multiple candidates, committees, or organizations are entitled to the LUC rate when purchasing airtime for use by a participating candidate. JA1–2. When a JFC purchases airtime for use by one of its participating candidates, the use of airtime by the candidate for an advertisement in connection with his or her campaign qualifies for the LUC rate under the plain text of the statute. And that conclusion is again confirmed by Section 315(b)(2)'s requirement that the candidate must personally certify or approve the broadcast for it to receive the LUC rate. *See* 47 U.S.C. § 315(b)(2).[8]

---

[8]   As to JFCs, the Media Bureau noted that this conclusion finds additional support in subprovisions of Section 315(b) that repeatedly treat "the candidate" and "any authorized committee of the candidate" together. JA1; *see* 47 U.S.C. § 315(b)(2)(A), (B), (E). Section 315(b)(2) provides that "authorized committee" has the same meaning as under FECA. *Id.* § 315(b)(2)(F). And under FECA, JFCs may be designated as "authorized committees" of the authorizing candidates. 52 U.S.C. § 30102(e)(3)(A)(ii); *see also id.* §§ 30101(6), 30102(e)(1).

While the text of Section 315(b) standing alone is dispositive, the prevailing practice among regulated entities and the agency's past understanding both reinforce the Media Bureau's reading. We understand that applying the LUC rate to candidate–party coordinated advertisements has long been the prevailing practice among broadcasters. For example, the National Association of Broadcasters— the chief national trade association for television and radio broadcasters in the United States—advises members in its *Political Broadcasting Handbook* (formerly known as the *Political Broadcasting Catechism*) that "[t]he national political parties and their campaign committee[s] have limited 'hard money' funds; ads paid for from those funds can be coordinated with a federal candidate and would, if they are, be entitled to the LUC."[9] And consistent with our understanding of existing practice, the Public Notice accords with "previous Media Bureau guidance regarding LUC eligibility for candidate–party coordinated ads" in

---

[9]  Nat'l Ass'n of Broads., *Political Broadcasting Catechism* 36 (18th ed. 2014); *accord* Nat'l Ass'n of Broads., *Political Broadcasting Handbook* 19 (19th ed. 2024).  This handbook is a commercially available industry guide, but because it might not be readily accessible to the Court, we are also moving to lodge excerpts from the handbook as an attachment to this brief pursuant to Fourth Circuit Rule 28(b).

response to informal inquiries from regulated parties.[10]  JA2.  The prevailing practice and understanding among those who have been practicing in the field thus further confirm that the Public Notice comports with Section 315(b).

## B.  Petitioners' Arguments Lack Merit.

Petitioners' various counterarguments fail to grapple with or overcome the straightforward statutory text.

Petitioners principally argue (Br. 19–23, 25–26, 30–31) that candidate–party coordinated ad and JFCs should not receive the LUC rate because much of the cost of the airtime may be borne by the party committee or JFC, rather than paid by the candidate and his or her principal campaign committee.  But the relevant question under Section 315(b) is whether the airtime is "for the use * * * by * * * a legally qualified candidate * * * in connection with his campaign," 47 U.S.C. § 315(b)(1)— not how much of the cost the candidate bears.

---

[10]  Media Bureau staff inform us that they understand prior guidance to have been conveyed in informal oral opinions, *see Political Primer*, 100 F.C.C.2d at 1478 ¶ 5, rather than in any formal agency document. Tellingly, if parties were being *denied* the LUC rate for coordinated advertisements, an aggrieved party could have filed a formal complaint that would have resulted in a written ruling, but we know of no such complaints or rulings.

The FCC has long understood and applied this distinction. Since at least 1966, with respect to "use" in Section 315(a), the Commission has advised that when "[a] political party buys TV time to distribute to individual candidates for use as they choose," this is "a use by a candidate" under the statute. *Political Primer*, 100 F.C.C.2d at 1492 ¶ 34(*i*) (citing *Declaratory Ruling Concerning Section 315*, 23 F.C.C.2d 758 (1966)). And the Commission has understood the term "use" in Section 315(b) to mean the same thing as in Section 315(a). *Id.* at 1514 ¶ 66(b), 1519 ¶ 70(a); *see, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (discussing the "presumption that a given term is used to mean the same thing throughout a statute"); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995) (similar).

Petitioners argue (Br. 20–21) that treating candidate–party coordinated ads as the candidate's use would render the cost of the airtime an in-kind contribution that could potentially exceed the amount of FECA's contribution limits. That is incorrect. Federal law specifically provides that "[a]ny coordinated party expenditure * * * shall be *in addition to* * * * any [permissible] contribution by the national committee to the candidate." 11 C.F.R. § 109.32(a)(3)(ii), (b)(4) (emphasis added). This aligns with FECA's tripartite scheme for political party activity,

which adopts separate rules for contributions, coordinated expenditures, and independent expenditures. That a coordinated expenditure is coordinated with a candidate, and is not independent, simply makes it a coordinated expenditure, *see* 52 U.S.C. § 30116(d) (recognizing coordinated and independent expenditures), not a contribution. Petitioners' approach would improperly collapse FECA's three categories down to two by improperly treating coordinated party expenditures as contributions.[11]

Petitioners are also incorrect to suggest (Br. 22–23) that Congress's desire to reduce campaign costs for candidates means that Congress wanted to withhold the same benefit from those working in coordination with candidates. On the contrary, affording the LUC rate to candidate–party coordinated ads and JFCs substantially furthers Congress's stated purpose to help candidates "more fully and completely inform the voters" and "better explain their stand on the issues." S. Rep. No. 92-96, at 20–

---

[11] Petitioners' counsel previously pressed a similar argument in the Supreme Court that "coordinated party expenditures" are "functionally identical to contributions" and should be treated the same as contributions under the First Amendment. Br. for Intervenor-Respondents at 21–36, *NRSC v. FEC*, No. 24-621 (U.S. filed Sept. 29, 2025), *available at* 2025 WL 2808706. The Supreme Court disagreed. *See NRSC v. FEC*, *supra* note 2, 2026 WL 1868932.

21. And contrary to Petitioners' suggestion that this would harm broadcasters, Congress specifically designed Section 315(b) to ensure that broadcasters will not have to sell their airtime at a loss. *See id.* at 27 (the LUC requirement "does no more than place the candidate on par with a broadcast station's most favored commercial advertiser").

Petitioners contend (Br. 1, 21–22) that the Public Notice is in tension with a statement in the reply brief that the U.S. Solicitor General filed in *NRSC v. FEC*. Paraphrasing a representation by the intervenors in that case, who were represented by Petitioners' counsel here, the government's brief stated that Section 315(b) "require[s] broadcasters to charge low rates for candidate spending, but not for party spending— whether coordinated or independent." *NRSC* Reply Br. at 23. But Petitioners misconstrue that statement, which the Supreme Court did not address or rely on in its opinion. The statement concerned only "party spending"—that is, expenditures in the party's own name. Such spending can still be "coordinated" within the meaning of federal campaign finance law if, for example, the party "simply consults with the candidate on which time slot the advertisement should run for maximum effectiveness." *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 467 (2001) (Thomas, J., dissenting) (brackets, citation, and internal

quotation marks omitted).  Indeed, the full context of the reply brief confirms that the quoted statement focused on that scenario, which is not at issue here.  *See, e.g., NRSC* Reply Br. at 10 (observing that "a party makes a coordinated expenditure * * * when it consults with a candidate in developing an advertising campaign"); *id.* at 24 (discussing "[p]arty-coordinated expenditures, in which parties decide how to spend money after consulting with the candidate").  The public notice challenged here does not cover spending by the party in its own name after consultation with the candidate.  Instead, the notice focuses on two distinct types of spending—namely, advertisements purchased jointly by candidates and parties, or those purchased by joint fundraising committees.  To the extent Petitioners construe the reply brief as suggesting that Section 315(b) does not extend to such spending, that construction misinterprets the brief and, more importantly, misstates the law.

Finally, Petitioners contend (Br. 23, 34) that the Public Notice is at odds with two past FCC orders that, in Petitioners' reading, entitle only candidates or their campaigns to receive the LUC rate.  But Petitioners misread those orders by plucking phrases out of context.  In the first order, the Commission was contrasting "independently sponsored advertisements" that are "not authorized by candidates," which are not

entitled to the LUC rate, with "the lowest unit charge [that] inures to the benefit of candidates" when "the candidate controls his appearance on the air and therefore is properly viewed as having 'used' the station's facilities." *1991 Political Programming Order*, 7 FCC Rcd. at 685 ¶ 34 & n.54. Candidate–party coordinated ads and candidate-authorized JFCs plainly fall into the latter category (controlled or authorized by the candidate) rather than the former (independent and unauthorized). And the second order, issued on reconsideration of the first, simply reiterates the same distinction. *See 1992 Political Programming Order*, 7 FCC Rcd. at 4614 ¶ 23 ("if an independent entity produces an advertisement that includes an appearance by a candidate, that independent entity is not entitled to the LUC," whereas "candidates or their authorized campaign committees are entitled to the LUC"). Understood in context, neither order fairly supports Petitioners' view that *only* candidates themselves (or their campaigns) may ever receive the LUC rate—a position that would be impermissibly at odds with what the statute itself says.

**CONCLUSION**

The petition for review should be dismissed for lack of jurisdiction, or in the alternative denied.

Dated: July 20, 2026

Respectfully submitted,

/s/ *Scott M. Noveck*

D. Adam Candeub
   *General Counsel*

Jacob M. Lewis
   *Deputy General Counsel*

Sarah E. Citrin
   *Deputy Associate General Counsel*

Scott M. Noveck
   *Counsel*

Sharon Swingle
Jennifer Utrecht
   *Attorneys*

FEDERAL COMMUNICATIONS COMMISSION

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, APPELLATE STAFF
950 Pennsylvania Ave. NW
Washington, DC 20530

45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent*
   *United States of America*

*Counsel for Respondent Federal*
   *Communications Commission*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App.
    P. 32(a)(7)(B) because, excluding the parts of the document
    exempted by Fed. R. App. P. 32(f):

    ☒   this document contains <u>9,327</u> words, *or*

    ☐   this document uses a monospaced typeface and contains ____
        lines of text.

2.  This document complies with the typeface requirements of Fed. R.
    App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
    32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced
        typeface using <u>Microsoft Word for Office 365</u> in <u>14-point
        Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced
        typeface using _____ with _____.


                        <u>*/s/  Scott M. Noveck*</u>
                        Scott M. Noveck
                        *Counsel for Respondents*

**STATUTORY ADDENDUM**

# STATUTORY ADDENDUM CONTENTS

**Page**

28 U.S.C. § 2342 ...................................................................... Add. 2

28 U.S.C. § 2344 ...................................................................... Add. 2

47 U.S.C. § 155 ....................................................................... Add. 2

47 U.S.C. § 315 ....................................................................... Add. 3

47 U.S.C. § 402 ....................................................................... Add. 5

11 C.F.R. § 109.32 ................................................................... Add. 6

11 C.F.R. § 109.37 ................................................................... Add. 6

28 U.S.C. § 2342 provides in pertinent part:

### § 2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communication[s] Commission made reviewable by section 402(a) of title 47; * * *

\* \* \*

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

28 U.S.C. § 2344 provides in pertinent part:

### § 2344. Review of orders; time; notice; contents of petition; service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. * * *

47 U.S.C. § 155 provides in pertinent part:

### § 155. Commission

\* \* \*

**(c) Delegation of functions; exceptions to initial orders; force, effect and enforcement of orders; administrative and judicial review; qualifications and compensation of delegates; assignment of cases; separation of review and investigative or prosecuting functions; secretary; seal**

(1) When necessary to the proper functioning of the Commission and the prompt and orderly conduct of its business, the Commission may, by published rule or by order, delegate any of its functions * * * to a panel of commissioners, an individual commissioner, an employee board, or an individual employee, including functions with

respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter; * * *

\* \* \*

(4) Any person aggrieved by any such order, decision, report or action may file an application for review by the Commission * * *, and every such application shall be passed upon by the Commission. * * *

\* \* \*

(7) The filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection. The time within which a petition for review must be filed * * * shall be computed from the date upon which public notice is given of orders disposing of all applications for review filed in any case.

\* \* \*

47 U.S.C. § 315 provides in pertinent part:

## § 315. Candidates for public office

\* \* \*

### (b) Charges

#### (1) In general

The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election, to such office shall not exceed—

(A) subject to paragraph (2), during the forty-five days preceding the date of a primary or primary runoff election and during the sixty days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period; and

(B) at any other time, the charges made for comparable use of such station by other users thereof.

**(2) Content of broadcasts**

**(A) In general**

In the case of a candidate for Federal office, such candidate shall not be entitled to receive the rate under paragraph (1)(A) for the use of any broadcasting station unless the candidate provides written certification to the broadcast station that the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office, in any broadcast using the rights and conditions of access under this chapter, unless such reference meets the requirements of subparagraph (C) or (D).

**(B) Limitation on charges**

If a candidate for Federal office (or any authorized committee of such candidate) makes a reference described in subparagraph (A) in any broadcast that does not meet the requirements of subparagraph (C) or (D), such candidate shall not be entitled to receive the rate under paragraph (1)(A) for such broadcast or any other broadcast during any portion of the 45-day and 60-day periods described in paragraph (1)(A), that occur on or after the date of such broadcast, for election to such office.

**(C) Television broadcasts**

A candidate meets the requirements of this subparagraph if, in the case of a television broadcast, at the end of such broadcast there appears simultaneously, for a period no less than 4 seconds—

(i) a clearly identifiable photographic or similar image of the candidate; and

(ii) a clearly readable printed statement, identifying the candidate and stating that the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast.

**(D) Radio broadcasts**

A candidate meets the requirements of this subparagraph if, in the case of a radio broadcast, the broadcast includes a personal audio statement by the candidate that identifies the candidate, the office the candidate is seeking, and indicates that the candidate has approved the broadcast.

**(E) Certification**

Certifications under this section shall be provided and certified as accurate by the candidate (or any authorized committee of the candidate) at the time of purchase.

**(F) Definitions**

For purposes of this paragraph, the terms "authorized committee" and "Federal office" have the meanings given such terms by section 30101 of title 52.

\* \* \*

**(d) Rules and regulations**

The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section.

\* \* \*

47 U.S.C. § 402 provides in pertinent part:

**§ 402. Judicial review of Commission's orders and decisions**

**(a) Procedure**

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28.

\* \* \*

11 C.F.R. § 109.32 provides in pertinent part:

### § 109.32 What are the coordinated party expenditure limits?

(a) *Coordinated party expenditures in Presidential elections.*

\*    \*    \*

(3) Any coordinated party expenditure under paragraph (a) of this section shall be in addition to—

\*    \*    \*

(ii) Any contribution by the national committee to the candidate permissible under 11 CFR 110.1 or 110.2.

\*    \*    \*

(b) *Coordinated party expenditures in other Federal elections.*

\*    \*    \*

(4) Any coordinated party expenditure under paragraph (b) of this section shall be in addition to any contribution by a political party committee to the candidate permissible under 11 CFR 110.1 or 110.2.

\*    \*    \*

11 C.F.R. § 109.37 provides in pertinent part:

### § 109.37 What is a "party coordinated communication"?

\*    \*    \*

(b) *Treatment of a party coordinated communication.* A payment by a political party committee for a communication that is coordinated with a candidate, and that is not otherwise exempted under 11 CFR part 100, subpart C or E, must be treated by the political party committee making the payment as either:

\*    \*    \*

(2) A coordinated party expenditure pursuant to coordinated party expenditure authority under 11 CFR 109.32 in connection with the general election campaign of the candidate with whom it was coordinated, which must be reported under 11 CFR part 104.