No. 26-1785

# United States Court of Appeals for the Fourth Circuit

_____

SHERROD BROWN, JON OSSOFF, ROY COOPER, AND KRISTEN MCDONALD RIVET,
PETITIONERS,

*v.*

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,
RESPONDENTS,

NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE AND NATIONAL REPUBLICAN
SENATORIAL COMMITTEE,
RESPONDENT-INTERVENORS

_____

*ON PETITION FOR REVIEW OF A PUBLIC NOTICE BY THE
FEDERAL COMMUNICATIONS COMMISSION'S MEDIA BUREAU, DA 26-300*

_____

**BRIEF OF NATIONAL MEDIA RESEARCH, PLANNING & PLACE-
MENT; SMART MEDIA GROUP; AND FLEXPOINT MEDIA AS *AMICI
CURIAE* SUPPORTING RESPONDENTS**

_____

ERIN MORROW HAWLEY
JOHN S. EHRETT
*Lex Politica PLLC*
*700 Pennsylvania Avenue SE,*
*Ste 440*
*Washington, D.C. 20003*
*(512) 354-1783*
*ehawley@lexpolitica.com*
*jehrett@lexpolitica.com*

Counsel for *Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* National Media Research, Planning & Placement; Smart Media Group; and FlexPoint Media make the following disclosure regarding their corporate statuses:

National Media Research, Planning & Placement is not a publicly held corporation, has no parent corporations, and does not issue stock held by a publicly held corporation.

Smart Media Group is not a publicly held corporation, has no parent corporations, and does not issue stock held by a publicly held corporation.

FlexPoint Media is not a publicly held corporation, has no parent corporations, and does not issue stock held by a publicly held corporation.

Dated:  July 24, 2026

/s/ Erin Morrow Hawley
Erin Morrow Hawley

**TABLE OF CONTENTS**

**Page**

Corporate Disclosure Statement ...............................................................i

Table of Authorities ...................................................................... iii

Interest of *Amici Curiae* ...................................................................1

Introduction ....................................................................................1

Argument........................................................................................4

I.    Based on the Text of the Communications Act and FCC Regulations, Broadcasters Have Historically Offered LUC to both Coordinated Party Advertisements and to Authorized Committee Advertisements. ....................................4

    A.    The Plain Text of the Communications Act Treats Candidates and Their Authorized Committees as Functional Equivalents...................................6

    B.    For Decades, the FCC Has Treated Coordinated Party Ads as Eligible for LUC, Because the "Use" Is By the Candidate. ....................................10

    C.    For Decades, Broadcasters Have Treated Coordinated Party Ads as Eligible for LUC, Because the "Use" Is By the Candidate...........................11

    D.    JFCs Are "Authorized Committees" under FECA, and as Such, Broadcasters Have Treated JFC Ads as Eligible for LUC When the "Use" Is By the Candidate...........................14

II.    LUC Is Not—and Should Not Be—Offered to Issue Committees or Super PACs...........................17

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..........................................................................19

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94 (1973)
    (Brennan, J., dissenting) ...........................................................................5

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ......................................14

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .....................................14

*FEC v. Colo. Republican Fed. Campaign Comm.*, 41 F.Supp.2d 1197 (D.
    Colo. 1999), *rev'd on other grounds*, 533 U.S. 431 (2001) ...............................10

*Hernstadt v. FCC*, 677 F.2d 893 (D.C. Cir. 1981) .....................................................4

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ...............................................................16

*Nat'l Republican Senatorial Comm. v. FEC*, No. 24-621, 2026 WL 1868932
    (U.S. June 30, 2026) ...........................................................................11, 16

STATUTES

2 U.S.C. § 432(e)(1) ....................................................................................................7

47 U.S.C. § 315(b)(1) ...........................................................................................2, 4, 6

47 U.S.C. § 315(b)(1)(A) ........................................................................................4, 8

47 U.S.C. § 315(b)(2) ............................................................................................2, 6

47 U.S.C. § 315(b)(2)(C)(ii) ...................................................................................6, 7

47 U.S.C. § 315(b)(2)(F) ...........................................................................................15

52 U.S.C. § 30101(6) .................................................................................................15

52 U.S.C. § 30101(17)(B) ..........................................................................................19

52 U.S.C. § 30102(e)(1) .............................................................................................15

52 U.S.C. § 30102(e)(3)(A)(ii) ..................................................................................15

52 U.S.C. § 30125 ......................................................................................17, 18

**REGULATIONS**

11 C.F.R. § 102.13(a)(1) ....................................................................................15

11 C.F.R. § 110.11(b)(2) ......................................................................................8

11 C.F.R. § 110.11(c)(3) .......................................................................................8

11 C.F.R. § 110.3(a)(1)(i) ...................................................................................15

47 C.F.R. § 73.1941(b) .........................................................................................8

47 C.F.R. § 73.1942(b) .........................................................................................8

**OTHER AUTHORITIES**

Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, *Nuts 'n Bolts of Political Broadcasting* (2018) ..........................................................................13

David D. Oxenford, Davis Wright Tremaine LLP, *Political Broadcasting: Answering Your Questions on the FCC's Rules and Policies* (2009) ...............12

Erwin G. Krasnow & John Wells King, Garvey Schubert Barer, *2010 Political Broadcasting Handbook* (2010) ..........................................................12

FEC Advisory Op. 2024-07 (Team Graham) (Aug. 29, 2024) ...............................17

*FEC Form 2 (Statement of Candidacy)*, Fed. Elec. Comm'n (2009) ......................16

*Guide to Political Broadcasting Rules*, Lerman Senter PLLC (2024) ....................13

*In re Campaign '76 Media Commc'ns, Inc. v. Stations WGN & WGN-TV, Chi., Ill. Concerning Pol. Broad.*, 58 F.C.C.2d 1142 (1976) ..............................9

*In re Codification of the Comm'n's Political Programming Policies*, 7 FCC Rcd. 678 (1991) (Report & Order) .................................................................19

*In re Request by Hon. Bill Stuckey, Jr., House of Representatives, Washington, D.C. for Section 315 Fairness Ruling*, 35 F.C.C.2d 937 (1972) .......9, 10, 18

*In re Request for Declaratory Ruling Concerning Section 315, KWWL-TV, Waterloo, Iowa*, 23 F.C.C.2d 758 (1966) ........................................................11

*In the Matter of Codification of the Comm'n's Political Programming Policies*, 7 FCC Rcd. 4611 (1992)................................................................15, 20

Nat'l Ass'n of Broad., *Political Broadcast Catechism* (Ann Bobeck et al. eds., 16th ed. 2004) ...........................................................................12

*Public Notice DA 26-300*, Fed. Commc'ns Comm'n (Mar. 30, 2026)....................19

Robert K. Kelner, *The Practical Consequences of McCutcheon*, 127 Harv. L. Rev. F. 380 (2014) .............................................................................16

## INTEREST OF *AMICI CURIAE*

Amici National Media Research, Planning & Placement, Smart Media Group, and FlexPoint Media are media buyer organizations who contract with political committees to purchase advertising space from broadcasters. National Media Research, Planning & Placement is an audience intelligence and activation firm that focuses on audience location, definition, and outreach within a modern media environment. Smart Media Group is a media agency focused on data investment and digital retargeting to power political campaigns. FlexPoint Media is an omni-channel placement agency specializing in building media plans based on a client's target audience.

Media buyers serve as the connection point between political candidates and committees and the media outlets they wish to use to communicate their messages. In general, they liaise with advertisers—of whatever sort—to plan media spend and secure advertisement placement in a variety of channels, including broadcast and cable media. As media buyers, all three amici have extensive and longstanding experience navigating the FCC regulatory compliance landscape in the context of purchasing and planning political media airtime, and can speak to industry norms.[1]

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or any other person other than amicus, its members, or its counsel contributed money intended to fund preparing or submitting this brief. Amici curiae have conferred with counsel for petitioners, respondents, and intervenors, and counsel for each of those parties has indicated that they do not oppose the filing of this amicus brief by July 24, 2026.

**INTRODUCTION**

Petitioners ask this Court to rewrite years' worth of settled broadcast law in the middle of an election cycle—law which media buyers, broadcasters, and candidate campaigns have all followed, and relied upon, for decades.[2] The Court should decline. Under the plain text of the Communications Act, decades of FCC guidance, and longstanding industry practice, any advertisement authorized by a candidate and in which the candidate also appears is entitled to the lowest unit charge—regardless of which authorized entity pays. This has been broadcasters' unanimous position for countless election cycles and has informed amici's business practices for just as long.

The FCC's March 2026 policy guidance thus restates a longstanding principle that amici have relied on: candidates and their authorized committees may benefit from the lowest unit charge (LUC) offered by broadcasters when they purchase political advertising for the candidate. The plain text of the Communications Act protects a candidate's "use" of a broadcasting station and extends that protection to "any authorized committee." 47 U.S.C. § 315(b)(1)–(2). FCC regulations confirm that "use" by a candidate is the crucial inquiry—as does longstanding industry practice. Thus, both party-coordinated ads and JFC ads, which represent ways in which a candidate uses a broadcast facility, get the benefit of LUC.

---

[2]

Petitioners take the novel position that the Communications Act distinguishes between "candidates," which are entitled to LUC, and "committees," which are not. That reading fails. At the outset, amici agree with Intervenors that Petitioners failed to exhaust their administrative remedies, *see* Intervenors' Br. at 18-21, and write this brief separately to explain longstanding industry practice. Amici believe that Petitioners' argument badly distorts political broadcasting law. As Petitioners are forced to concede, the statute isn't *actually* limited to situations where "legally qualified candidates"—and not their committees—pay. That would render LUC illusory as candidates always pay through a committee. Rather, what matters for LUC purposes is whether a candidate engages in "use" of the broadcast station. Current law and broadcast industry practice, with which amici are well acquainted through their work as media buyers, make clear that the key distinction is drawn between ads approved by the candidate and in which the candidate appears, and non-coordinated ads, like Super PAC and issue advertisements. In the simplest terms: candidate ads get LUC and independent third-party ads do not.

Petitioners' approach would muddle this statutory regime and upend both caselaw and industry practice. The Court should decline that invitation.

**ARGUMENT**

**I.    Based on the Text of the Communications Act and FCC Regulations, Broadcasters Have Historically Offered LUC to both Coordinated Party Advertisements and to Authorized Committee Advertisements.**

The Communications Act provides, in relevant part, that "[t]he charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election" shall not exceed the "lowest unit charge" in the immediate runup to a primary and general election. 47 U.S.C. § 315(b)(1), (b)(1)(A). In essence, this law allows political candidates to purchase ad time at the same rate as a station's "most favored commercial advertiser[s]," who receive volume and frequency discounts that a candidate would not otherwise be able to access. *Hernstadt v. FCC*, 677 F.2d 893, 898, 900–01 (D.C. Cir. 1981) (quoting S. Rep. No. 92-96, at 2 (1971)).

The LUC law makes good policy sense. Without the requirement to offer LUC to candidates, inflated advertising costs during peak windows—e.g., primetime— might make it effectively impossible for a candidate to disseminate their message over the airwaves. As amicus Campaign Legal Center explains, "Congress created the lowest unit charge requirement because it was concerned about the rising cost of political advertising and wanted to ensure that candidates were not priced out of reaching voters just before an election." CLC Amicus Br. at 6 (citing *Hernstadt*, 677 F.2d at 898, 900–01).

4

Effectively denying candidates access to the airwaves would harm the public's interest in self-government. The LUC provision of the Communications Act is a logical corollary of the principle that broadcast spectrum, because it is a scarce physical resource, must be administered for the public good. *See Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 173–74 (1973) (Brennan, J., dissenting) ("[B]oth radio and television broadcasting utilize a natural resource— the electromagnetic spectrum—that is part of the public domain. And, although broadcasters are granted the temporary use of this valuable resource for terminable three-year periods, 'ownership' and ultimate control remain vested in the people of the United States.").

In short, Congress's determination that candidates using broadcast station should receive LUC was intended to result in *more* political speech, not *less*. But Petitioners take a broadside to this statutory structure. In their view, only "legally qualified *candidates*"—somehow defined to include primary candidate committees but not other committees—are entitled to LUC. Pet. at 2–3. By Petitioners' lights, neither party committees engaged in coordinated expenditures, nor certain other authorized committees (JFCs), are entitled to LUC because those committees are not, themselves, "legally qualified candidates." *Id*. This interpretation ignores the text of Section 315, the FCC's implementing regulations, and decades-long industry practice.

**A.** **The Plain Text of the Communications Act Treats Candidates and Their Authorized Committees as Functional Equivalents.**

47 U.S.C. § 315(b)(1) refers to "any person who is a legally qualified candidate" and who "use[s]" a broadcast station. But nothing in the statute suggests that *only* candidates—and not their authorized committees—may receive the LUC. Much the reverse: the statute repeatedly presumes that authorized committees will pay for a candidate's use. Consistent with longstanding practice predating the LUC, the statute presupposes that "authorized committees" will foot the bill for a candidate use. 47 U.S.C. § 315(b)(2)(A)–(B). So too does it explicitly provide that a candidate's use of a broadcast station is entitled to LUC when,among other things, the candidate states that he or she "approved the broadcast and that the candidate's authorized committee paid for the broadcast." 47 U.S.C. § 315(b)(2)(C)(ii).

Meanwhile, Section 315(b)(1) refers—in the passive voice—to "charges made for the use of any broadcasting station" by a candidate. If Congress intended to limit LUC to charges paid by a candidate, it could easily have said so. It did not. Instead, Section 315(b)(1) refers to "candidates" because they are the entities who "use" a broadcasting station. Committees do not "use" a broadcasting station like candidates do: that is to say, they do not appear on the airwaves themselves. But that does not mean that committees may not pay for a candidate's use.

Petitioners' contrary logic defeats the point of offering LUC. If Section 315(b)(1)'s reference to "a legally qualified candidate" excludes committees, LUC

6

would be largely unavailable to *anyone*—since candidates operate, and make media buys, through their committees. By law, every federal candidate must designate one "principal campaign committee" within 15 days of becoming a candidate. 2 U.S.C. § 432(e)(1). This entity—not the "legally qualified candidate"—raises money and pays the bills, including advertising bills. Simply put, the candidate acts and argues in the public square; the committee pays. Congress enacted LUC to guarantee candidates affordable airtime, but the logic behind Petitioners' argument would mean the rule is satisfied only in the rare case where a candidate spent personal money directly.

Petitioners are therefore forced to concede that *some* committees are entitled to LUC. Yet Petitioners insist that ads must be purchased by the candidate's primary campaign committee and no other. That is not what the statute says. It draws no distinction between categories of authorized committees that may or may not pay for a candidate's use. Quite the opposite. What matters, for Communications Act purposes, is solely who is "using" the broadcast and whether a committee is "authorized"—authorized, that is, by the candidate engaged in the broadcast use. *See* 47 U.S.C. § 315(b)(2)(C)(ii) (ad must specify that "the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast").

In short, LUC focuses not on whether a legally qualified candidate *pays* but on whether the candidate engages in "the use of any broadcast station." The FCC's

7

regulations confirm this use-based interpretation: "If a station permits a candidate to *use* its facilities, the station shall make all discount privileges offered to commercial advertisers, including the lowest unit charges." 47 C.F.R. § 73.1942(b) (emphasis added). The regulations define "use" as any "candidate appearance (including by voice or picture)." 47 C.F.R. § 73.1941(b). And disclaimer regulations for broadcast television apply to advertisements that are either "authorized or paid for by a candidate *or* the authorized committee of a candidate." 11 C.F.R. § 110.11(c)(3) (emphasis added).

As Intervenors explain, FCC regulations distill this into three straightforward elements: an advertisement qualifies as a candidate "use" entitled to the LUC when (1) the candidate's recognizable voice or image appears, 47 C.F.R. § 73.1941(b); (2) the advertisement is authorized by the candidate and not an independent expenditure; and (3) the candidate is legally qualified during the pre-election period Section 315(b) covers, *see* 47 U.S.C. § 315(b)(1)(A). Both coordinated party advertisements and JFC advertisements satisfy each element of this test—the candidate appears, approves, and is legally qualified—regardless of which authorized entity cuts the check. FCC disclaimer regulations contemplate exactly this arrangement, covering advertisements "authorized by a candidate, [or] an authorized committee of a candidate, . . . but . . . paid for by any other person." 11 C.F.R. § 110.11(b)(2). The standard "stand by your ad" disclaimer used in coordinated party spots—naming the party

8

committee as payor while the candidate states that he or she "approved this message"—is built around that understanding.

The basic purpose behind the LUC provision further confirms this interpretation. As the FCC has long recognized, the point of the LUC law is to establish parity between political advertising and other kinds of advertising. "This 'lowest unit charge' provision has heretofore been thought to mean that a station may not charge a political advertiser more for the use of a given segment of time than would be charged to the station's most favored commercial advertiser." *In re: Campaign '76 Media Commc'ns, Inc. v. Stations WGN & WGN-TV, Chi., Ill. Concerning Pol. Broad.*, 58 F.C.C.2d 1142, 1145 (1976).

With the Communications Act and its LUC provision, Congress did not intend to draw arcane distinctions among types of committees that might fund a candidate's media buys, and therefore broadcast appearances. The underlying goal was fair treatment for political advertising—including political advertising carried out "on behalf of" a candidate, with the candidate's approval and participation, by third parties. *In re Request by Hon. Bill Stuckey, Jr., House of Representatives, Washington, D.C. for Section 315 Fairness Ruling*, 35 F.C.C.2d 937, 937 (1972).

**B.    For Decades, the FCC Has Treated Coordinated Party Ads as Eligible for LUC, Because the "Use" Is By the Candidate.**

Coordinated advertisements—in which a candidate directly works with a national party committee to craft, shape, and air advertising messages—have long been deemed to constitute such a "use." More than five decades ago, the FCC explained that a candidate's elective appearance in an ad was sufficient to constitute a "use" of a broadcast, irrespective of whether the airtime in question was purchased "on his behalf" by a third party. *See In re Bill Stuckey*, 35 F.C.C.2d at 937 ("[S]ome broadcast time bought to further the candidacy of a person may be on his behalf and will count against his spending limit, but will not be entitled to the 'lowest unit charge' if it does not involve a 'use' by the candidate. . . . If a candidate makes any appearance on a political spot announcement in which he is identified or identifiable by voice or picture, the whole announcement should be considered a use by the candidate."). In short, coordinated party ads are a qualifying "use" when candidates appear in them. Whether the national party committee or the candidate's own campaign committee foots the bill is entirely irrelevant to that question. Courts agree that coordinated expenditures "qualify for the lowest rates on the purchase of broadcasting time[.]" *FEC v. Colo. Republican Fed. Campaign Comm.*, 41 F. Supp. 2d 1197, 1210 (D. Colo. 1999), *rev'd on other grounds*, 533 U.S. 431 (2001).

This is not a new position. Decades before the handbooks discussed below, the FCC held that a candidate's appearance in a party-sponsored spot is a candidate

10

"use" under Section 315. *In re Request for Declaratory Ruling Concerning Section 315, KWWL-TV, Waterloo, Iowa*, 23 F.C.C.2d 758, 758 (1966). And the Supreme Court's recent decision confirms that party-coordinated spending is, if anything, more clearly candidate speech today than it was in 1966. Coordinated expenditures are now the functional equivalent of a candidate's own speech, and treating that spending as such "allow[s] all political parties . . . to participate more freely and compete more fully in the political process, and to coordinate more closely with their candidates." *Nat'l Republican Senatorial Comm. v. FEC*, No. 24-621, 2026 WL 1868932, at *16 (U.S. June 30, 2026).

### C. For Decades, Broadcasters Have Treated Coordinated Party Ads as Eligible for LUC, Because the "Use" Is By the Candidate.

As amici are well aware as media buyers, broadcasters have no vested interest in offering LUC to more payors than required by law. Quite the contrary. Because the LUC is lower than the market rate for any potential block of airtime—often significantly lower—broadcasters have a powerful incentive to construe their LUC obligations narrowly and deny LUC eligibility to entities that do not fall within the statutory scope of entities entitled to the lower rate.

Yet broadcasters and the compliance industry around them have understood for decades that their obligations to make LUC available to candidates include an obligation to offer the LUC to coordinated party advertisements. A representative sample of broadcast industry guidance materials demonstrates the point:

11

- 2004 guidance from the National Association of Broadcasters, the industry's leading lobby group, has long made clear that LUC is triggered by the "use by a candidate" and so is available to coordinated party ads. Nat'l Ass'n of Broad., *Political Broadcast Catechism*, 37 (Ann Bobeck et al. eds., 16th ed. 2004), https://perma.cc/BZ95-C3HR.

- A 2009 broadcast-industry handbook states that political parties may be entitled to LUC where they purchase time in conjunction with a candidate, and where the candidate confirms that this is an "authorized expenditure" made on his behalf. David D. Oxenford, Davis Wright Tremaine LLP, *Political Broadcasting: Answering Your Questions on the FCC's Rules and Policies* 12 (2009), http://bit.ly/4wrRZHk.

- A 2010 broadcast-industry handbook states that once a *political party* tells a station a purchase is coordinated and the candidate confirms it's an authorized expenditure, the party may be entitled to lowest unit rates; the sponsorship identification will typically have a tag saying that the candidate approved the message. Erwin G. Krasnow & John Wells King, Garvey Schubert Barer, *2010 Political Broadcasting Handbook* 28 (2010), https://perma.cc/8V4T-2ZD2.

- A 2018 broadcast law practitioner guide, generated by the Virginia Association of Broadcasters, states that a candidate "uses" an ad, for purposes of en-

titlement to LUC, when the ad is funded by the candidate's campaign committee—*or authorized agent*, such as a national political party engaged in coordinated advertising. Brooks, Pierce, McLendon, Humphrey & Leonard, *Nuts 'n Bolts of Political Broadcasting* 8 (2018), https://perma.cc/QC7K-VJJK.

- A 2024 broadcast law practitioner guide confirms that "coordinated" spots — paid for by political parties but coordinated with a campaign or candidate — have become common and are entitled to LUC. Lerman Senter PLLC, *Guide to Political Broadcasting Rules* 6 (2024), https://perma.cc/F46N-UVWN.

If the question of whether coordinated party advertisements are entitled to LUC was really an open question, this decades-long industry practice of offering LUC to both Democrat and Republican candidates/parties[?] for coordinated party ads would make no sense. No broadcast station has an incentive to offer the LUC to any more advertisers or media buyers than required by law. The consistent practice of the broadcast industry—enjoyed by both sides of the aisle—is powerful evidence of what the statutory text and common sense already make clear: what matters for purposes of LUC eligibility is the *candidate's* involvement, not whether a national political party happens to be making payment. In fact, as Intervenors point out, Petitioners themselves have consistently benefited from LUC in party-coordinated ads. Br. Intervenors at 8–12.

These reliance interests independently counsel against Petitioners' reading. An agency changing course must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation modified), and "[i]t would be arbitrary or capricious to ignore such matters," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Media Bureau's Public Notice does the opposite of ignoring those interests—it confirms the rule both political parties and amici have relied on for decades. Meanwhile, Petitioners ask this Court to upend settled expectations without a reasoned explanation for doing so.

### D. JFCs Are "Authorized Committees" under FECA, and as Such, Broadcasters Have Treated JFC Ads as Eligible for LUC When the "Use" Is By the Candidate

Petitioners insist that JFC ads—even those that constitute a use by the candidate—are not eligible for LUC. That's wrong. Joint fundraising committees are "authorized committees" under FECA, and the Communications Act imports FECA's definitions. That settles the matter. Against this legal backdrop, it is hardly surprising that the FCC has long offered LUC to candidates *and* their authorized committees. When the Commission stated, in a 1992 Memorandum Opinion and Order codifying its prior political programming policies, that "authorized campaign committees" were, like candidates, entitled to LUC, it was not announcing a novel policy. *See In the Matter of Codification of the Comm'n's Political Programming Policies*, Mem-

14

orandum Opinion and Order, 7 FCC Rcd. 4611, 4614 (1992). Rather, the Commission was applying the statute.

More specifically, Section 315 defines the term "[a]uthorized committees" with reference to FECA. 47 U.S.C. § 315(b)(2)(F) ("authorized committee" has "the meaning given such term[] by [52 U.S.C. § 30101]"). For its part, FECA's definition of "authorized committee" extends well beyond a candidate's principal campaign committee. FECA defines the term as "the principal campaign committee *or any other political committee* authorized by a candidate under section 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate." 52 U.S.C. § 30101(6); *see also* 52 U.S.C. § 30102(e)(1) ("Each candidate for Federal office . . . shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate. . . . A candidate may designate *additional political committees* in accordance with paragraph (3) to serve as authorized committees of such candidate" (emphasis added)). And while FECA generally disallows multi-candidate authorized committees, 52 U.S.C. § 30102(e)(3)(A)(ii) expressly carves out JFCs—committees "established solely for the purpose of joint fundraising." To be clear, FEC regulations permit a candidate to have more than one authorized committee. 11 C.F.R. §§ 102.13(a)(1), 110.3(a)(1)(i). So "the authorized committee" in the statute cannot be read to mean only the principal campaign committee to the exclusion of a JFC.

15

Joint fundraising committees are indisputably "authorized committees" under FECA: candidates choose to use them to receive contributions and make expenditures on their behalf. *See McCutcheon v. FEC*, 572 U.S. 185, 215 (2014). They are routinely deployed by members of both political parties. Robert K. Kelner, *The Practical Consequences of* McCutcheon, 127 Harv. L. Rev. F. 380, 382–83 (2014). And when a candidate files their statement of candidacy, they are asked to designate "other authorized committees" on an FEC form—a form which expressly includes joint fundraising committees as examples. *See FEC Form 2 (Statement of Candidacy)*, Fed. Elec. Comm'n (2009), https://www.fec.gov/resources/cms-content/documents/policy-guidance/fecfrm2.pdf (providing for "designation of other authorized committees (including joint fundraising representatives)"). No one seriously doubts that joint fundraising committees fall within the scope of "authorized committees" as understood by FECA. *See Nat'l Republican Senatorial Comm. v. FEC*, No. 24-621, 2026 WL 1868932, at *15 (U.S. June 30, 2026) (presupposing lawfulness of joint fundraising committees).

Once again: the critical question is not which entities are ultimately paying. The critical question is whether the committees in question are operating with the candidate's involvement and authorization. If so, the committees are "authorized committees" for purposes of both FECA and the Communications Act. And when a candidate electively employs such a committee to pay for his "use" of a broadcast

16

facility, that purchase is entitled to the LUC. That sort of political speech by candidates is what Congress intended to protect by creating the LUC provision in the first place.

## II.  LUC Is Not—and Should Not Be—Offered to Issue Committees or Super PACs.

The LUC entitlement is not unlimited. Third parties who engage independently in political spending and advertising, without any coordination with a candidate's campaign, may not avail themselves of the LUC. That means Super PACs and issue-advertising stakeholders cannot benefit from the lower rate, and so amici never seek the LUC on their behalf.

Amicus Campaign Legal Center's hysteria about Super PAC spending at the LUC should be ignored. Several prophylaxes in both black-letter law and FEC guidance prevent such Super PAC spending. The "soft-money ban" keeps Super PACs from mingling their corporate funds with candidate and party committee dollars, regardless of whether spending on advertising or anything else. *See* 52 U.S.C. § 30125. Amicus suggests that the FEC eroded the soft-money ban in its Team Graham advisory opinion. *See* FEC Advisory Op. 2024-07 (Team Graham) (Aug. 29, 2024). This is not so: the Team Graham advisory opinion was predicated on the fact that "Senator Graham, Team Graham, and their agents would not engage in coordinated communications with [a] Super PAC." *Id.* In plain language, Team

Graham sought to distribute fundraising materials like event invitations and solicitation forms—the request itself had nothing to do with television advertising.

Amicus did not point to a single Team Graham JFC television advertisement funded by a Super PAC—and could not, because no Team Graham JFC television ads were ever made. Anyone, including amicus, can see this on Team Graham's publicly-accessible FEC reports. In fact, amicus failed to provide a single example from the entire political ecosystem of a Super PAC funding a JFC television advertisement. And using corporate or unlimited contributions to fund JFC ads is already prohibited. *See* 52 U.S.C. § 30125.

Importantly, the Communications Act also does not extend the LUC to Super PAC advertising on its own. The reason is simple: not every political "use" of a broadcast facility is a use by a candidate. The Communications Act's LUC provisions are intended to facilitate *candidates* getting *their* messages out—which is why both the statute and FCC guidance use the language of "authorization" to describe the actions of non-candidate entities. When a candidate authorizes a committee to act, that committee is operating on their behalf; the *candidate*, not some third party, is the one who is "using" broadcast facilities. *In re Bill Stuckey*, 35 F.C.C.2d at 937.

Where there's no authorization or coordination, conversely, there's no "use" by the candidate. By law, "independent expenditures" are "not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's

18

authorized political committee, or their agents, or a political party committee or its agents." 52 U.S.C. § 30101(17)(B). And so, given this lack of coordination, when independent expenditures are made, the message in question is not the candidate's. Indeed, the message a candidate wishes to convey, and the message of a third party making independent expenditures, may not actually be aligned—as the Supreme Court has long recognized. *Buckley v. Valeo*, 424 U.S. 1, 47 (1976) ("The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.").

The FCC's 2026 guidance restated this straightforward, and logically consistent, principle: "Advertising time purchased by political parties as an independent expenditure is not entitled to LUC. These expenditures involve no coordination between the party and a candidate." *Public Notice DA 26-300*, Fed. Commc'ns Comm'n. (Mar. 30, 2026), https://docs.fcc.gov/public/attachments/DA-26-300A1.pdf; *see also* Report & Order, *In re Codification of the Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 678, 685 n.54 (1991). No coordination means no authorization or candidate "use"—and hence, no entitlement to LUC.

None of this is new—it has been the FCC's stated position for decades. Candidate "use" is the decisive factor in determining whether LUC applies. *See In the*

*Matter of Codification of the Comm'n's Pol. Programming Pol'ys*, 7 FCC Rcd. 4611, 4613 (1992) (stating that use under Section 315 "include[s] only non-exempt candidate appearances that are controlled, approved or sponsored by a candidate or the candidate's authorized committee. . . . In our view, the plain language of the statute as well as its legislative history support the conclusion that *Congress meant to regulate only those broadcasts involving, at a minimum, the candidate's tacit approved participation in the broadcast*" (emphasis added) (internal citations omitted)). Coordinated party advertisements, and ads run by joint fundraising committees that include the candidate's primary committee as a member, presuppose "the candidate's tacit approved participation" and so constitute "uses" of broadcast facilities entitled to the LUC. *Id.* The same cannot be said of independent advertising buys by third parties—which is why those third parties are *not* entitled to LUC.

*     *     *

The existing understanding of LUC eligibility—which the FCC's 2026 guidance merely reconfirmed—has served the interests of political candidates and broadcasters alike for decades. There is no basis in the text of the statute, in FCC regulations, in Commission precedent, or in longstanding industry practice for the revisionary reading that Petitioners demand. Petitioners' attempt to rewrite the Communications Act would radically upend settled expectations and transform the landscape of broadcasting law. This Court should decline the invitation.

20

**CONCLUSION**

For these reasons, the Court should deny the Petition.

Respectfully submitted,

/s/ Erin Morrow Hawley

ERIN MORROW HAWLEY
JOHN S. EHRETT
*Lex Politica PLLC*
*700 Pennsylvania Avenue SE,*
*Ste #440*
*Washington, DC 20003*
*(512) 354-1783*
*ehawley@lexpolitica.com*
*jehrett@lexpolitica.com*

Counsel for *Amici Curiae*

JULY 24, 2026

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 4,604 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: July 24, 2026

/s/ Erin Morrow Hawley
Erin Morrow Hawley

## CERTIFICATE OF SERVICE

I, Erin Morrow Hawley, an attorney, certify that on this day the foregoing

Brief was served electronically on all parties via CM/ECF.

Dated: July 24, 2026

/s/ Erin Morrow Hawley
Erin Morrow Hawley