**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 26-1785**

SHERROD BROWN; JON OSSOFF; ROY A. COOPER, III; KRISTEN MCDONALD RIVET,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

Respondents,

and

NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

Intervenors.

------------------------------

CAMPAIGN LEGAL CENTER,

Amicus Supporting Petitioners,

and

NATIONAL MEDIA RESEARCH, PLANNING & PLACEMENT; SMART MEDIA GROUP; AND FLEXPOINT MEDIA,

Amicus Supporting Respondents.

---

On Petition for Review of a Decision of the Federal Communications Commission. (DA 26-300)

---

Argued: August 7, 2026 Decided: August 25, 2026

---

Before WILKINSON, KING, and WYNN, Circuit Judges.

---

Petition for review granted by published opinion. Judge King wrote the majority opinion, in which Judge Wynn joined. Judge Wynn wrote a concurring opinion. Judge Wilkinson wrote a dissenting opinion.

---

**ARGUED:** David Robert Fox, ELIAS LAW GROUP LLP, Washington, D.C., for Petitioners. Scott M. Noveck, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. Thomas Ryan McCarthy, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Intervenors. ON BRIEF: Richard A. Medina, Nicole E. Wittstein, ELIAS LAW GROUP LLP, Washington, D.C., for Petitioners. Sharon Swingle, Jennifer Utrecht, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; D. Adam Candeub, General Counsel, Jacob M. Lewis, Deputy General Counsel, Sarah E. Citrin, Deputy Associate General Counsel, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. David L. Rosenthal, Conor D. Woodfin, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Intervenors. Tara Malloy, Erin Chlopak, Saurav Ghosh, Shanna Ports, CAMPAIGN LEGAL CENTER, Washington, D.C., for Amicus Campaign Legal Center. Erin Morrow Hawley, John S. Ehrett, LEX POLITICA PLLC, Washington, D.C., for Amici National Media Research, Planning & Placement; Smart Media Group; and Flexpoint Media.

---

KING, Circuit Judge:

This time-sensitive matter concerns who is entitled to particularly favorable rates — known as the "lowest unit charge," or "LUC" — for broadcast campaign advertisements in the run-up to elections. The statutory LUC requirement provides that during the 45-day period preceding a primary election and the 60-day period preceding a general election, "[t]he charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign" must be at "the lowest unit charge of the station for the same class and amount of time for the same period." *See* 47 U.S.C. § 315(b)(1)(A).

There is no question that candidates are entitled to the LUC. But it is disputed whether political parties and joint fundraising committees with non-candidate members can also be entitled to the LUC. The Federal Communications Commission (the "FCC," or the "Commission") has asserted that they can, saying so in a "Public Notice" issued by the FCC's Media Bureau on March 30, 2026.

The Petition for Review before us challenges the Public Notice, which takes effect on September 4, 2026, for the impending November general election. The four petitioners, all Democrats, are U.S. House of Representatives candidate Kristen McDonald Rivet of Michigan and U.S. Senate candidates Sherrod Brown of Ohio, Jon Ossoff of Georgia, and Roy Cooper of North Carolina (collectively, the "Federal Candidates"). Their contention is that the Public Notice contravenes the plain language of the LUC requirement and pertinent campaign finance statutes. In the Federal Candidates' words, the Public Notice "unlawfully dilutes [their] and other candidates' statutory right to buy advertising time at

lowest unit charge by insisting that broadcasters make that same right available to political parties and joint fundraising committees in circumstances where their spending cannot, under campaign finance law, be considered spending by or on behalf of a candidate." *See* Reply Br. of Pet'rs 1.

On the other side of this dispute are the FCC, as a respondent, and the National Republican Congressional Committee and the National Republican Senatorial Committee (together, the "Party Committees"), as intervenors. The FCC and the Party Committees separately — but similarly — argue both that we lack jurisdiction to review the Public Notice and that the Public Notice is correct on the merits.[1]

As explained herein, we are confident of our jurisdiction to review the Public Notice. Further, we conclude that the LUC requirement and campaign finance statutes are clear that neither political parties nor joint fundraising committees with non-candidate members can be entitled to the LUC. We therefore grant the Petition for Review, such that we set aside and hold for naught the Public Notice.

## I.

As background, the FCC's Media Bureau was acting pursuant to its delegated authority[2] when, on March 30, 2026, it issued the Public Notice, titled "FCC Media Bureau

---

[1] We note that the United States is also a respondent, shares counsel with the FCC, and joins in the FCC's arguments opposing the Petition for Review.

[2] In March 2002, the FCC established the Media Bureau by reorganizing the existing Cable Services and Mass Media Bureaus into a new entity. *See* 47 C.F.R. § 0.61. In doing (Continued)

Provides Guidance on Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees." *See* J.A. 1.[3] At its outset, the Public Notice specifies that the LUC requirement applies to the following:

> (1) "authorized committees, including authorized committees that engage in joint fundraising with legally qualified candidates for federal office"; and
>
> (2) "advertisements that qualify as coordinated expenditures of political parties and legally qualified candidates for federal office."

*Id.* The Public Notice poses as a "remind[er]" of the LUC requirement and purports to merely "restate previous Media Bureau guidance regarding LUC eligibility." *Id.* at 1-2. Significantly, however, the Public Notice identifies no previous Media Bureau guidance stating that political parties and joint fundraising committees with non-candidate members can ever be entitled to the LUC.

A.

On April 29, 2026, before filing their Petition for Review in this Court, the Federal Candidates filed an Application for Review with the FCC (the "Application for FCC Review," or the "Application").[4] Seeking to have the full Commission set aside the Media

---

so, the FCC expressly delegated to the Media Bureau the authority to "[a]dminister and enforce rules and policies regarding political programming and related matters." *Id.* § 0.61(e); *see also* 47 U.S.C. § 155(c)(1) (authorizing FCC to delegate authority).

[3] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this matter, which is wholly comprised of the two-page Public Notice.

[4] The Application for FCC Review is an exhibit to the Federal Candidates' Petition for Review in this Court. *See Brown v. FCC*, No. 26-1785, Ex. B (4th Cir. June 22, 2026), ECF No. 3.

Bureau's Public Notice, the Application contests the Public Notice's claim that it merely reiterates well-settled principles. The Application argues that the Public Notice instead constitutes a novel interpretation of the LUC requirement that is incompatible with the relevant statutes and directly contradicted by FCC and other precedents.

The Application also addresses how the Public Notice aggrieves the Federal Candidates, explaining that they are in "highly competitive" races for U.S. House and Senate seats being targeted by the Party Committees; that the Party Committees are expected to heavily spend on advertisements opposing the Federal Candidates and supporting their opponents, "including through coordinated expenditures and [joint fundraising committee] advertising"; and that by requiring broadcasters to extend the LUC to political parties and joint fundraising committees for such advertisements, the Public Notice "places [the Federal Candidates] at a competitive disadvantage, forcing them to respond to a higher volume of the counter advertisements than otherwise could have been purchased at the same price point, and diluting their independent campaign messaging." *See* Application for FCC Review 18-19.

Twice, the Application urges an expedited decision by the Commission given the impending November general election. In its introduction, the Application emphasizes that "[e]xpedited action by the Commission is essential." *See* Application for FCC Review at iv. And in closing, the Application reiterates that "urgent action by the Commission is needed" and that "[t]he Commission should therefore expedite this matter and promptly set aside the [Public Notice]." *Id.* at 19.

Nevertheless, in the months that followed, the Commission took no action whatsoever on the Application for FCC Review.

B.

Given the looming November general election, the Federal Candidates turned to this Court in late June 2026, filing their Petition for Review and successfully moving to expedite our proceedings. The FCC promptly responded with a still-pending motion to dismiss the Petition for Review for lack of jurisdiction, principally contending that there can be no judicial review of the Public Notice until the Commission issues a decision on the Application for FCC Review. The FCC's subsequent response brief repeats that jurisdictional contention and also defends the Public Notice on the merits, with support from the Party Committees' response brief and opposition from the Federal Candidates' opening and reply briefs. Following briefing, the parties further aired their positions at an oral argument, conducted during a special sitting of our Court on August 7, 2026, in Richmond.

Notably, in support of its jurisdictional contention, the FCC has emphasized the importance of awaiting the Commission's decision on the Federal Candidates' Application so that this Court will have the benefit of the Commission's expertise. That is, the FCC has contended that even if we could go ahead with a review of the Public Notice, we should allow the Commission to have the first say on the Public Notice's merits. At the same time, the FCC's counsel — speaking for the Commission and the United States — has insisted that the Public Notice is correct.

C.

With this matter poised for our decision, the FCC notified us on August 17, 2026, that there has at last been some action on the Application for FCC Review. Specifically, the FCC advised that its Chairman had circulated a proposed order to his fellow Commissioners three days earlier that — rather than passing on the Public Notice's merits — would dismiss the Federal Candidates' Application as an "improper vehicle" for the Commission's review of the Public Notice. *See Brown v. FCC*, No. 26-1785 (4th Cir. Aug. 17, 2026), ECF No. 63, at 1 (FCC's letter to this Court under Federal Rule of Appellate Procedure 28(j)). According to the FCC, the Chairman's proposed order is premised on the notion that the Public Notice merely restates previous Media Bureau guidance, such that the Application would have the Commission improperly "revisit[] existing law on the eve of an election, after primaries have occurred and plans have been made for the general election based on the existing rules." *Id.*

Additionally, the FCC proffered a recent order of the Media Bureau denying a petition of the Television Bureau of Advertising, Inc. ("TVB"), for reconsideration of the Public Notice. *See In re Entitlement to Lowest Unit Charge for Legally Qualified Candidates for Federal Office and All Authorized Committees*, DA 26-851, Order on Reconsideration (FCC Aug. 13, 2026). Sticking with the characterization of the Public Notice as a reiteration of previous guidance, the Media Bureau's order asserts that "[s]uch a reminder is not a decision or action that can be challenged through a petition for reconsideration." *Id.* at 1. Once again, however, the Media Bureau failed to identify any previous guidance stating that political parties and joint fundraising committees with non-

candidate members can be entitled to the LUC. Instead, the order only vaguely references prior "response[s] to informal inquiries from regulated parties." *Id.* at 2.

As the FCC would have it, the foregoing developments — the FCC Chairman's proposed order dismissing the Federal Candidates' Application, along with the Media Bureau's order denying TVB's reconsideration petition — bolster the FCC's contention that judicial review of the Public Notice cannot be had. In response, the Party Committees concur that this "Court lacks jurisdiction to review the Public Notice" as "a reminder of longstanding guidance." *See Brown v. FCC*, No. 26-1785, at 1 (4th Cir. Aug. 18, 2026), ECF No. 64 (Party Committees' response to FCC's Rule 28(j) letter).

For their part, the Federal Candidates maintain that "[t]he existence of a draft proposed order denying [their Application for FCC Review] confirms additional agency review is futile," as does "[t]he Media Bureau's denial of TVB's reconsideration petition." *See Brown v. FCC*, No. 26-1785, at 1 (4th Cir. Aug. 19, 2026), ECF No. 65 (Federal Candidates' response to FCC's Rule 28(j) letter). Additionally, the Federal Candidates underscore that the new developments confirm that the FCC's "merits argument is weak." *Id.* The Federal Candidates urge us to proceed with reviewing the Public Notice, while advising that they "will file a second, protective Petition for Review" if the full Commission agrees to an order disposing of their Application. *Id.* at 2.

II.

In these circumstances, we are confident of our jurisdiction to review the Public Notice.[5] That is, we possess jurisdiction under 28 U.S.C. § 2342(1) (conferring "exclusive jurisdiction" on the courts of appeals "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by [47 U.S.C. § 402(a)]"). We proceed to explain why the Public Notice constitutes a "final" order "of the Commission" that has been "made reviewable by § 402(a)." Notably, our analysis involves the conclusion that, by its conduct, the Commission has constructively denied the Application for FCC Review and thereby adopted the Public Notice.

A.

We begin with why the Public Notice has been "made reviewable by § 402(a)." Under § 402(a), proceedings to "enjoin, set aside, annul, or suspend any order of the Commission" must be "brought as provided by and in the manner prescribed in [28 U.S.C. §§ 2341-2351]." In turn, § 2342(1) accords our Court "exclusive jurisdiction" to review "all final orders" of the Commission. Section 2342 also provides that "[j]urisdiction is invoked by filing a petition as provided by section 2344." For its part, § 2344 sets forth two steps to invoke jurisdiction: (1) the agency provides notice of entering a final order,

[5] Having assured ourselves that we possess jurisdiction to review the Public Notice, we hereby deny the FCC's motion to dismiss the Petition for Review.

and (2) an aggrieved party files a petition to review the order within 60 days of the order's entry.

Here, the Media Bureau published its Public Notice on March 30, 2026, starting the 60-day clock for invoking our jurisdiction. *See* 47 C.F.R. §§ 1.103(b), 1.4(b)(4) (explaining that Commission action taken under delegated authority is final, "for purposes of seeking . . . judicial review," on "the date on which the descriptive 'Public Notice' is released"). And because the Federal Candidates filed their Petition for Review before § 2344's 60-day deadline expired, they properly invoked our jurisdiction.[6]

B.

Next, we explain why the Public Notice is, and always has been, an order "of the Commission." The Commission is entitled to "delegate any of its functions . . . to a panel of commissioners, an individual commissioner, an employee board, or an individual employee, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter." *See* 47 U.S.C. § 155(c)(1). And an order made under such delegation has "the same force and effect" as orders of the Commission. *Id.* § 155(c)(3). Relevant here, the Media Bureau "acts for the Commission under delegated authority" when it "administer[s] and enforce[s] rules and policies regarding political programming and related matters." *See* 47 C.F.R. § 0.61(e)

---

[6] Because the Federal Candidates timely filed the Petition for Review, we need not decide whether § 2344's 60-day deadline is jurisdictional. We observe, however, that the 60-day deadline is more akin to a "nonjurisdictional rule[] govern[ing] how courts and litigants operate within" the bounds of our "adjudicatory authority." *See Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023); *cf. Harrow v. Dep't of Def.*, 601 U.S. 480 (2024).

(citation modified). Thus, from the start, the Public Notice was an order of the Commission. And of course, now that the Commission has constructively denied the Application for FCC Review and thereby adopted the Public Notice, it remains an order of the Commission.

C.

1.

Finally, we explain why the Public Notice is, and always has been, a "final" order. In doing so, we first recognize that the Public Notice was "final" upon issuance by the Media Bureau and remained so after the Federal Candidates filed their Application for FCC Review.

When determining whether an order is final, "courts should take as their NorthStar the unique constellation of statutes and regulations that govern the action at issue." *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019). Pursuant to the statutes governing here, an otherwise final order of the Commission, made under delegated authority, becomes nonfinal when the order is "reviewed as provided in [47 U.S.C. § 155(c)(4)]." *See* 47 U.S.C. § 155(c)(3). Section 155(c)(4) provides a two-step review process: (1) an aggrieved party files an application for review, and (2) the application is "passed upon by the Commission." So only when review is completed, not merely begun, does an order made under delegated authority become nonfinal. *See Cawthorn v. Amalfi*, 35 F.4th 245, 258 (4th Cir. 2022) ("The past tense is 'backward-looking'; it refers to things that have already happened, not those yet to come."); *Participles Generally*, Chicago

Manual of Style § 5.114 ("The past participle denotes the verb's action as being completed.").

Indeed, the FCC's own regulations contemplate the completion of both steps. *See* 47 C.F.R. § 1.102(b)(3) ("If an application for review of a non-hearing or interlocutory action is filed . . . the Commission may in its discretion *stay the effect* of any such action *until its review of the matters at issue has been completed*." (emphasis added)); *cf. id.* § 1.102(a)(3) (explaining that, for final actions following review of an initial decision, an application for review automatically stays "the effect of the decision" until the Commission completes its review); *see also id.* § 1.102(b)(1) ("Non-hearing or interlocutory actions taken pursuant to delegated authority shall . . . be effective upon release of the document containing the full text of such action, or in the event such a document is not released, upon release of a public notice announcing the action in question."). Thus, although the Federal Candidates filed the Application, the Public Notice remained final pending completion of the review process.[7]

2.

In any event, the Public Notice is a "final" order because the Commission, through its own actions — and inaction — has since constructively denied the Application for FCC Review and adopted the Public Notice. Our Court and other courts of appeals have made

---

[7] Concluding otherwise would create a "Catch-22 situation" where the filing of an application for review strips the order of finality for purposes of judicial review but not for the effect of the order itself. Here, the Public Notice would go into effect on September 4, 2026, regardless of whether the Commission had passed upon the Federal Candidates' Application before then. Such a situation is necessarily illogical and intolerable.

it clear that "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *See Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970) (citing *Deering Milliken, Inc. v. Johnston*, 295 F.2d 856 (4th Cir. 1961)). In this regard, our Court has ruled that "a denial of a request need not be explicit, but rather may be treated as a 'constructive' denial based on the decision maker's conduct." *See Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 271-72 (4th Cir. 2013) (recognizing that a denial of relief may be "actual or constructive, as an indeterminate delay has the same effect as an outright denial").

The present circumstances readily constitute a constructive denial. When the Federal Candidates initiated this action on June 22, 2026, their Application for FCC Review was pending with the Commission for approximately two months. When we conducted our oral argument earlier this month, the Application was pending for 100 days. On September 4 — the date the LUC requirement becomes effective for the impending November election — it will be 128 days since the Federal Candidates filed their Application.

Despite the time-sensitive nature of these proceedings, the Commission intentionally took no action and offered no response to the Application for more than three months. The Commission did not, for example, seek responses from impacted parties, or engage in fact finding, or secure supplemental briefing, or solicit public comment, or schedule or conduct an oral argument.

Meanwhile, at our oral argument, the FCC's lawyer admitted — with commendable candor — that "it is very unlikely that the Commission will act here before September 4th." *See* Oral Argument at 49:49-50:12, *Brown v. FCC*, No. 26-1785 (4th Cir. Aug. 7, 2026). Concomitantly, the lawyer also represented to this Court that there would be value in awaiting the Commission's decision on the Public Notice's merits and that the Public Notice is, in any event, absolutely correct.

Ten short days later, the Commission finally took some action on the Federal Candidates' Application. But that action had nothing to do with assessing the merits of the Public Notice either by September 4, 2026, or ever. Rather, the FCC Chairman proposed the summary dismissal of the Application as unreviewable by the Commission.

In these unusual circumstances, we are satisfied that the Commission has constructively denied the Application for FCC Review and thereby adopted the Public Notice. *Cf. Friedman v. FAA*, 841 F.3d 537, 542-43 (D.C. Cir. 2016) (finding constructive denial where the FAA "placed [the applicant] in a holding pattern" by refusing to issue a formal decision). The Public Notice is "final" for this reason.[8]

3.

The Public Notice also constitutes a "final" order because it is — in both substance and operation — a legislative rule, meaning that the Public Notice is necessarily the law of

---

[8] Given that the Commission has effectively adopted the Public Notice, we need not wade into the parties' dispute as to whether the only statutory precondition to filing the Petition for Review was first filing the Application for FCC Review (as the Federal Candidates contend), or whether 47 U.S.C. § 155(c)(7) permits judicial review only after the Commission has ruled on the Application (as the FCC argues).

the land and final. As then-Judge Kavanaugh explained in *National Mining Association v. McCarthy*, agency action

> that purports to impose legally binding obligations or prohibitions on regulated parties — and that would be the basis for an enforcement action for violations of those obligations or requirements — is a legislative rule.

*See* 758 F.3d 243, 251 (D.C. Cir. 2014). A legislative rule, sometimes also called a substantive rule, must be distinguished from an interpretive rule. An interpretive rule "simply state[s] what the administrative agency thinks the statute means, and only remind[s] affected parties of existing duties," or otherwise "clarif[ies] or expl[ains] . . . an existing statute or rule." *See Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) (citation modified).

In that regard, although the Public Notice purports to merely "remind broadcasters and the public about the FCC's lowest unit charge . . . requirements," *see* J.A. 1, our Court has long emphasized that whether an agency's rule is "substantive" or "interpretative" is a pragmatic inquiry; it does not depend on the agency's self-serving characterizations of the same. *See Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989) (recognizing that an agency's "characterization of its statement as an exposition of its policy or interpretation of the standard does not preclude our finding that it is something more").

Even a passing review of the Public Notice reveals that it is a legislative rule and is thus necessarily final. As discussed *infra*, this Public Notice, at minimum, "supplements a statute," "adopts a new position [that is] inconsistent with existing regulations," and otherwise "effects a substantive change in existing law or policy." *See Children's Hosp.*,

896 F.3d at 620 (citation modified). The Public Notice leaves broadcasters with "no choice but to comply" with its unlawful expansion of the LUC statute. *See* Br. of Pet'rs 34. And as the Public Notice emphasizes, the LUC is a *requirement*, such that noncompliance by a broadcaster carries with it hefty penalties — including fines, forfeitures, and rebates. *See* 47 U.S.C. § 503(b)(2)(A) (authorizing $25,000 per day penalty for violating LUC requirement).

* * *

In sum, we possess jurisdiction under 28 U.S.C. § 2342(1) to consider and resolve the Federal Candidates' challenge to the Public Notice. That is because the Public Notice constitutes a "final" order "of the Commission" that has been "made reviewable by § 402(a)."[9]

---

[9] In recognizing our jurisdiction, we also reject the FCC's suggestion that the Federal Candidates lack Article III standing to challenge the Public Notice in federal court. Simply put, the Federal Candidates easily satisfy the requirements for Article III standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (explaining that Article III standing requires an injury-in-fact that is fairly traceable to the defendant's conduct and that can be redressed by a favorable court decision).

The Federal Candidates have established a cognizable injury-in-fact by alleging that the Public Notice unlawfully extends the LUC to joint fundraising committees and political parties, thereby reducing the cost of advertising against the Federal Candidates, increasing the volume of opposing advertising they must confront, and placing them at a competitive disadvantage. *See Shays v. Fed. Election Comm'n*, 414 F.3d 76, 86 (D.C. Cir. 2005) (recognizing that an injury arises when a candidate for federal public office "face[s] *intensified* competition" under an unlawful regulatory scheme, requiring the candidate to "anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow"). Turning to traceability, there is a "causal connection" between the Media Bureau's issuance of the Public Notice and the injuries alleged by the Federal Candidates. And finally, concerning the issue of redressability, we may award judicial (Continued)

III.

Being satisfied that we possess jurisdiction, we turn to the merits of the Federal Candidates' challenge to the Public Notice. And we conclude that, for purposes of entitlement to the LUC under 47 U.S.C. § 315(b)(1)(A), the term "candidate" means "candidate." The Public Notice therefore unlawfully requires broadcasters to extend the LUC to political parties and joint fundraising committees with non-candidate members.

A.

As a threshold matter, we underscore that the legitimacy of the Public Notice turns on a question of pure statutory interpretation, and that our Court is obliged to "exercise [its own] independent judgment" in conducting that review. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Put differently, it is "emphatically the province and duty of" our Court — not the FCC — "to say what the law is." *See id.* (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

Notably, parties on each side of this litigation have been accused of speaking with a forked tongue by advancing positions that are contrary to those they have previously taken. The Party Committees contend that one of the Federal Candidates, Sherrod Brown, has benefitted from the very interpretation of the LUC requirement that he now opposes. Specifically, they assert that Brown "benefitted from the application of the LUC rule to

---

relief that would directly redress the Federal Candidates' injury by setting aside the Public Notice.

[his] own candidate-party coordinated ads . . . in the 2024 election cycle during the World Series." *See* Br. of Intervenors 9.

The Federal Candidates assert an inconsistency in the FCC's position, pointing to recent representations made to the Supreme Court by the United States Solicitor General in *National Republican Senatorial Committee v. FEC*. There, the Solicitor General stated that the LUC statute "require[s] broadcasters to charge low rates for candidate spending, but not for party spending — whether coordinated or independent." *See* Reply Br. of Federal Resp'ts, *Nat'l Republican Senatorial Comm. v. FEC*, No. 24-621, 2025 WL 3068193, at *23 (U.S. Oct. 1, 2025). According to the Federal Candidates, the Solicitor General thus explicitly endorsed their view that political parties are not entitled to the LUC, even when their spending is coordinated with a candidate.

In response to the hypocrisy accusations, both sides contend that such examples are being taken out of context and should hold no weight in assessing the Public Notice. We agree with the latter contention. We need not decide which, if either, party is guilty of speaking with a forked tongue to decide the merits of this dispute. Instead, we simply rely upon the plain text of the LUC requirement and pertinent campaign finance statutes. *See United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) ("When interpreting a statute, courts must first and foremost strive to implement congressional intent by examining the plain language of the statute." (citation modified)).

B.

As recited previously, 47 U.S.C. § 315(b)(1)(A) grants the LUC only "for the use of any broadcasting station by any person who is a legally qualified candidate for any public

office in connection with his campaign." *See also* 47 C.F.R. § 73.1942(a) (same). Given that simple statutory command, it was the FCC that recognized — approximately 35 years ago in 1991 — that "*only candidates* are entitled to [the] lowest unit charge benefits," and that "independent entities" supporting or opposing candidates are not "entitled to the lowest unit charge." *See In re Codification of the Comm'ns Pol. Programming Pol'ys*, 7 F.C.C. Rcd. 678, 685 ¶ 34 n.54, 686 ¶ 38 (1991) (emphasis added). The statutory text is unambiguous, and it provides no support for the Media Bureau's significant and unilateral expansion of the LUC requirement.

Indeed, "absent ambiguity or a clearly expressed legislative intent to the contrary, we apply the plain meaning of the statute." *See George*, 946 F.3d at 645 (citation modified). And here, the pertinent legislative history is consistent with the LUC requirement's plain language. Congress enacted the LUC requirement to address a growing "concern about" rate discrimination by broadcasters against candidates for federal office, as well as "the increasing cost[s] of election campaigns." *See Hernstadt v. FCC*, 677 F.2d 893, 897 (D.C. Cir. 1980). Section 315(b)(1)(A) "regulat[es] rates charged political candidates" and was specifically "viewed [by Congress] as providing an additional break for candidates." *Id.* It "was intended to ensure that, during the pre-election period, candidates would receive . . . volume and frequency discounts regardless of the number of announcements purchased." *Id.* at 900.

Moreover, as the Federal Candidates cogently explain, "[i]f Congress had wanted to extend lowest unit charge to party expenditures also, it easily could have said so when it first authorized coordinated expenditures a short two years after passing the lowest unit

charge requirement." *See* Br. of Pet'rs 22. But Congress refrained from doing so, opting instead to limit the LUC requirement to avoid "imposing unreasonable and possibly economically devastating burdens on small stations." *See Hernstadt*, 677 F.2d at 898. And when presented with an opportunity to amend the LUC requirement in 2010 and extend the LUC to political parties, Congress declined to do so. *See, e.g.*, DISCLOSE Act, S. 3295, 111th Cong. § 401(a)(1)(c) (2010).

C.

Rather than heeding the plain language of the LUC requirement, the Public Notice requires broadcasters to extend the LUC to political parties and joint fundraising committees with non-candidate members, without providing any statutory justification for that rule. That has left the parties herein to debate whether party coordinated expenditures and spending by joint fundraising committees with non-candidate members involve "use . . . by" the candidate within the meaning of 47 U.S.C. § 315(b)(1)(A).

1.

According to the FCC and the Party Committees, candidate "use" requires only that an advertisement be "authorized by" a candidate. *See* Br. of Resp'ts 43-44; Br. of Intervenors 24, 28. To resolve this question, we again turn to § 315(b)(1)(A)'s plain text.

As a strict textual matter, equating "use" and "authoriz[ation]" makes little sense because "use" by a candidate, and mere "authoriz[ation]" for an advertisement by a candidate, are two distinct concepts. To "authorize" means to "give formal approval to; to sanction, approve, countenance" something done by someone else. *See Authorize*, Oxford English Dictionary (2d ed. 1989). Conversely, the term "use" requires "active

employment" by the user. *See Bailey v. United States*, 516 U.S. 137, 144 (1995). Thus, for someone else's "use" to be the candidate's "use," it would not only have to be authorized by the candidate, but done *on behalf* of that candidate. And as discussed, the situations in which that can occur are strictly circumscribed by the pertinent campaign finance statutes.

Consistent with the foregoing, the FCC has long understood that "use" by the candidate requires the candidate's personal use, not his or her mere authorization of someone else's use. For example, in its 1984 *Political Primer*, the FCC explained its position that "use" in § 315(b)(1) — and the accompanying entitlement to the LUC — "applie[s] only to the personal use of the radio facilities by the candidates themselves." *See Political Primer: Law of Political Broadcasting & Cablecasting*, 100 F.C.C.2d 1476, ¶ 32 (1984) (quoting *Felix v. Westinghouse Radio Stations, Inc.*, 186 F.2d 1, 3 (3d Cir. 1950)). Despite that standard, and the ever-changing landscape of pre-recorded negative and independent advertisements in our national political discourse, the Commission also confirmed in the 1990s that an opponent's or outside group's negative advertisements that use a candidate's voice or picture to attack the candidate are not the targeted candidate's "use." *See* 1991 Political Programming Order, 7 F.C.C. Rcd. 678, 684 ¶ 30. Positive advertisements that are produced and distributed by "an independent entity," are also not considered a candidate's "use," even if they "include[] an appearance by a candidate." *See In re Codification of Comm'n's Pol. Programming Pol'ys*, 7 F.C.C. Rcd. 4611, 4614 ¶ 23 (1992).

2.

The question that yet remains is whether Congress included the two beneficiaries of the challenged Public Notice — that is, political parties engaged in coordinated expenditures and joint fundraising committees with non-candidate members — when it limited the LUC to "use . . . by" the candidate. *See* 47 U.S.C. § 315(b)(1)(A). For the following reasons, we are satisfied that Congress did not do so.

a.

Starting with political parties engaged in coordinated expenditures, such expenditures are not entitled to the LUC under § 315(b)(1)(A) because they are the political party's use — not the candidate's use. That conclusion flows from a commonsense and practical construction of the LUC requirement — a construction of the statutory provision that the FCC has affirmatively agreed with in the past. *See* 1992 Political Programming Order, 7 F.C.C. Rcd. 4611, 4614 ¶ 23 (recognizing that the FCC has "always held that *only* candidates or their authorized campaign committees are entitled to the LUC pursuant to [§] 315(b)" (emphasis added)).

Restricting the LUC to candidates and their authorized committees makes good sense because the only way a third-party advertisement could be deemed as "use . . . by" the candidate is when the third-party acts on behalf of the candidate. And pursuant to 52 U.S.C. § 30101(6), a political committee may make expenditures "on behalf of" a candidate only if it is an "authorized committee" of that candidate. Because political parties support multiple candidates and therefore cannot be authorized committees of a particular candidate, *id.* § 30102(e)(3)(A), such parties cannot act "on behalf of" the

candidate so as to turn their spending into candidate "use." To conclude otherwise would put the LUC requirement and the campaign finance statutes "at war with one another." *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018) ("It is this Court's duty to interpret Congress's statutes as a harmonious whole rather than at war with one another.").

We are unpersuaded by the positions espoused by the FCC and the Party Committees. For its part, the FCC insists that its Public Notice "does not cover spending by the party in its own name after consultation with the candidate." *See* Br. of Resp'ts 43. Yet that is precisely what party coordinated expenditures are — i.e., they are "the party's expenditures on, for example, advertisements produced or distributed in consultation with a candidate's campaign." *See Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct. 2404, 2413. We thus agree with the Federal Candidates' assertion that "[i]t is unclear what, exactly, [the FCC] think[s] *is* entitled to [the] lowest unit charge as a party coordinated expenditure." *See* Reply Br. of Pet'rs 31.[10]

---

[10] To be sure, the FCC refers to a scenario where "a candidate and [a] political party's national or state committees together purchase airtime for the campaign's use." *See* Br. of Resp'ts 2, 10. If the FCC is suggesting a situation in which a candidate pays part of an advertisement's cost and the political party foots the bill for the rest, we agree with the Federal Candidates that the "analysis is simple." *See* Reply Br. of Pet'rs 31. That is, "the candidate's share is the candidate's expenditure and therefore the candidate's 'use,' while the party's share is a party coordinated expenditure — 'spending by the party in its own name after consultation with a candidate,' which [the FCC] do[es] not defend as entitled to lowest unit charge." *Id.*

Alternatively, the FCC describes a scenario where a political party purchases airtime "to distribute to individual candidates for use as [the candidates] choose." *See* Br. of Resp'ts 40. But that is belied by the Party Committees' characterization of how party coordinated expenditures actually work in the real world: airtime is not transferrable in that way, and party coordinated expenditures involve the party itself placing orders and (Continued)

Meanwhile, the Party Committees support a different approach. According to the Party Committees, all "candidate-party coordinated [advertisements] are a candidate 'use'" if the candidate "appear[s] in these [advertisements]" and authorizes a particular advertisement vis-à-vis the "stand by your ad" disclaimer that is required by 47 U.S.C. § 315(b)(2)(C). *See* Br. of Intervenors 24. But this defies the FCC's own treatment of candidate authorization of an individual advertisement as insufficient to entitle an independent entity's advertisement to lowest unit charge. *See* 1992 Political Programming Order, 7 F.C.C. Rcd. 4611, 4613-14 ¶ 23. That is, the FCC has long recognized that "only candidates or their authorized campaign committees are entitled to the LUC," such that "even if an independent entity produces an advertisement that includes an appearance by a candidate, that independent entity is not entitled to the LUC." *Id.* And under 52 U.S.C. § 30102(e)(3), political parties cannot be authorized committees because the parties support multiple candidates.

Not only that, but the plain language of § 315(b)(2) supports the conclusion that the "stand by your ad" disclaimer is not, on its own, enough to entitle an advertisement to the LUC. Section 315(b)(2) does not create eligibility for the LUC; rather, it renders a candidate ineligible for the LUC for failing to agree to comply with or for breaching the "stand by your ad" disclaimer requirement. If § 315(b)(2) were read otherwise, § 315(b)(1)'s test for the LUC — that is, "the use of any broadcasting station by any person

running ads, albeit "candidate-sanctioned" ones. *See* Br. of Intervenors 7-9. As the Party Committees acknowledge, party-coordinated ads are consequently run by party committees. *Id.* at 9-10.

who is a legally qualified candidate" — would be nothing more than surplusage. *Cf. Chevron USA Inc. v. Plaquemines Parish, La.*, 146 S. Ct. 1052, 1063 (2026) (recognizing that courts must not "read a statute in a way that makes part of it redundant" (citation modified)).

Ultimately, § 315(b)(1)(A) says what it says, and it does not say that the LUC extends to political parties engaged in coordinated expenditures. Therefore, the Public Notice is contrary to law for expanding the statute to say that it does.

b.

Finally, we assess whether joint fundraising committees with non-candidate members are eligible for the LUC, as prescribed by the Media Bureau's Public Notice. We conclude that they are not. This analysis is straightforward: The applicable FCC regulations governing the operation of joint fundraising committees ensure that their use is, in substantial part, the use of their non-candidate members, which consequently is not "use . . . by" a legally qualified candidate. *See* 47 U.S.C. § 315(b)(1)(A).

Instead, joint fundraising committees are, in effect, pass-through entities that "collect contributions, pay fundraising costs from gross proceeds and from funds advanced by participants, and disburse net proceeds to each participant." *See* 11 C.F.R. § 102.17(b)(1). Notably, they do not get their own contribution limits, but they may collect "the total amount that the contributor could contribute to all of the participants" pursuant to the applicable limits, and each participant's share of the contribution is reported as if it is made directly to the participating committee. *Id.* § 102.17(c)(3)(iii), (5). Similarly,

"expenses" are allocated between the participating committees based on pro-rata shares. *Id.* § 102.17(c)(7)(i)(A).

In this light, the Party Committees take the position that joint fundraising committees are entitled to the LUC because 52 U.S.C. § 30102(e)(3)(A) provides that such committees may be designated as the "authorized committee" of a participating candidate. *See* Br. of Intervenors 28. But fatal to that contention is the allowance of that designation "*solely* for the purpose of joint fundraising," *see* 52 U.S.C. § 30102(e)(3)(A) (emphasis added). Such a designation therefore makes it possible for joint fundraising committees to act "on behalf of" participating candidates when they fundraise for them. *Id.* § 30101(6). But that does not mean that all other acts by joint fundraising committees are undertaken on behalf of their participating candidates.

Undeterred by that reality, the Party Committees assert that § 315's text provides that "any authorized committee of such candidate" is entitled to the LUC. *See* Br. of Intervenors 21-22. But that is a misconstruction of the relevant statutory language. To reiterate, the LUC requirement is limited to "use . . . by" the candidate, and it says nothing about "authorized committees." *See* 47 U.S.C. § 315(b)(1)(A). Rather, "authorized committees" are referenced in § 315(b)(2) — a provision that expressly conditions a candidate's right to the LUC upon the candidate's certification that "the candidate (and any authorized committee of the candidate)" will include a disclaimer in any political broadcast. *Id.* § 315(b)(2). As the Federal Candidates aptly explain in reply, "[n]othing about this language suggests that authorized committees are always entitled to lowest unit

charge, regardless of whether a given advertisement involves 'use . . . by' a candidate." *See* Reply Br. of Pet'rs 38.

Turning to the FCC's position on the entitlement of joint fundraising committees to the LUC, the FCC maintains that "[w]hen a [joint fundraising committee] purchases airtime for use by one of its participating candidates, the use of airtime by the candidate . . . qualifies for the LUC rate." *See* Br. of Resp'ts 37. Incurable in that regard is the FCC's assumption that "use . . . by" a candidate is at issue in that situation, and the FCC's disregard of the regulations that govern joint fundraising committees. *See, e.g.*, Reply Br. of Pet'rs 39 (explaining that "regulations governing [joint fundraising committees] define which participant is responsible for which portion of every expenditure, and often mean that the bulk of the expenditure is not, by law, attributable to the candidate").

At bottom, a joint fundraising committee "cannot be understood to be 'using' a broadcaster on behalf of a candidate when it spends money that, under FCC regulations, was contributed to it as a contribution to a non-candidate committee and that must be deemed an expenditure by that non-candidate committee." *See* Reply Br. of Pet'rs 39. We thus rule that the Media Bureau's Public Notice illegally expands § 315(b)(1)(A)'s scope to extend the LUC to advertisements purchased by joint fundraising committees with non-candidate members.

* * *

Simply put, the LUC requirement and pertinent campaign finance statutes are clear that neither political parties nor joint fundraising committees with non-candidate members

can be entitled to the LUC. In asserting otherwise, the Public Notice is plainly contrary to law and cannot stand.[11]

---

[11] It is significant beyond measure that none of the parties in this litigation has raised or pursued a constitutional issue of any sort. Indeed, these appellate proceedings were extensively briefed and well-argued without even a mention of any First Amendment issue. And as we know, the federal courts are not in "the habit of . . . decid[ing] questions of a constitutional nature unless absolutely necessary to a decision of the case." *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). Nevertheless, our good dissenting colleague seeks to advance a position implicating the canon of constitutional avoidance, expressing concerns about the applicability of the First Amendment. Of importance, however, the constitutional avoidance doctrine "has no application in the absence of [statutory] ambiguity." *See Warger v. Shauers*, 574 U.S. 40, 50 (2014) (citation modified). And the controlling statutory language in these proceedings —

> The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign . . . [must be at] the lowest unit charge of the station for the same class and amount of time for the same period.

*See* 47 U.S.C. § 315(b)(1)(A) — simply says what it says, with no ambiguity in the statute's plain text.

As the Supreme Court has recognized, although a reviewing court may "construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute or judicially rewriting it." *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) (citation modified). Notwithstanding our distinguished friend's tardy effort to manufacture a constitutional issue in this proceeding, we are not entitled to rewrite the statute. Put simply, as an applicable old proverb reminds us, we cannot "make a silk purse from a sow's ear." *See U.S. v. Godwin*, 272 F.3d 659, 681 (4th Cir. 2001).

IV.

Pursuant to the foregoing, we grant the Federal Candidates' Petition for Review and set aside as unlawful and hold for naught the Public Notice issued by the FCC's Media Bureau.

*PETITION FOR REVIEW GRANTED*

WYNN, Circuit Judge, concurring:

I join the well-reasoned majority opinion in full. Indeed, it gives the parties and the public adequate notice of the ground rules for the upcoming elections. That laudable objective would be entirely undermined if we accepted the jurisdictional gamesmanship the FCC asks us to employ.

I write separately to emphasize the incontrovertible fact that the *latest* possible date for agency finality is September 4, 2026, when the 60-day period preceding the upcoming elections begins under 47 U.S.C. § 315(b)(1). Any other considerations are nonjurisdictional, and they are particularly unpersuasive when the sole issue turns on our de novo review of a question of statutory interpretation.

Certainly, the odd procedure at work here brings to mind some of the concerns that the Supreme Court articulated in *Loper Bright*: There are "occasion[s] on which abdication in favor of the agency is *least* appropriate." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024). Here, adopting the FCC's position could shift the task of pre-enforcement statutory interpretation entirely to the agency. Under that regime, the FCC may use its delegated authority as a get-out-of-review-free card. First, one of its divisions issues a "public notice" of its broad reinterpretation of a statute. That notice has the "same force and effect" as a rule promulgated by the Commission. 47 U.S.C. § 155(c)(3). Second, the full Commission does nothing. Third, the new rule goes into effect with no judicial review.[1]

[1] The dissent suggests that prolonged inaction by the Commission is "a reasonable concern" that could be alleviated through a writ of mandamus compelling agency action. Diss Op. at 48. But it also recognizes that a several-month delay is generally insufficient (Continued)

That cannot be what Congress intended. And thankfully, precedent does not direct such a dangerous result.

I.

The FCC argues, without legal authority, that we cannot consider constructive denial in our finality analysis.[2] *See* Response Br. at 27.

Yet finality is a "pragmatic" inquiry. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). And it is uncontroversial that "[b]oth an agency's failure to act and its affirmative actions are subject to review." *Sierra Club v. Larson*, 882 F.2d 128, 130 (4th Cir. 1989).

That is why federal appellate courts have long held that "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970) (citations omitted); *see Int'l Navigators Council of Am. v. Shaffer*, 444 F.2d 904, 910 n.11 (D.C. Cir. 1971) (explaining that "administrative inaction" that is "the equivalent of an order denying relief" is "susceptible of direct review") (quotation omitted). Thus, when an agency has delayed its response "beyond the time in which action could be effective," a court may determine that "inaction has precisely the

for mandamus relief. *Id*. How mandamus could be a solution to the FCC's unfettered ability to change broadcast rules in the months before an election eludes me.

[2] The FCC argues only that constructive denial has never been applied to the Communications Act. Of course, that level of specificity allows it to ignore any instances in which the concept has been applied to other agency action.

same impact on the rights of the parties as denial of relief." *Coal. For Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1251 (10th Cir. 2001).

To hold otherwise would be to give agencies the unfettered ability to avoid judicial review, in violation of the statutory scheme. According to the FCC, it should be able to employ its delegated authority to take action that is equivalent to actions by the full Commission, ignore any challenges rather than formally deny them, and then allow the time for effective relief to pass without any judicial review of the merits. Under that reading, we should abandon our usual pragmatic approach for a strictly technical rule that hinges on the formality of agency action.

We are not the first to reject such a strained and hyperformal interpretation of finality. In *Friedman v. FAA*, the D.C. Circuit found that the FAA's refusal to reach a formal determination constituted "a constructive denial" of an airline pilot's license application. 841 F.3d 537, 541 (D.C. Cir. 2016). The court explained that the applicable test for finality was not "whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently final to warrant review in the context of the particular case." *Id.* at 542 (cleaned up).

At oral argument, the FCC agreed that it needed the chance to put its "two cents worth in" before this Court reviews the Media Bureau document. Oral Arg. at 49:05–15, https://www.ca4.uscourts.gov/OAarchive/mp3/26-1785-20260807.mp3. Yet almost immediately thereafter, the agency conceded that "it's very unlikely the Commission will act here before September 4th." Oral Arg. at 49:45–50:15. That is precisely the sort of

"vague prospect of reconsideration" that indicates the FCC may permit the deadline for effective action to pass without further discussion. *Friedman*, 841 F.3d at 543.

The agency's position, in substance, is that it may thwart the judicial review of an operative rule either by postponing its own review until review is no longer meaningful or by declining to act at all. That conception of administrative authority cannot be reconciled with the judicial role. As I reiterate below, an agency may not reserve to itself the power to defeat judicial review through delay or inaction. That is too much power for an agency.

In its subsequent letter to this Court on August 17, the FCC confirmed that it did not intend to review the petitioners' challenges. Instead, the agency informed us that the Chairman had circulated a proposal to dismiss the petitioners' application; further, the agency had already dismissed a related request for review from another interested party. *See Brown v. FCC*, No. 26-1785 (4th Cir. Aug. 17, 2026), Dkt. No. 63. In other words, the FCC has no intention of using any of its potential "power to persuade" us in this case, as the dissent asserts it must.[3] *See* Diss. Op. at 51.

Yet without relief, the parties agree that on September 4, 2026, broadcasters will be obligated to offer the lowest-unit charge to qualified parties. *See* Oral Arg. at 55:00–25;

---

[3] Moreover, the practical benefits of a formal decision from the Commission are minimal in this case. Statutory interpretation is "exclusively a judicial function," and we owe no deference to the agency's interpretation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 387 (2024). To be sure, there may be situations in which we are persuaded by an agency's opinion "to the extent it rests on factual premises within [the agency's] expertise." *Id.* at 402 (quotation omitted). But here, the parties acknowledge that the single merits issue is one of pure statutory interpretation.

47 U.S.C. § 315(b)(1) (lowest-unit charge in effect 60 days before a general election). Those who fail to heed the FCC's latest interpretation of § 315(b) "do so at the risk of significant . . . civil penalties." *Hawkes*, 578 U.S. at 600; *see* 47 U.S.C. § 503(b)(2)(A) (describing penalties up to "$25,000 for each violation or each day of a continuing violation"). Thus, broadcasters will be put in the difficult position of either (1) risking those penalties or (2) selling broadcast time at a lower rate to the additional groups that the agency identifies.[4]

II.

The FCC also argues that we must conclude that a final agency action occurred before the petitioners filed their petition for review in this Court, arguing that a too-early filing has jurisdictional consequences. Not so.

Under 28 U.S.C. § 2344, parties "aggrieved by the final order may, within 60 days after its entry, file a petition to review the order" in this Court. In the past, courts have tied the commencement of the 60-day period to their jurisdiction, such that a petition filed too

---

[4] Though the FCC attempts to persuade us otherwise, it is clear that the volume of broadcast time that these groups would purchase under the lowest-unit charge would be a sea change. For example, before the Supreme Court's decision in *National Republican Senatorial Committee v. FEC*, "party-coordinated expenditures in House races have never exceeded 1% of total campaign spending." 146 S. Ct. 2404, 2433 (2026) (Kagan, J., dissenting). Additionally, the FCC's submission of the 2024 National Association of Broadcasting Handbook shows that additional committees, such as joint fundraising committees, demanding the lowest-unit charge "has become a more frequent situation" only in "recent years," and "[s]tations should consult their attorney if confronted with" such a request. Attachment to Response Br. at 7.

early was "incurably premature." *Council Tree Commc'ns, Inc. v. F.C.C.*, 503 F.3d 284, 287 (3d Cir. 2007).

But in recent years, the Supreme Court has emphasized that "most time bars are nonjurisdictional." *Harrow v. Dep't of Def.*, 601 U.S. 480, 484 (2024) (quotation omitted). Thus, we should "treat a procedural requirement as jurisdictional only if Congress 'clearly states' that it is." *Id.* (quotation omitted). Such a clear statement would "speak[] to a court's authority to hear a case" rather than simply speak in mandatory terms to petitioners. *Id.* at 485. Thus, the Supreme Court read a requirement in a similar statute—which stated that "any petition for review shall be filed within 60 days after the Board issues notice of the final order or decision of the Board"—as nonjurisdictional and likely subject to equitable exceptions. *Id.* (quoting 5 U.S.C. § 7703(b)(1)); *see id.* at 489.

I see no defensible distinction between that language and § 2344's 60-day filing deadline. Thus, whether the petition was early is irrelevant to our jurisdictional analysis, so long as we are satisfied that we have jurisdiction when we rule on the merits of the petition.[5]

[5] The dissent asserts that, even if it is nonjurisdictional, the 60-day requirement is a mandatory claims-processing rule, not an "optional deadline." Diss. Op. at 44 n.1. But the petitioners have not blown past a deadline. The FCC instead claims that they have petitioned us too *early*. Indeed, we have explained that even a premature notice of appeal—for which lateness would have jurisdictional consequences—becomes "effective" if the district court issued a final order while the appeal is pending. *In re Bryson*, 406 F.3d 284, 289 (4th Cir. 2005) (quotation omitted).

III.

Finally, it bears emphasis that the statutory and regulatory scheme before us is an unusual one. Congress did not itself create the Media Bureau. Rather, it authorized the Commission to delegate its functions and provided that any action taken pursuant to such delegated authority "shall have the same force and effect" as action taken by the Commission itself. 47 U.S.C. § 155(c)(3); *see* § 155(c)(1). Acting under that authority, the Commission created the Media Bureau and vested it with responsibility for administering and enforcing the Commission's "rules and policies" governing political programming.[6] *See* 47 C.F.R. § 0.61(e).

The consequence is straightforward. When the Media Bureau acts pursuant to delegated authority, its order binds regulated parties without awaiting any further action by the Commission. It takes effect; it imposes obligations; and it speaks with the authority Congress has accorded to the Commission's delegate. In every practical sense, therefore, such an order is final when issued by the Media Bureau. Yet the statutory scheme permits

[6] It bears repeating that this power, if unchecked by judicial review, could give the agency the wholesale power to rewrite statutes. Here, the attempt is to add joint fundraising committees and national party committees to § 315(b)(1). The dissent avoids the rewriting that is required to slot these additional groups into the statute by lumping them together in its analysis. *See* Diss. Op. at 56-57. Thus, the dissent sidesteps the clear textual problem: Everyone agrees that party committees are not authorized committees in these circumstances, yet the statute requires a candidate who is claiming the lowest-unit charge to state both "that the candidate has approved the broadcast and *that the candidate's authorized committee paid for the broadcast*." 47 U.S.C. § 315(b)(2)(C)(ii) (emphasis added). After avoiding this Achilles heel, the dissent then employs an unbriefed constitutional argument about discrimination against party-coordinated speech. Diss. Op. at 60-68. It then arrives at a construction that happens to also favor joint fundraising committees. That is too much for the text to bear.

the Commission to consider a challenge to that order while the order remains in force. That result is an unusual asymmetry: A Media Bureau order operates with the full force of a Commission order even as the Commission considers whether that order should stand.

The peculiarity becomes more pronounced when § 155(c)(3) is read alongside § 155(c)(7). Congress has authorized the Commission to delegate to the Media Bureau the power to issue operative orders carrying "the same force and effect" as Commission orders. At the same time, Congress requires a party aggrieved by delegated action to seek Commission review as a "condition precedent to judicial review." 47 U.S.C. § 155(c)(7). The Commission would transform that exhaustion requirement into something quite different: a means by which its own delegate may issue a binding order, while the Commission withholds the very action that, in the Commission's view, is necessary before a court may review the order.

Surely, Congress did not permit the Commission to have it both ways—empowering its own Media Bureau to speak with the Commission's full legal force when imposing obligations on regulated parties, while at the same time allowing the Commission to thwart any meaningful judicial review of a Media Bureau's order by unduly delaying its own action or declining to act at all. This is especially subject to abuse in highly time-sensitive matters such as the one before us. That's too much power for an agency to possess without an explicit grant from Congress.

IV.

In sum, neither statute nor precedent directs us to throw up our hands when an agency acts in a way that is, for all practical purposes, final. Indeed, when confronted with

novel paths that may thwart judicial review, we should reconfirm our "background presumption of judicial review" of agency actions. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 157 (2025).

WILKINSON, Circuit Judge, dissenting:

Collaboration between candidates and parties "has formed the essence of our Nation's party system of government" since the Founding. *National Republican Senatorial Committee v. FEC*, 146 S. Ct. 2404, 2416 (2026). What a shame the majority assaults that very "essence" in this very case.

In striking that blow, the majority first transgresses its jurisdictional bounds. Our jurisdiction is limited to "final orders" of the Federal Communications Commission. 28 U.S.C. § 2342; 47 U.S.C. § 402. The FCC is presently considering an "application for review" brought by the same petitioners before us here. In both fora, petitioners make the same arguments and seek the same relief: a modification or reversal of the rule laid out in the FCC Media Bureau's Public Notice. While the Commission reviews the application, the Public Notice before us is not a final order. This court may not sit in judgment of the Commission until the Commissioners complete their statutory duty to "pass[] upon" the application and decide whether to adopt the Public Notice. 47 U.S.C. § 155(c)(4).

But if we *had* jurisdiction, the First Amendment would disfavor petitioners' view of ambiguous statutory text. The majority says that the Communications Act denies Lowest Unit Charge (LUC) rates to candidates speaking via party-coordinated advertisements, whether such coordination is direct or the functional product of Joint Fundraising Committee expenditures. But Congress cannot dangle lower rates for *some* candidate speech as a means of penalizing *other* candidate speech. The differentiated advertisement rates sought by petitioners degrade both the "important and traditional role of political

parties during campaigns" and the collaborative speech between candidate and party that role creates. *NRSC*, 146 S. Ct. at 2415.

Because I disagree with the majority both about our jurisdiction and about the inferior place the majority assigns to protected collaborative speech, I respectfully dissent.

## I.

The Communications Act and the Hobbs Act govern whether our court is fit to decide this case and to decide it now. 47 U.S.C. § 155; 28 U.S.C. §§ 2342–44. Read properly, those statutes work together to prohibit us from exercising jurisdiction at this time.

The FCC Commissioners are a bipartisan group of five principal officers appointed by the President and confirmed by the Senate. 47 U.S.C. § 154. Congress made clear that those individuals should review and refine the work of FCC staff members before that work may be challenged in federal court. *Id.* §§ 155(c)(4), (7). Congress undoubtedly recognized the value of the Commissioners deliberating, providing an explanation of their reasons, and signing their names in support of—or in opposition to—the policy expressed in the staff decision.

My colleagues in the majority fail to respect those worthy aims and wrest jurisdiction from the FCC before the Commissioners can perform the role Congress assigned to them. The majority's choice to proceed to the merits undermines Congress's statutory scheme and disempowers the most politically accountable actors within the Commission.

A.

The Communications Act authorizes the Commission to delegate to its staff the power to issue certain decisions. 47 U.S.C. § 155(c)(1). Aggrieved parties who seek to challenge actions taken on delegated authority must proceed in two steps.

First, they must seek agency review by filing an "application for review" before the full Commission within 30 days of public notice of a decision by FCC staff. 47 U.S.C. § 155(c)(7); 47 C.F.R. § 1.115(d). Once an application is filed, the Commission has a mandatory obligation to act on the application. 47 U.S.C. § 155(c)(4) ("[E]very such application *shall* be passed upon by the Commission") (emphasis added).

At step two, aggrieved parties may file a "petition for review" in federal court. *Id.* § 155(c)(7). A "condition precedent" to filing the petition for review in a federal court is "[t]he filing of an application for review" in front of the full Commission. *Id.* The Communications Act provides that "[t]he time within which a petition for review [in a federal court] must be filed . . . shall be computed from the date upon which public notice is given of orders disposing of all applications for review" before the Commission. *Id.*

The Communications Act then provides for judicial review by adopting the procedural requirements contained in the Hobbs Act. *See* 47 U.S.C. § 402(a) (invoking 28 U.S.C. §§ 2342–44). The Hobbs Act states that any aggrieved party may "file a petition" for review in the appropriate federal court "within 60 days after" the entry of a "final order." 28 U.S.C. § 2344.

B.

The jurisdictional question at hand is thus a straightforward matter of statutory interpretation. Judicial review is unavailable until the FCC renders a final order. There is no final order here because the full Commission is still formulating its final decision. The Communications Act and the Hobbs Act together strip us of jurisdiction to hear a petition for review unless it is filed in the 60-day window that begins at the point when the Commission "dispos[es] of all applications for review." 47 U.S.C. § 155(c)(7); 28 U.S.C. § 2344. We may not enlarge our jurisdiction on a whim.

Petitioners seek to complicate the matter because they lack a strong statutory argument. According to petitioners, those complaining of action taken by FCC staff may seek judicial review as soon as they *file* an application for review asking the full Commission to set aside or modify the action. Noting that the Communications Act requires "filing" an application for review before the full Commission as "a condition precedent to judicial review," 47 U.S.C. § 155(c)(7), petitioners argue that Congress must have meant to imply that the FCC need not *resolve* the application before courts can step in.

This is a myopic interpretation of what Congress intended. Petitioners invoke jurisdiction under the Hobbs Act, which requires petitions for review in courts of appeals to be filed "within 60 days after . . . entry" of a "final order" of the Commission. *See* Pet. for Review at 1; 28 U.S.C. §§ 2342(1), 2344; 47 U.S.C. § 402(a). "The obligation to file within [the] sixty-day window" imposed by the Hobbs Act "is jurisdictional in nature, and may not be enlarged or altered by the court . . . absent 'exceptional' circumstances." *Bhd.*

*of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 103 (D.C. Cir. 2020) (internal citations omitted).[1]

Therefore, to say that a petition for review is timely before the Commission has even "dispos[ed] of all applications for review" pending before it impermissibly enlarges the filing window. 47 U.S.C. § 155(c)(7). As then-Judge Scalia noted, "[i]f the intent were to establish a filing deadline rather than a filing window, it would more naturally have been phrased 'no later than 60 days after . . . entry' rather than 'within 60 days after . . . entry.'" *W. Union Tel. Co. v. FCC*, 773 F.2d 375, 377 (D.C. Cir. 1985) (declining to exercise jurisdiction over a premature appeal of an FCC order).

Of course, decisions made by FCC staff carry undeniable weight. An "order, decision, report, or action" by Commission staff under delegated authority has "the same force and effect" as an action taken by the Commission itself. 47 U.S.C. § 155(c)(3). If no one asks the full Commission to review a staff decision, perhaps it becomes final because it "mark[s] the 'consummation' of the agency's decisionmaking process" on the matter. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation omitted). But after the petitioners

[1] *Harrow v. Department of Defense*, 601 U.S. 480 (2024), holds that the deadline for review of decisions by the Merits System Protection Board is a non-jurisdictional claims-processing rule. It does not address the Hobbs Act's 60-day window, which lower courts have generally treated as jurisdictional. *See, e.g.*, *Consumers' Research v. FCC*, 67 F.4th 773, 784 (6th Cir. 2023); *Commonwealth Edison Co. v. U.S. Nuclear Regul. Comm'n*, 830 F.2d 610, 614 (7th Cir. 1987); *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 963 (8th Cir. 2014); *Consumers' Research v. FCC*, 88 F.4th 917, 922 (11th Cir. 2023). Even if those lower courts are wrong, a mandatory claims-processing window is still no optional deadline. *See Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 192 (2019); *Manrique v. United States*, 581 U.S. 116, 121 (2017) (noting that such rules are "unalterable" if "properly raise[d]").

filed an application for review—which obligated the full Commission to review the Public Notice—the FCC's decisionmaking process carried on. So, there is not yet a final order from which to measure any 60-day window.[2] It cannot be final because the Commission is still considering the question.

C.

Petitioners' argument that merely *filing* an application for review provides this court with jurisdiction would demand an audacious act of judicial overreach. That argument disrespects the value of agency finality, namely the benefit of having a complete, collective judgment of the most accountable agency officials before judicial review commences. The full Commission must have an opportunity to "pass[] upon" petitioners' application for review before our task begins. 47 U.S.C. § 155(c)(4).

By allowing an appeal at this stage, the majority creates two parallel tracks of redundant litigation and cuts the Commissioners out of the picture where Congress required their involvement. It makes little sense to think that Congress envisioned two separate proceedings in a race against one another. But accepting jurisdiction here allows future

[2] It does not matter whether the policy embodied in the Public Notice is a legislative rule or an interpretive rule. *See* Maj. Op. at 15–16. Even if its terms are more "substantive" than "interpretive," *id.*, Congress has barred judicial review until the Commission disposes of petitioners' application. *See* 5 U.S.C. § 701(a)(1). Only after the Commission has weighed in may the "substantive" or "interpretive" nature of the policy bear on its reviewability. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) ("First, the action must mark the consummation of the agency's decisionmaking process . . . . And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." (quotation omitted)). The first prong is missing here until the Commission addresses petitioners' application. A legislative rule is only "necessarily final," Maj. Op. at 16, with respect to *Bennett*'s second prong.

complainants to challenge FCC staff decisions in a near-simultaneous one-two punch: they can quickly file both an application for review before the FCC and a petition for review in a federal court. Perhaps future filings will be minutes apart.

Worse yet, accepting jurisdiction here not only undermines *efficiency*, it subverts *accountability*. Agencies are creatures of Congress. Rules Congress imposes on agencies may strike courts as ill-advised, but those rules are often products of Congress's desire to ensure that those making policy in the executive branch face accountability for any missteps or abuses. *See United States v. Arthrex*, 594 U.S. 1, 16 (2021). The FCC Commissioners, appointed by the President with the advice and consent of the Senate, tether this agency to the people through their elected representatives, creating "lines of accountability." *Id.* Functionally erasing Commission-level review from the text of the Communications Act allows Commissioners to evade accountability by shunning Congress's command that they weigh in with their considered judgment and put their views on the record. Disregarding that mandate muddies up the public's effort to ascertain "on whom the blame or the punishment of a pernicious measure . . . ought really to fall." *Id.* (quoting The Federalist No. 70, at 476 (A. Hamilton)).

Other courts have uniformly recognized the necessity of Commissioner review of FCC staff decisions. *See Alabama Power Co. v. FCC*, 311 F.3d 1357, 1366 (11th Cir. 2002) ("The petitioners must give the Commission an opportunity to issue a final decision; otherwise, the statutory prerequisite [of filing an application for review] would be rendered useless."); *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 287 (3d Cir. 2007); *Ga. Power Co. v. Teleport Commc'ns Atlanta, Inc.*, 346 F.3d 1047, 1050 (11th Cir. 2003); *Int'l*

*Telecard Ass'n v. FCC*, 166 F.3d 387, 387–88 (D.C. Cir. 1999) (per curiam). My colleagues do not discuss the precedents with which they disagree, and they can point to no case recognizing a right to judicial review of an FCC staff order while the full Commission considers the same petitioner's application for review of that order.

Instead, my colleagues note that Section 155(c)(3) grants actions taken under Commission-delegated authority "the same force and effect" as actions "of the Commission," "unless reviewed as provided in [Section 155(c)(4)]." Maj. Op. at 11–12. So, the majority claims, an order must have that "same force and effect"—i.e., it must be final—until the Commission has *finished* reviewing it. *Id.* at 12. "[O]nly when review is completed, not merely begun, does an order made under delegated authority become nonfinal." *Id.*

That is a puzzling construction: it is unclear how *the completion of Commission review* could be the thing that makes an order "nonfinal." The true meaning of Section 155(c)(3)'s "unless" clause is much simpler. It just means that the Commission could, in disposing of an application for review, overturn a staff decision, which would eliminate its "force and effect." That risk underscores the non-finality of the staff decision while the Commission's review proceeds. It may be true that staff orders are final if no party ever asks for Commission review. But once an application *is* brought before the full Commission, we know the staff action will not be the FCC's last word on the matter, because the FCC is obligated to review that application. 47 U.S.C. § 155(c)(4). How indeed could a staff memo be seen as a "final order" once the Commission has been legally bound to consider modifying or rejecting it?

I understand that petitioners feel they are in a bind because judicial review is conditioned on first asking the Commission for relief. *Id.* § 155(c)(7) (requiring an order "disposing of all applications for review"). But those are the rules Congress applied to their situation. Judicial review is unavailable until the full Commission reviews petitioners' application.

D.

The majority highlights what I view to be a reasonable concern: what if the Commission never acts on an application for review? Is it possible for the FCC to evade review of an unlawful decision so long as the Commission (1) delegates to its staff the authority to make the decision, and (2) indefinitely holds applications for review challenging the decision?

I think not. If the Commission were to attempt to table an application indefinitely, the Commission would be violating the law. *See* 47 U.S.C. § 155(c)(4) ("[E]very . . . application shall be passed upon by the Commission."). The use of "shall" in the statute indicates a mandatory duty that must be undertaken. *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command. 'Shall' means 'must.'" (citation omitted)).

For that reason, as the FCC recognizes, this court has jurisdiction under the All Writs Act to issue a writ of mandamus compelling the agency to render its final decision. Resp. Br. at 28. The D.C. Circuit, when confronted with similar claims of "unreasonable delay," has asked "whether the agency's delay is so egregious as to warrant mandamus." *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984); *cf. In re Core*

*Communications*, 531 F.3d 849, 850 (D.C. Cir. 2008) (considering a seven-year delay by the FCC "egregious" and issuing a writ of mandamus).

While mandamus is a rare and extraordinary remedy, courts may calibrate their discretion to issue the writ and act more aggressively when the circumstances warrant it. *See U.S. ex rel. Greathouse v. Dern,* 289 U.S. 352, 359 (1933) (emphasizing that the mandamus remedy is "controlled by equitable principles"). That said, it is inconceivable for mandamus to be appropriate here after two months of agency inaction. To be sure, the Commission need not sit on its hands for seven years for mandamus to be appropriate, s*ee In re Core Communications*, 531 F.3d at 850, but two months in a difficult and complex case such as this one is plainly not egregious. Besides, judges are not in a strong position to question the agency's relative priorities or to formulate a view of how long disposing of any given application "should" take, given that courts themselves are not often models of alacrity.

After a writ of mandamus has issued, further inaction and delay evincing an intent to evade judicial review may render it appropriate for a court to consider an application "passed upon" and effectively denied by the Commission. *See Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C. Cir. 1970). However, considering *this* application constructively denied before mandamus, as the majority holds, is untenable. Maj. Op. at 13. Countless future FCC staff decisions are vulnerable to hasty appeal under the majority's reasoning, short-circuiting the Commission's internal review process in much the same way as the majority's view of the jurisdictional statutes.

E.

A hasty constructive-denial timeline is especially improper in the circumstances of this case. The majority proposes nothing less than an upending of settled campaign finance ground rules right in the middle of an election season. Throughout this year's primary season broadcasters have *already* provided LUC rates to groups the majority excludes from LUC eligibility. *See, e.g.,* 28(j) Response of Intervenors at 2 n.1 (ECF 64) (comparing advertising purchases in the 2026 New Hampshire Senate race). If allowed to remain in effect through the date of this year's general elections, the Public Notice will simply apply the same consistent standards to the entire election season.

Nor did the Public Notice change the status quo in the first place. Instead, as petitioners concede, party-coordinated ads received LUC rates in prior election cycles, too. *See* Pet. Reply Br. at 35; *see also* Br. of Intervenors at 8–12. At worst, petitioners will keep facing for a few more months the LUC rules under which they have long labored—and, at times, profited. *See* Br. of Intervenors at 9–10 (listing cases in which Petitioner Brown received LUC for party-coordinated ads, as well as similar cases for candidates backed by intervenors). At the very least, constructive denial demands more agency neglect than a two-month hesitation in upending longstanding election rules.

The majority's constructive-denial holding instead tells the FCC that, moving forward, our court will ignore its internal review process unless it renders a decision in two months or less. Courts themselves take longer when the complexity of the action or the internal process of the court demands it. I am unwilling in these circumstances to accept

jurisdiction and run roughshod over Congress's command that the agency "pass[] upon" and "dispos[e] of" petitioners' application for review. 47 U.S.C. §§ 155(c)(4), (7).

F.

A few final points merit comment. First, it is important in discussing the interplay between Congress, courts, and agencies to take account of the Supreme Court's landmark decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). When Congress asks an agency to produce a reasoned interpretation of law for courts to review, those reasons still have value after *Loper Bright* because they "'constitute[] a body of experience and informed judgment to which courts and litigants [may] properly resort for guidance,' even on legal questions." *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–140 (1944)).

The Commission has the "power to persuade" us in this case especially because we are confronting intricate questions of campaign finance law that the agency has encountered before and on which the agency maintains institutional knowledge. *See, e.g., The Law of Political Broadcasting & Cablecasting: Political Primer*, 100 F.C.C.2d 1476 (1984); *In the Matter of Codification of the Commission's Political Programming Policies*, Memorandum Opinion and Order, 7 F.C.C. Rcd. 4611 (1992). Much remains unclear based on the record we have. I, for one, would like to hear a full explanation of the Commissioners' views.

To say that the Commission's expertise is irrelevant is not only an insult to the Commission. It is an insult to Congress, which explicitly determined that the Commission "shall" "pass[] upon" applications for review and explain itself before this court could

weigh in. 47 U.S.C. § 155(c)(4). If we were to suggest that the perspectives of the Commissioners are worthless, we would be substituting our own policy judgment for that of the legislative branch.

Lastly, this court received a 28(j) letter from the FCC on August 17, 2026. Supplemental Authorities (ECF 63-1). The letter informs us that the Commission's wheels are indeed turning: the Chair has circulated a draft order on which the Commissioners may vote. *Id.* at 1. Regardless of the content of the draft order, which we cannot yet read, the fact that it has been circulated only reinforces the lack of a final judgment of the Commission. The majority is stepping on the Commission's toes as the Commission stands in the middle of its deliberations. My colleagues consider petitioners' application constructively denied, suggesting that the Commissioners are "refusing to issue a formal decision," Maj. Op. at 15, even though the Commission has telegraphed that it is on the precipice of issuing its decision. We do not have jurisdiction in this case until the Commission adopts the order and disposes of petitioners' application. That is what Congress required. 47 U.S.C. §§ 155(c)(4), (7).

* * *

Either there is a final order or there is not. At this point there is not. The full Commission has not acted. So we lack jurisdiction. Jumping the gun is bad business, and, in this case, will upend settled rules in the middle of an election season. The majority cites various exigencies to justify its course, but it is all too easy for courts to contrive exigencies to achieve congenial results. Its decision will only facilitate premature interference with agency proceedings in many other contexts.

In the end, we are not authorized to ignore the congressional judgment that full agency deliberations here have something worthwhile to contribute. Jurisdictional rules determine what courts may and may not do. Take heed.

II.

We lack jurisdiction at this time and should not have reached the merits. Since the majority does so, I must address that portion of its opinion as well. I would note once again, however, that this is an especially inopportune time for courts to be fine-tuning campaign finance ground rules in the run up to a general election.

The text of the Communications Act, though ambiguous, accommodates, and may indeed favor, the FCC's view. But if petitioners are right about the text, I worry that the statute brushes against the First Amendment by favoring some forms of candidate speech over others. I would avert that threat by resolving any doubts in favor of the Constitution.

A.

47 U.S.C. § 315(b)(1) provides LUC rates "for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election." The trouble comes in the undefined phrase, "use" by a "candidate." The FCC reads "use" broadly, petitioners narrowly. The FCC has the stronger of two plausible approaches to ambiguous text.

Consider the different ways a candidate could "use" a broadcasting station, starting with a minimalist view. A candidate could take his own, personal funds, and purchase an advertisement. Under a very narrow, literal view of "use," the statute might offer LUCs only for such purchases.

But "use" cannot be quite so narrow as that. As petitioners themselves note, "[e]veryone agrees that stations must offer lowest unit charge for advertisements purchased by [candidates'] principal campaign committees on behalf of the 'legally qualified candidate' they support." Mot. to Expedite (ECF 8-1) at 5. That consensus is eminently sensible. Federal law requires every candidate for federal office to establish such a "principal campaign committee," and a candidate usually pays for campaign expenses via such a committee. *See* 52 U.S.C. § 30102(e)(1). Besides, if the LUC goes to ads purchased via personal funds, but not ones purchased via principal campaign committees, it is just a handout to rich candidates. To avoid that prospect, a candidate must be "using" the broadcasting station even when his principal campaign committee is the one footing the bill.

B.

If a candidate can "use" a station via his principal committee, perhaps he can do the same via other committees, too. The same statute that *requires* federal candidates to designate principal campaign committees *allows* them to designate "authorized committees." *Id*. Those authorized committees include the "joint fundraising committees," or JFCs, at issue here. *See* 52 U.S.C. § 30102(e)(3)(A)(ii).

In recent practice, a JFC is a means to run candidate ads in coordination with a political party. It is a fundraising committee that includes both the candidate's own principal committee and other members, chief among them party committees. *See* Pet. Br.

at 7–9.[3] The JFC raises money and uses it to run advertisements. But the advertisements a JFC runs are functionally just advertisements for the candidate. So, for example, a JFC advertisement might close with a QR code that links to a JFC-specific donation page, but otherwise showcases an ordinary candidate appearance or blurb. *See id.* (describing trend of JFC advertisements "nearly indistinguishable from ordinary campaign ads").

Such a JFC advertisement, from a viewer's perspective, looks like "use" by a "candidate." *See* Pet. Br. at 8–9; Br. of Campaign Legal Center as Amicus Curiae at 11–13 (describing example from campaign of Sen. Jon Tester). It typically includes a candidate appearance and a candidate message, and it is paid for by a committee that the candidate authorized. *See id.* Existing FCC regulations already embody that intuition by defining "use" as "a candidate appearance (including by voice or picture)." 47 C.F.R. § 73.1941(b).

The statutory text supports this more expansive understanding of "use." Under 47 U.S.C. § 315(b)(2)(A), a "candidate for Federal office . . . shall not be entitled to receive [the LUC] for the use of any broadcasting station unless the candidate provides written certification to the broadcast station that the candidate (*and any authorized committee of the candidate*) shall not make any direct reference to another candidate for the same office." (emphasis added).

[3] A JFC could in theory be formed without a party committee. *See* 11 C.F.R. § 102.17(a)(1)(i). Petitioners, however, object to party-dominated JFCs in their briefing, and amici likewise discuss only JFCs that include party committees as members. *See* Br. of Campaign Legal Center as Amicus Curiae, Dkt. 45, at 9–18. Accordingly I express no view at this time on the LUC rules as applied to JFCs without such party members.

That reference to "authorized committee[s]" could mean two things. First, a candidate who wants an LUC rate must agree to separate restrictions on his authorized committee—even though the committee does *not* get the LUC—if he wants the LUC for himself. But it would be very strange to ask a candidate to make a pledge about the actions of his authorized committees to obtain the LUC for himself alone. Besides, it is odd to say that JFC "use" of a broadcast station is not the candidate's "use" if the candidate has the power to make pledges about what kind of content the JFC can or cannot air.[4]

Instead, a second, broader reading of "use" is more plausible: namely, that authorized-committee ads are a subset of candidate ads, a subset subject to the same LUC-related restrictions because, like other "use" by a "candidate," it qualifies for the LUC.

C.

Petitioners reject this interpretation because of a JFC's party-coordinated nature. As their briefing helpfully explains, party committee members "often completely dominate JFC fundraising." *See* Pet. Br. at 25. Most gross revenue is allocated to party committee members, who then, in turn, under FEC regulations, also bear the vast majority of JFC advertising expenses. *See id.* at 26; 11 C.F.R. § 102.17(c)(6)–(7). And, as petitioners' counsel put it at oral argument, "Under FECA, every dollar that is spent in a federal election is spent by some one organization. In other words, there's no concept of a joint purchase

---

[4] The majority argues that such a reading would make "use" by a "candidate" redundant. *See* Maj. Op. at 25–26. That is incorrect; under this broader reading, "authorized committee" would be explaining and defining "use" by a "candidate," not supplanting that phrase.

that is not divisible." Oral Argument at 20:22-20:33. So, the argument goes, JFC ads cannot be *candidate* speech—they must be *party* speech.

That view presents a false dichotomy, one the majority uncritically adopts. *See* Maj. Op. at 26–28. Given "the important and traditional role of political parties during campaigns," *National Republican Senatorial Committee v. FEC*, 146 S. Ct. 2404, 2415 (2026), it is wrong to say that party-coordinated speech is either just candidate speech or just party speech. Perhaps Congress could have demanded such attribution by limiting the LUC to advertisements *paid for* by a candidate (or a party, or some other entity). That would match petitioners' characterization of FECA as a statute in which "every *dollar that is spent* in a federal election is spent by some one organization." (emphasis added). But in the LUC context Congress attached attribution to *use*, not payment, selecting a term whose ordinary meaning permits multiple actors.

Grafting a narrow meaning of "use" onto the statute distorts that term in a way especially unsuited to the campaign environment. Political campaigns are not, and never have been, siloed, isolated affairs, which allow the neat attribution of speech to only one actor at a time. JFC speech is multi-person speech—that is the whole point of coordination, and the very reason the committee is a "joint" one. A candidate does not stop "using" a broadcast station just because his or her authorized message employs a party-coordination mechanism.

Of course, the FCC's rule extends beyond JFCs to embrace some other party-coordinated speech, too. Candidate advertisements are formally "party-coordinated" when they meet regulatory standards for candidate involvement, but are paid for by a party. *See*

11 C.F.R. § 109.37 (defining party-coordinated communications); 52 U.S.C. § 30120(a)(2) (contemplating advertisements purchased by parties but authorized by candidates). But the same logic still applies—coordination alone does not keep a candidate from "using" a station, because the very nature of coordination is multi-person use. It is unsurprising, then, that broadcasters have routinely offered LUCs to party-coordinated candidate ads. *See* Intervenor Br. at 8–12.

*Some* party speech is obviously not candidate use. For example, a party might run an advertisement for the *party*, without mentioning any particular candidate, or without seeking any candidate's authorization. That would not be candidate "use" in any ordinary sense of the term. *See* Br. of Intervenor at 26 (disclaiming entitlement to LUC for such advertisements). But a party-coordinated advertisement that features a candidate's image and speech and message, and is authorized by the candidate, does seem like "use" by the candidate, even if it is "use" by the party, too.

III.

Today's statutory disagreement is no ordinary difference of opinion between litigants. At stake is political speech at the heart of the election season, and hence at the heart of the First Amendment. It is therefore proper to consult that amendment in resolving statutory doubts.

The FCC's reading of "use" by a "candidate" is a natural and plausible one, given the fact that candidate-party coordinated speech remains a species of candidate speech alone. But the FCC's position is hardly a slam dunk. The phrase "use" by a "candidate" retains some inherent ambiguity.

The Constitution resolves it. "When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict." *United States v. Hansen*, 599 U.S. 762, 781 (2023). Here, that harmony favors the FCC.

A.

Suppose, for the sake of argument, that petitioners rightly apprehend the Communications Act. If so, I fear, they misapprehend the First Amendment. As a rule, Congress "may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Agency for Intern. Dev. v. All. for Open Soc'y Intern., Inc.*, 570 U.S. 205, 214 (2013) (quoting *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 59 (2006)) (internal punctuation omitted). Congress had no obligation to create any "Lowest Unit Charge" scheme for ads by political candidates. Having done so, however, Congress cannot escape First Amendment scrutiny by using the benefit to candidates to deny comparable speech-enhancing benefits to closely coordinating entities. Allowing such denials risks smothering political speech severely.

As explained above, whatever the precise statutory meaning of "use," candidates for federal office do speak in many ways. Sometimes they pay for advertisements directly, out of their own pockets. More commonly their principal campaign committee purchases advertisements on their behalf. And they can also speak by coordinating advertisements with national political parties. A candidate's authorship of speech does not end because another speaker joins him.

Under petitioners' statutory construction, the Communications Act favors some of these modes of candidate speech while disfavoring others. It offers the LUC to independent candidate speech—personal ad purchases or principal campaign committee ad purchases. But it denies the LUC to party-coordinated speech, like JFC-purchased advertisements and regular party-coordinated ad buys. This is an unfortunate attempt to disfavor those kinds of speech, a penalty the First Amendment forbids.

B.

Statutory discrimination against party-coordinated speech is unsurprising here, because the LUC statute was passed as part of the Federal Election Campaign Act (FECA), which also placed broader, direct limits on party-coordinated speech. *See* Pub. L. 92-225, 86 Stat. 4; 52 U.S.C. § 30116(d). The Supreme Court initially upheld those limits in *Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 437 (2001). Now, however, FECA's party-coordination limits are gone, struck down by the Supreme Court as antithetical to the First Amendment. *See NRSC*, 146 S. Ct. at 2428.

Before us in the present case is a kind of mop-up duty: we must decide whether Congress can do indirectly, via the LUC rules, what it cannot do directly—disfavor various kinds of party-coordinated spending. To complete that task, we must, of course, go beyond *NRSC*'s rule of decision. An end to party-coordinated expenditure limits does not automatically require different LUC rules. But *NRSC*'s approach, and its appreciation for collaborative political speech, nevertheless guides our hand.

"To understand the severity of the First Amendment problem caused by" a restriction on party-coordinated speech, "one must first appreciate the important and

traditional role of political parties during campaigns." *Id*. at 2415. Though it is fashionable to quote George Washington's admonition against the "spirit of party," *see* George Washington, Farewell Address (1796), "[t]he formation of national political parties was almost concurrent with the formation of the Republic itself." *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). Parties immediately began to play an indispensable role in the national electoral process. By the 1820s, Martin Van Buren structured and professionalized the party concept, joining with Andrew Jackson to create the Democratic Party and the centralized electoral model we recognize today. He did so with the aim of uniting citizens through "party principle," not "personal preference" or "sectional & personal feelings," imagining parties as vehicles to prioritize ideals over personalities. Letter from Martin Van Buren to Thomas Ritchie (Jan. 13, 1827) (Library of Congress Van Buren Papers Collection, Series 2). That framework eventually carried Van Buren himself—a slight man whose first language was not even English—to the presidency. *See* Edward L. Widmer, Martin Van Buren 6–7 (2005).

Individuals hardly vanished: Andrew Jackson's populist appeal aided Van Buren's project. But collective organization—especially at the local party level—dramatically increased voter turnout and engagement: From 1824 to 1840, voter turnout in presidential elections increased from 26 percent to 80 percent. *See* National Archives Center For Legislative Archives, The Two-Party System: A Revolution in American Politics, 1824 to 1840, at 11 (2021), https://perma.cc/97WY-UJWQ. That shift helped turn abolitionism (or at least the Free Soil movement) into a key plank of the new Republican Party, the second

major political party that remains with us today. *See* Akhil R. Amar, Born Equal: Remaking America's Constitution 160 (2025).

Even before Van Buren's time, political parties acted in ways comparable to modern "party-coordinated" advertising. This was especially true in 19th-century presidential elections, where many candidates declined to campaign on their own behalf to avoid accusations of undue showmanship and self-importance. Instead, they worked behind the scenes to coordinate party activities. *See* Richard J. Ellis & Mark Dedrick, *The Presidential Candidate, Then and Now*, 26 Perspectives on Political Science 208, 208–11 (2010). In the early 1800s, that included direct party support for newspapers in the form of "working capital, official advertising, and patronage." William Miles, The People's Voice: An Annotated Bibliography of American Presidential Campaign Newspapers xxiii–xxiv (1987).

Later, formal party affiliation with newspapers ended, but so-called "campaign newspapers" still coordinated with partisans on all sides, offering outlets for political cartoons, articles by influential party members, or announcements of forthcoming speeches and rallies. Their "use . . . as an effective election tool was a direct outgrowth of the symbiotic relationship between press and political party." *Id.* xxiii. It would have mystified the editors of those papers, and the parties who created and supported them, to imagine a modern statute that distinguished between articles printed with a candidate's blessing, articles penned by the candidate himself, and articles created by the editor on his own.

Indeed, until 1940, when Congress amended the Hatch Act to place a $3 million annual limit on political party committee expenditures, there was no such thing as a monetary restriction on party speech. *See* Pub. L. No. 76-753, 54 Stat. 767, 772 (1940). "For nearly 200 years after the ratification of the First Amendment, parties could spend freely to support their candidates during campaigns and could do so in coordination with the candidates." *NRSC*, 146 S. Ct. at 2416.

FECA's strike against parties was one element in a mid-20th century push against political party influence in American politics. Some of the diminution of party influence was initiated by the parties themselves. Internal activism and reforms weakened party influence in the party nominating process. *See* Morris Fiorina, *The Decline of Collective Responsibility in American Politics*, 109 Daedalus, No. 3, Summer 1980, at 25, 29. And statutory action placed limits on party spending and fundraising. *See id.* But those changes "diminished [the] relative power of political parties as compared to outside groups," creating a disquieting shift toward single interest groups and highly visible individual candidates. *NRSC*, 146 S. Ct. at 2413.

C.

To be sure, political parties cannot substitute for candidate speech. In a democracy, voters elect individuals, not parties. But the Supreme Court's recent campaign-finance decisions tell us that an election is not just about the speech of individual candidates: it is about *collaborative* speech too.

Collaborative speech between candidates and parties serves democracy in at least two important ways: coalition-building and collective responsibility. Parties have

incentives that single-issue groups (or individual candidates) do not share. In a two-party system, parties need to harmonize the views of vastly diverse swathes of Americans, appealing to voters with very different geographic and educational backgrounds. They do this in part by traditional mechanisms like party primaries and nominating conventions, which single-interest groups, with their single-issue focus, cannot employ to the same effect. Thus, by working with candidates, parties synthesize numerous views into highly distinctive (but generic) brands and trademarks that voters recognize and trust. An elephant or a donkey on a campaign poster or television ad often matters as much as the content of the ad itself, and party affiliation allows reasonably informed voting without time-consuming research into individual office-seekers.

Strong collective branding creates collective responsibility. Since parties must synthesize wide-ranging views and localities, they ward off one of the chief threats to our political system—the danger James Madison called "faction," a group of citizens "united and actuated by some common impulse of passion, or of interest, adversed to the rights of other citizens, or to the permanent and aggregate interests of the community." *See* The Federalist No. 10 (James Madison). A party that allows such a faction to gain the upper hand risks alienating other parts of its coalition. Likewise, an incompetent or scandalous candidate reflects poorly on the party as a whole. And congressional dithering hurts the party in power, not just individual members of Congress.

Political parties check faction in part as an automatic function of their size, the "number of citizens and extent of territory" across which they are scattered. *Id.* That "greater variety" of internal factions keeps any one segment from "being able to outnumber

and oppress the rest." *Id.* So the big-tent, two party system has the same virtues Madison attributes to a large republic. But the risks of collective responsibility also demand centralized party discipline. Parties clamp down on "[m]en of factious tempers, of local prejudices, or of sinister designs," who "may, by intrigue, by corruption, or by other means, first obtain the suffrages, and then betray the interests, of the people." *Id.* Parties avert those threats to their brand by coordinating with candidates, sometimes via the content of coordinated advertising or, more often, by the initial choice to funnel money and efforts toward one candidate over another. That makes party-coordinated collaborative speech a filter to "refine and enlarge the public views." *Id.*

The collaborative-speech protection candidates and parties enjoy is no constitutional orphan. It is only one manifestation of a broader First Amendment interest in collective speech. Even within the electoral sphere, parties are not the only beneficiaries: *Citizens United* vindicated the collective political speech of corporations and labor unions. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342–43 (2010). And beyond the strictly electoral realm, the power of collaborative speech was recognized in the "right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I. Add to that the right to freedom of association, which was underscored by the Supreme Court in *NAACP v. Alabama* and its progeny. 357 U.S. 449, 460–66 (1958) (freedom of expressive association prevented compelled disclosure of membership lists); *see also Gibson v. Fl. Legis. Investigative Comm'n*, 372 U.S. 539, 549 (1960) (similar); *NAACP v. Button*, 371 U.S. 415, 430–37 (1963) (freedom of association protected NAACP's right to engage in public interest litigation). Those provisions

demonstrate the importance of collaborative speech as a tool of deliberative democracy well beyond the election-law context.

None of this is to exalt the party over the individual, or to downplay the importance of strong expressions of personal conscience. But it is the very strength of party identity that can make deviation from the party line an often-admirable act. In an odd way, democratic speech needs both the party and the maverick. Political systems that blend and draw upon individual and collective speech are healthier in First Amendment terms than those that prize a single element of speech alone.

D.

After *NRSC*, then, I doubt the First Amendment tolerates FECA's indirect strike against party-coordinated speech any more than it sanctions direct limits on the speech of the candidate himself. "What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77–78 (1990). The First Amendment would frown upon any law that told candidates, "You may not speak in coordination with your party, and you may not work with your party to place ads via Joint Fundraising Committees, either." Nor could Congress escape First Amendment scrutiny with expenditure limits on that speech. But discriminatory LUC rules present an indirect version of that same burden by penalizing candidates for favoring collaborative speech over solo self-promotion.

"When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). That test is the one generally applied to expenditure limits, *see McCutcheon v. Federal Election Comm'n*, 572 U.S. 185, 197 (2014) (plurality opinion), and an anti-party discriminatory LUC scheme burdens expenditures. So exacting scrutiny seems like the proper standard here, especially because "the First Amendment generally prohibits the suppression of political speech based on the speaker's identity." *Citizens United*, 558 U.S. at 350 (2010).

But the choice of standard, as in *NRSC*, is academic. Whatever the correct level of scrutiny, there is simply no government interest that could justify an indirect version of the burdens on "the important and traditional role of political parties during campaigns" the Supreme Court already invalidated. *NRSC*, 146 S. Ct. at 2415. As *NRSC* points out, a per se interest in reducing campaign spending "is a flatly impermissible basis for restricting speech." *Id.* at 2417. The goal of preventing undue party influence over candidates likewise "does not make any sense" given *NRSC's* historical exposition of collaborative party-candidate speech. *Id.* at 2418 (quotation omitted). A regulatory-fairness type of interest here will not suffice, either, because neutral application of LUC rates to *both* types of candidate speech—individual and party-coordinated—simply creates more total speech. Both the Democratic and Republican parties are equally able to take advantage of the broader LUC rate as well. The more speech, the merrier, as far as the First Amendment is concerned.

Indeed, the Supreme Court "now recognizes 'only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption.'" *Id.* at 2418 (quoting *McCutcheon*, 572 U.S. at 206–07). But no bond connects quid pro quo corruption to discriminatory LUC rules. If anything, collaborative speech is *less* likely to involve corruption because, as *NRSC* explained, the party filter works like a hedge against the pursuit of undue or malevolent influence by single-issue groups or powerful donors over a single candidate. *See id.* at 2419. And Congress possesses numerous other anti-corruption weapons more narrowly tailored to the task at hand. Such prophylactics, *NRSC* noted, include "earmarking" laws—laws that subject contributions "in any way earmarked or otherwise directed through an intermediary or conduit," like a party, to contribution limits. *Id.* at 2420–21. Here, as in *NRSC*, limits on party-coordinated spending are not justified by a desire to prevent earmarking; the earmarking laws already do that job, and any desire to heap "prophylaxis upon prophylaxis upon prophylaxis" does not overcome the First Amendment. *Id.* at 2423.

IV.

We lack jurisdiction over this case. A staff decision presently awaiting agency review is hardly "final." That should end our inquiry.

Instead of respecting the basic separation of powers, the majority manufactures jurisdiction to abrogate a federal agency process it finds inconvenient. I understand that agencies often deserve judicial skepticism, but Congress is not bereft of power to mandate compliance with the agency procedures it creates. The majority also conjures up final agency orders through such means as "constructive" agency denials and agency briefs

before this court. Maj. Op. at 27–29. These stratagems are no substitute for full agency deliberations and explanations. To hold them so is to vitiate the very agency accountability the Supreme Court in *Loper Bright* worked so hard to create.

Not content with circumventing the FCC, the majority extends the same treatment to political parties. Its minimization of the party role is at odds with many long years of American political history, and now, after *NRSC*, equally at odds with the view of the Supreme Court. *NRSC* sought to rein in an ahistorical, anti-party trend in statutes and jurisprudence, restoring the proper balance between the individual and the collective in our political life. Instead of following the Supreme Court's lead, the majority adopts a miserly and constitutionally suspect statutory construction of "use" by a "candidate," needlessly restricting political speech in the sensitive period leading up to an election.

I would not neuter a federal agency and seize imaginary jurisdiction only to disfavor the place of political parties in our democratic dialogue and to dampen the vigor of pre-election political speech. I respectfully dissent.